## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TODD CHRISLEY a/k/a MICHAEL** | ) | No. 1:19-CR-00297-ELR-JSA |
| **TODD CHRISLEY, JULIE** | ) | |
| **CHRISLEY, and PETER** | ) | |
| **TARANTINO,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## JOINT MOTION FOR NEW TRIAL

Come now the Defendants, Todd and Julie Chrisley, by and through counsel, and move this Court under Fed. R. Crim. P. 33 for a new trial. In support of their motion, the Chrisleys rely on the following facts and arguments, as well as any facts and arguments presented at a hearing on this motion, which they respectfully request. To this end, Defendants state:

## INTRODUCTION

Rule 33 permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33. The Eleventh Circuit has defined the interest-of-justice standard as "a broad standard" that "is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous." *United States v. Vicaria*,

12 F.3d 195, 198 (11th Cir.1994). Rather, the district court can—and should—order a new trial when it concludes that the "circumstances are such that the trial was . . . fundamentally unfair." *United States v. Martinez*, 763 F.2d 1297, 1315 (11th Cir.1985). This case meets that standard.

The Chrisleys' trial was fundamentally unfair in two respects:

*First*, the government presented and failed to correct false testimony from IRS Revenue Officer Betty Carter, who lied about the Chrisleys owing taxes for years when she knew no taxes were due. This testimony had the effect of falsely painting the Chrisleys as untruthful, likely to commit other forms of fraud, and evading the tax payments alleged in the indictment.

*Second*, at the government's insistence, the Court admitted substantial volumes of evidence at trial which were obtained in violation of the Fourth Amendment, even though this evidence had been suppressed under this Court's prior rulings, without requiring the government to make any showing at all that the evidence should not be excluded. By relying on a putative (but non-existent) procedural error, the Court avoided addressing the substantive problems with the government's evidence.

Either issue, on its own, justifies a new trial. This Court should grant the motion and require the government to make its case against the Chrisleys only with evidence lawfully obtained and witnesses who testify truthfully.

<u>ISSUE 1: FALSE TESTIMONY</u>

**I.      A New Trial Is Necessary Because the Government Presented and Failed to Correct False Testimony from IRS Revenue Officer Betty Carter.**

The Supreme Court has observed that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972). It also has explained that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of State of Ill.*, 360 U.S. 264 (1959). The government is guilty of both evils here.

At trial, the government presented the testimony of Revenue Officer Betty Carter of the IRS, who testified that Todd and Julie Chrisley had not paid their federal income taxes for many years and owed the IRS untold sums of money. When pressed, Officer Carter swore that she had confirmed her claims in the IRS's internal system the day before her testimony, and those records showed that the Chrisleys owed taxes for at least years 2014, 2015, and 2016. This was all false.

Shortly after trial, Officer Carter contacted the Chrisleys' accountant to admit that the Chrisleys had paid their taxes and owed the IRS nothing. But the jury never heard the truth. Instead, the jury was left with the false impression that the Chrisleys continued to avoid paying taxes for these years.

This false testimony went directly to the Chrisleys' character for truthfulness and credibility, corrupting the trial and violating their due process rights under *Giglio* and its progeny. A new trial is necessary to correct this injustice.

## Relevant Background

Officer Carter testified that she prepared for her testimony by examining the relevant tax payment records through the IRS's internal systems. She swore that she reviewed the IRS's "integrated data system," which, "show[s] returns that are filed, taxes that are due, payments that are made, basically the activity on the money side of the account." (Trial Tr. Vol. 2 at 580:11-581:5).

Purportedly based on her review of these records, Officer Carter testified that the Chrisleys failed to pay taxes for various years and still owed the IRS money for those years. For example, she testified that, based on her review of the IRS's records, which she completed the morning before her testimony, the Chrisleys owed taxes for 2010:

> Q:     Now, have you seen Todd and Julie Chrisley's 2010 joint return?
>
> A:     I have not.
>
> Q:     You've never seen it?
>
> A:     No.
>
> Q:     Oh, okay. Have you seen Todd and Julie Chrisley's 2011 tax return?
>
> A:     Not specifically, no.
>
>        …

> I know they had balances owed, but I haven't seen the
> actual return.
>
> Q: Okay. For 2010 are you aware now that there are no taxes
> owed?
>
> A: I'm not aware of that. There is taxes owed.
>
> Q: Not on – you believe there is on 2010?
>
> A: **I checked them yesterday morning. Yes.**

(Trial Tr. Vol. 3 at 719:7-23) (emphasis added).

In addition, when asked whether she knew that the Chrisleys did not

owe taxes for 2013 or 2014, she first testified she was unsure:

> Q: You're a revenue officer who's looked at the filings in this
> case. Are you aware that tax returns were filed for those
> two years?
>
> A: Now they have been, yes.
>
> Q: Yes. And the amounts owed are zero. Did you know that?
>
> A: I'm not sure that's accurate.
>
> Q: The tax returns that were filed with the IRS –
>
> A: Which years are you talking about?
>
> Q: — for the 2013 and 2014, the amount of tax owed by the
> Chrisleys is zero; did you know that?
>
> A: No, I did not.

(*Id*. at 679:3-13.) She then testified affirmatively that the Chrisleys' taxes were

*not* fully paid for 2014 and that she had confirmed this fact the day before her

testimony:

> Q: Okay. Now, in 2014 there was a balance of about $77,000
> that was fully paid; correct?
>
> A: 2014?
>
> Q: Yes.

A: **That's not accurate.**

Q: Okay. Do you have your schedule there of payments and the like?

A: No.

. . .

Q: In fact, the final return for 2014 showed zero; correct?

A: **That's not accurate**.

Q: You don't believe that?

A: **I checked yesterday. There is a balance owed for 2014**.

Q: No. No. the return, the return, the final return for tax year 2014 shows zero; is that correct?

A: **I don't know about the return. I know there's an outstanding balance for 2014**.

(*Id*. at 705:24-706:7; 727:15-22) (emphasis added).

Officer Carter also testified that the Chrisleys owed money for 2015 and 2016. While she could not recall the exact amount, she was adamant that the Chrisleys had not paid their 2015 and 2016 taxes and indicated that she would look up the exact amount after her testimony and notify defense counsel:

Q: Let's go to 2015. Isn't it true that neither Todd nor Julie owe[s] a penny?

A: **That's not true**.

Q: Any idea the amount?

A: I can give an approximate amount of what they owe for everything that's outstanding.

Q: I don't want you to guess. I really don't. Do you have a number for 2015?

A: No.

Q:    Would you get that for us?

A:    Uh-huh.

Q:    2016, isn't it true they don't owe any money?

A:    **No. They owe**.

Q:    Do you know the number?

A:    No.

Q:    You'll let us know?

A:    Yes.

(*Id.* at 774:12-775:3) (emphasis added).

Officer Carter did not contact defense counsel during the trial to let them know how much the Chrisleys' owed, as she indicated she would do. Instead, she waited until after the trial. At that point, when the government had obtained the convictions they were after, she spoke with the Chrisleys' accountant, Bruce Seckendorf, and admitted that the Chrisleys did not owe the IRS the money she claimed at trial that they did. *See* Exhibit 1: Declaration of Bruce Seckendorf. According to Officer Carter, the Chrisleys were current on their taxes for 2014, 2015, and 2016 but the IRS had failed to apply the payments to their account. *See id*. In email correspondence following the call, Officer Carter confirmed that the IRS's system showed that the Chrisleys had made payments for 2014, 2015, and 2016 that exceeded the amounts owed for those years. Put more simply, they did not owe money for the years that Officer Carter swore at trial that they did. Her testimony left the misimpression that the Chrisleys still owed substantial sums to the IRS when in fact the IRS had

been failing to apply payments that the Chrisleys made. All told, the IRS owed the Chrisleys substantial refunds, not the other way around.

This contradiction was not a mere mistake. Despite whether the payments the Chrisleys made had been applied to the balance or not, as Officer Carter asserted to Mr. Seckendorf, she still would have seen them in the IRS's integrated data system, which she confirmed she viewed to prepare for her testimony. *See* Exhibit 2: Declaration of Terry Taira. (explaining that the systems that Officer Carter testified about show all payments made). And it was these same records that she referred to when speaking with Mr. Seckendorf that admittedly show that the Chrisleys did not owe the IRS a dime at the time Officer Carter testified. Rather, the IRS owed them a substantial refund. This information was not only available to Officer Carter both before her testimony and thereafter, but it was also further known to and available to the prosecutors. Even so, Officer Carter was permitted to testify falsely and emphasize that false testimony when challenged under cross-examination. At no time did either Officer Carter or the prosecutors attempt to correct the statements with the Court or the jury.

### Argument

"There are two categories of *Brady* violations, each with its own standard for determining whether the undisclosed evidence is material and merits a new trial." *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1333 (11th Cir. 2009)

(citation omitted). The first category of violations are called *Giglio* claims, which occur where "undisclosed evidence reveals that the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 103-04; *Giglio*, 405 U.S. at 153 (noting that the same rule applies when "the State, although not soliciting false evidence, allows it to go uncorrected when it appears") (internal quotation marks omitted); *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (the *Giglio* rule applies to, *inter alia*, a prosecutor's "implicit factual representations to the jury" while questioning a witness).

Under this category of *Brady* violations, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Smith*, 572 F.3d at 1333 (citation omitted). The "could have" standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt. *Id.* "This standard favors granting relief." *Id.* Here, it demands it.

A.   **The government knowingly used Officer Carter's false testimony and failed to correct it.**

Officer Carter's testimony that the Chrisleys did not pay their taxes for 2014, 2015, and 2016 was false. She admits this. *See* Ex. 1. And the Court can conclude she knew the testimony was false when she gave it given that

(according to her own testimony) she checked the IRS's integrated data system (which shows the payments) the day before she testified. *See* Ex. 2. At the very least, Officer Carter should have known that the payments were made and visible in the IRS's system when she testified to the contrary. Her actions certainly suggest she knew. Although she testified that she would confirm the amount owed and notify defense counsel after her testimony, neither she nor the prosecutors provided defense counsel with this information.

Because Officer Carter is a government agent, her knowledge is imputed to the prosecutors. *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1349 (11th Cir. 2011) (imputing the knowledge of the detective to the prosecutor) (citing *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) ("[A] prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Officer Carter's testimony was false, and she knew or should have known it. Because she is an agent of the prosecution, the first prong of the *Giglio* test is met.

Even if this were not the standard, there is evidence that the prosecutors themselves knew her testimony to be false. For example, the government filed a motion *in limine* seeking to exclude evidence of tax payments that the Chrisleys made before trial. (Doc. 196.) There's no plausible explanation for filing such a motion yet being unaware of the payments that the Chrisleys made before trial—especially when the prosecutors possessed and disclosed the

IRS transcripts showing that no taxes were due for many of these years, *see, e.g.*, Trial Ex. 36-41, and defense counsel repeatedly told them about the payments, (Doc. 201 at 2). This was doubly true after defense counsel's attempted cross-examination of Officer Carter on this issue, which repeatedly raised the issue of these payments.

## B. The testimony "could have" affected the judgment.

A new trial is necessary because the government cannot carry its burden of showing that Officer Carter's false testimony was harmless beyond a reasonable doubt. *Guzman*, 663 F.3d at 1348. While *Giglio* error is a species of *Brady* error, "the *Giglio* materiality standard is 'different and more defense friendly' than the *Brady* materiality standard." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1108 (11th Cir. 2012) (quoting *Alzate*, 47 F.3d at1109-10). This standard favors granting relief. *Smith*, 572 F.3d at 1333. Because *Giglio* looks to the corrupting and corrosive effect of the testimony, the question is *not* whether truthful testimony would have had a sufficient impeaching effect to affect trial. Rather, the question is what effect did the *false testimony itself* have on the fact-finding process.

Eleventh Circuit cases explain this distinction well. In *Guzman*, for example, a prosecution witness, Martha Cronin, was paid $500 for her testimony. *Guzman*, 663 F.3d at 1342-43. At trial, Cronin and a detective falsely testified that the witness received nothing in return for her testimony.

*Id.* Defendant's counsel cross-examined Cronin at length and impeached her testimony on other grounds. *Id.* at 1350. In addition, there was independent evidence of the defendant's guilt beyond Cronin's testimony. *Id.* at 1350-51. The prosecutor denied knowledge of the payment, and the detective testified she never disclosed the payment to the prosecutor. *Id.* at 1342-43.

On review, the Eleventh Circuit granted a new trial, citing *Giglio*, based on the witnesses' false testimony. The Court acknowledged that Cronin's testimony about the defendant's guilt was independently corroborated and supported by other evidence. *Id.* at 1350. But the Court noted that it "must consider the cumulative effect of the false evidence for the purposes of materiality." *Id.* at 1351 (citing *Kyles*, 514 U.S. at 436-37 n. 10; *Smith*, 572 F.3d at 1334). To do this, it looked to the corrupting and corrosive effect the prosecutor's use of false testimony had on the fact-finding process at trial.

In determining that the false testimony was material, the Eleventh Circuit looked not only at the fact that the jury received false information but also discussed how the fact that the witnesses testified falsely would have been considered by the jury in evaluating the witness's credibility. *Id.* at 1352-53. The Court noted that the defendant's counsel was never given the opportunity to fully impeach the false testimony of both Cronin and the detective. *Id.* at 1353. "Because [the detective] was the lead detective, her impeachment would have "impugned not only her veracity but the character of the entire

investigation[,]" which "would have been consistent with [the defendant's] testimony that he was not involved in the offense and evidence of other viable suspects." *Id*. at 1353.

The facts here show that, like in *Guzman*, the government knowingly condoned false testimony of a critical witness. Officer Carter's testimony was critical to the government for many reasons. For example, her involvement in the case predates almost any other testifying witness. And the government used her testimony to establish, among other things, that the Chrisleys avoided paying taxes and were deceptive in their dealings with her. The jury could have used this testimony as a basis for reaching a guilty verdict on the conspiracy charged in Count 8, given the breadth of the jury instructions. And, just as evidence of tax payments post-dating the defendant's notification of potential criminal prosecution is relevant and admissible to establish "a defendant's state of mind at the time of the alleged criminal acts," *United States v. Sperrazza*, No. 1:12-CR-6-WLS (M.D.Ga. June 4, 2013) (citing *Hill v. United States*, 363 F.2d 176 (5th Cir. 1966)), a juror reasonably might conclude that a lack of such payments demonstrates a defendant's intent to evade payment of other taxes.

As a result, Officer Carter's false testimony was exceedingly damaging to the Chrisleys. In *Guzman*, the false testimony related only to the witness's motive to lie. Here, the false testimony went directly to the defendants'

character for truthfulness and to their intent to evade the payment of taxes—both key issues at trial. Courts across the country have recognized that a defendant's failure to pay taxes is probative of the defendant's truthfulness and credibility. *See, e.g.*, *Solano v. A Navas Party Prod., Inc.*, 2010 WL 11505479, at *2 (S.D. Fla. July 12, 2010) ("If Plaintiff never paid taxes, that too, may be probative of his truthfulness.") (citing *See Chamblee v. Harris & Harris, Inc.*, 154 F. Supp. 2d 670, 681 (S.D.N.Y. 2001) ("Evidence that a witness has failed, for years, to file a tax return is a matter which affects the witness's credibility."); *Mischalski v. Ford Motor Co.*, 935 F. Supp. 203, 208 (E.D.N.Y. 1996) (failure to pay income taxes bears "directly on a plaintiff's propensity for truthfulness and must be admitted for impeachment purposes if plaintiff takes the stand").

The same happened here. Officer Carter's false testimony had the predicable impact of impugning the Chrisleys' character for truthfulness. Based on the false testimony, the jury was more likely to conclude that the Chrisleys had a habit of avoiding paying taxes and had a character for fraud, making them more likely to have committed other frauds. *United States v. Shayota*, No. 15-CR-00264-LHK, 2016 WL 6093237, at *5 (N.D. Cal. Oct. 19, 2016), *aff'd*, 784 F. App'x 986 (9th Cir. 2019) (excluding evidence of prior alleged tax fraud under Rule 403 because "[a] jury is likely to draw the

conclusion that [the defendant], who was indicted for tax fraud, has a character for fraud and is therefore more likely to have committed other frauds").

Further, a rational fact-finder on the jury would not only consider the fact that the Chrisleys actually *did* pay their taxes for 2014, 2015, and 2016, but also that Officer Carter *lied* about it under oath. Like the detective in *Guzman*, if the defendants would have been able to impeach Officer Carter's false testimony, it would have impugned the veracity of the entire investigation and prosecution. In addition, Officer Carter's lies had the consequence of undercutting the jury's belief in defense counsel, who stated in opening statements that the Chrisleys had paid their taxes for some of these years. (Trial Tr., Vol. 2, at 407:15-22.) The Court permitted counsel to make this argument over the government's objection seeking to keep information about the tax payments out of evidence; in response, the government simply offered false testimony that the payments did not happen when, in fact, they did.

False testimony of the kind given by Officer Carter had less obvious effects that also can have a grave impact on the trial. For example, when a defendant considers whether to testify in his own defense, a critical consideration is what impeachment he is likely to face. If, as here, the government claims to possess records showing a prior bad act or some other impeachable offense, the defendant may choose not to testify to avoid the

government's impeachment. When this occurs and the government's claim was a bluff, the defendant suffers prejudice and due process is implicated.

Officer Carter's false testimony corrupted the trial. Her testimony smeared the Chrisleys' character and credibility and provided the jury with false information about their payment of taxes that bolstered the government's theory of the case. If the jury knew that Officer Carter's testimony was false, it would have impugned her credibility and the credibility of the entire investigation. For these reasons, the government cannot show that her testimony was harmless beyond a reasonable doubt. A new trial is necessary.

## II.    A New Trial Is Necessary Because the Government Violated *Brady* When It Suppressed Evidence Showing the Chrisleys' Tax Payments.

Officer Carter's testimony also revealed that the government committed an additional constitutional violation. As discussed above, Officer Carter testified that she had "checked" the IRS's internal integrated data system that shows "payments that are made" the day before her testimony. (Tr. Vol. 2 at 580:11-581:5; Tr. Vol. 3 at 719:7-23; 727:15-22.) She claimed that the system showed that the Chrisleys owed taxes for 2010, 2014, 2015, and 2016 at the time of trial. (Tr. Vol. 3 at 679:3-13; 705:24-706:7; 727:15-22; 719:7-23; 774:12-775:3.) But defense counsel was never provided a copy of the information available on the system she cited, leaving them unable to impeach her testimony about what the system showed.

While a *Giglio* violation is a type of *Brady* violation, the other category of *Brady* violations implicated here occurs when the government suppresses evidence that favors the defense. *See Smith*, 572 F.3d at 1334. This type of *Brady* violation has four elements: (1) the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989). Each of these elements is met here.

*First*, the government possessed the evidence at issue, as it is information housed in the IRS's internal system. This evidence would have favored the Chrisleys because it would have impeached Officer Carter's false claims that (i) the Chrisleys owed taxes for the relevant years and (ii) that the IRS's integrated data system supported her testimony.

*Second*, the Chrisleys never possessed any copies of reports from the IRS's integrated data system. Because this information is housed on an internal government system, the Chrisleys could not have obtained them on their own through reasonable diligence; they would have had to get the documents from the government.

*Third*, despite its *Brady* obligations, the government suppressed the evidence. And though the Chrisleys' current tax balance became an issue at trial, the government withheld the evidence, allowed its agent to provide false testimony about it, and then failed to subsequently correct that false testimony.

*Fourth*, a reasonable probability exists that the outcome of the proceedings would have been different. As discussed above, had defense counsel been provided the information that Officer Carter claimed she was relying on, the jury would have learned that the Chrisleys did *not* owe the IRS for these years. This would have been relevant to rebut the government's claim that the couple willfully evaded taxes and would have dispelled concerns about the Chrisleys' character for truthfulness. And, as discussed above, the jury would have learned that Officer Carter was willing to provide repeated false testimony, and even double down on her false testimony by relying on evidence that does not exist. Because she is a government agent, her lack of credibility would have impugned the credibility of the government's entire case.

This *Brady* violation rendered the trial unfair, and a new trial is necessary.

## ISSUE 2: ADMISSION OF PREVIOUSLY SUPPRESSED EVIDENCE

### III. A New Trial Is Necessary Because the Court Admitted Evidence in Violation of the Fourth Amendment.

At the government's insistence, the Court admitted substantial volumes of evidence at trial that were obtained in violation of the Fourth Amendment, even though this evidence had been suppressed under the Court's prior rulings. When it did so, the Court did not require the government to make any showing at all that this evidence qualified for an exception to the exclusionary rule that would permit its admission. This was error.

The chain of events leading to the error is long but easy to follow. The Georgia Department of Revenue ("DOR") illegally searched two warehouses leased by the Chrisleys. While executing the search, DOR agents unlawfully seized financial documents that they believed to be fraudulent. The DOR agents' actions were reprehensible, to say the least, but are not at issue here. This Court ultimately determined that the searches were unconstitutional and, as a result, suppressed both the documents the government obtained from the warehouses and all evidence derived from those records ("the fruits"). The government did not appeal this decision.

What is at issue now is whether the Court properly enforced its suppression order. The facts already in the record establish that nearly all the investigative steps federal agents took after March 2017 were prompted by

what was found in the illegal search. As a result, much of the evidence the government collected should have been inadmissible at trial. But prosecutors sought to admit some of it anyway. And, when the Chrisleys raised the issue, the Court declined to decide the question on its merits—ruling *sua sponte* that their motion seeking to enforce the Court's suppression order was untimely. The effect of this procedural ruling was to erase the Court's prior substantive one and permit the government to introduce fruits of the illegal warehouse search without showing that it met an exception to the exclusionary rule. This was a grave error. A new trial is necessary to correct it.

### Relevant Background

1. *The Chrisleys filed two motions to suppress evidence raising separate and distinct grounds for relief.*

The Chrisleys' first motion to suppress asked the Court to suppress evidence seized pursuant to search warrants executed at 4125 Welcome All Road and 1800 Century Blvd NE ("Warehouse Motion") (Doc. 36). The Warehouse Motion requested the following relief: that "all evidence obtained from the subject search warrants [for the illegal warehouse search] **and all fruits derived therefrom**" be excluded from evidence. (*Id.* at 13) (emphasis added). The Warehouse Motion plainly asked that the Court suppress the actual documents and records seized at the warehouses along with all evidence *derived* from those documents and records.

A few months later, the Chrisleys filed a second motion to suppress on alternative grounds. This motion challenged the admissibility of the documents the IRS obtained from Google and America Online ("AOL") pursuant to search warrants seeking emails and other electronic documents related to the Chrisleys ("ESI Motion"). Here, the Chrisleys argued that the search warrants were fatally overbroad. (Doc. 52 at 2.) This raised a separate attack on the evidence; if the first motion failed, it provided an independent basis to exclude at least this narrower category of evidence from trial.

After a two-day evidentiary hearing on the separate motions, Magistrate Judge Justin Anand entered a Report and Recommendation on each motion, determining first that the Chrisleys' ESI Motion should be denied (Doc. 105), and then holding the next day that their Warehouse Motion should be granted (Doc. 107). In the first R&R, the Magistrate Judge declined to suppress the electronic evidence because the warrant was overbroad. Nothing about this ruling, however, impacted or narrowed the Court's holding in the separate Warehouse Motion, which it recommended be granted.

In the second R&R, the Magistrate Judge held that the Court should grant the Chrisleys motion to exclude all documents and materials seized at the warehouse *and* all documents and materials derived from the illegal search. The Magistrate Judge explained:

> [T]he federal warrant application itself expressly references what DOR told the [federal] agents about the contents of the seized the material, that is, forged bank records. In other words, IRS only knew what these documents showed because DOR illegally seized them from private premises in the first place, and then told IRS what those documents contained.

(Doc. 107 at 25.). As the R&R makes clear, the records discovered by the DOR during its illegal search were what prompted the IRS to seek the records from DOR. Further, because the government cannot benefit from the fruits of that illegal search, it cannot conduct investigative activities using the information that was obtained illegally.

The government did not appeal the second R&R, so the Court adopted it in its entirety. (Doc. 127.) Thus, the Court's ultimate suppression ruling on the Warehouse Motion extended far beyond the physical documents that the DOR seized from the warehouse: It suppressed *all* information, documents, and records the federal government obtained that flowed from information it learned as a result of the illegal search ("previously suppressed evidence").

> 2. *The Chrisleys' filed their Motion to Require Proof of Admissibility to enforce the Court's prior suppression order.*

Thus, when counsel for the Chrisleys attended the March 28, 2022 pretrial conference via telephone, they believed (correctly) that the status of nearly all documents and records the federal government obtained after the warehouse searches was settled: *The Court's prior ruling barred them from trial.* And, as the pretrial hearing began, this understanding held; the

government said it did not intend to introduce any evidence seized from the warehouses, or any evidence derived from the search, at trial. But then the prosecutors changed their tune. Later in this hearing, for the first time, the government suggested that it might have "independent sources" for the previously suppressed evidence it sought to introduce. This was news to the Chrisleys. As the Magistrate Judge noted in the R&R:

> The government [did] not assert an independent source argument, that is that the IRS or FBI were aware of the existence of these documents and the probable cause basis for seizing them independently of the information learned from DOR, including the information provided as to the contents of the forged bank records.

(Doc. 107 at 26 n.5.)

In response to the government's claim that it had independent sources for some of the previously suppressed evidence, the Chrisleys filed a "Motion to Require the United States to Establish Admissibility of Suppressed Evidence and Brief in Support" three days after the hearing with the Magistrate Judge. (Doc. 162.) This motion specified five categories of evidence that derived from information the DOR and the IRS illegally obtained. (*Id.* at 2-6.) Because "it [wa]s currently unknown what other information the [government] intend[ed] to introduce into the trial of this matter," the motion specifically asked the Court to enforce its prior order excluding from trial any evidence "derived from the excluded Warehouse evidence." (*Id.* at 7.)

This request was not a new or belated suppression motion. It tracked the language of the relief requested in the original Warehouse Motion, *which the Court granted*, to ensure that the suppressed evidence was kept out of trial. The Chrisleys explicitly recognized that "the Court has already ruled on the inadmissibility of this evidence." (Doc. 162 at 2.) Rather than seeking to suppress the evidence for a second time, the Chrisleys sought to ensure that the government could not sneak in previously suppressed evidence without a hearing. If the government truly sought to introduce the evidence it derived from the warehouse searches under some exception to the "fruit of the poisonous tree" doctrine, as it stated in the pre-trial conference, the Chrisleys asked the Court to force the government "to establish the admissibility of [the previously] suppressed evidence prior to trial." (*Id*.)

The question this motion posed for the Court was straightforward: Did the government have a valid legal basis to admit the previously suppressed evidence? The government understood the issue perfectly, arguing that it did. (Doc. 178.) It claimed that the evidence it sought to use at trial met two exceptions to the exclusionary rule: (1) it came from an independent source untainted by the illegal warehouse searches (*id*. at 15-21); or (2) the government would have inevitably discovered it (id. at 21-26). It also argued that the Chrisleys' motion was akin to a motion to suppress and therefore untimely. (*Id*. at 12-15.) At oral argument, however, the government quickly

withdrew its timeliness argument. (Doc. 193 at 24:15-24.) In the end, it asked the Court for an evidentiary hearing so that it could "perfect the record" to establish an exception to the exclusionary rule. (Doc. 178 at 29).

3. *Despite the government's request, the Court declined to hold an evidentiary hearing and reach the merits of the issue.*

At the end of the pretrial conference, the Court declined the government's request for an evidentiary hearing to determine whether the disputed evidence could be admitted through an exception to the exclusionary rule and took the matter under advisement. (Doc. 193 at 51.) It later issued a ruling finding that certain emails were admissible because the Chrisleys' motion was untimely. The Court did not address the other categories of evidence that the Chrisleys specified in their pretrial motion. Instead, the following is the entirety of the Court's order on this issue:

> Motion [Doc. 162] to require proof of admissibility is **DENIED**. After taking this matter under advisement at the pretrial conference, the Court further reviewed the pleadings, R&R and Order on this issue and determined that the emails at issue here were previously allowed into evidence at trial pursuant to the Court's denial of Defendants' motion to suppress search warrants for emails and electronically stored information. [Docs. 52, 105, 127.] Thus, the motion currently before the Court is untimely.

(Doc. 183 at 3.)

As a result, the Court admitted much of the previously suppressed evidence—and did so without requiring the government to prove that it had been obtained from an independent source or was otherwise admissible. The

evidence improperly admitted at trial included dozens of emails to and from the Chrisleys, allegedly fabricated bank statements, credit reports, invoices, documents related to the BP oil spill, and more. *See* Exhibit 3: Improperly Admitted Evidence (specifically listing the evidence that was previously suppressed as a fruit of the DOR search but admitted into evidence). As Exhibit 3 makes clear, the previously suppressed evidence made up much more than half of the government's case and impacted each of the charges in the indictment. Without this evidence, the government's case would have collapsed.

## Argument

### A. The Court erred when it failed to enforce its suppression order.

The Chrisleys' motion to enforce the Court's prior suppression order was critically important to their defense. (Doc. 162.) And the government recognized it as such, responding with a 30-page brief and nearly 200 pages of exhibits. (Doc. 178.) Both parties were prepared for an evidentiary hearing, which the government explicitly requested "so the Court can make the required factual findings." (Doc. 178 at 1, 29.) But the Court declined to hold a hearing and make those findings, choosing instead to deny the motion in a three-sentence order that offered two faulty rationales. (Doc. 183 at 3.)

*First*, the Court mistakenly concluded that "the emails at issue here were previously allowed into evidence at trial pursuant to the Court's denial of Defendants' motion to suppress search warrants for emails and electronically stored information." (*Id.*) This holding mistook both the law and the record. As a legal matter, the denial of a motion to suppress does not render the contested evidence admissible; it simply denies relief based on the grounds asserted in the motion. As a factual matter, the ESI Motion had nothing to do with the Warehouse Motion. While the two motions cover some of the same documents, each motion set forth *separate grounds* for relief, and one motion did not preclude or affect the relief requested in the other. More to the point, the question raised by the ESI Motion was whether the search warrants were impermissibly overbroad not whether they were fruits of the illegal warehouse search. In turn, the Court's denial of the ESI Motion stemmed from the scope of the warrant, not any exceptions to the exclusionary rule.

*Second*, the Chrisleys' motion to enforce the suppression order was not "untimely." (*Id.*) Although the Court did not explain what procedural error defense counsel committed, it suggested that the motion was untimely because the ESI Motion previously had been denied. But there is no explanation for how these dots connect. Nor is there a logical connection. The Chrisleys' later motion was not a motion to suppress evidence; it simply asked the Court to enforce the relief (suppression) that the Court previously granted.

Moreover, the Chrisleys' filed their motion as soon as the need to do so became clear: when the government announced shortly before trial that it had an "independent source" that it believed would allow it to admit documents that otherwise fell within the scope of the Court's suppression order. (Doc. 193 at 30:17-31:14.) Perhaps for this reason, the government "withdr[e]w [its] arguments about the untimeliness of [the Chrisleys'] motion, conceding that "it sounds like ultimately this is a big misunderstanding between the parties and the Court." (Doc. 193 at 24:15-24.) Once the government conceded that the motion was not untimely, it was improper for the Court to raise timeliness as a bar to relief. *See Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("[O]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.") *quoted by United States v. Sainz*, 933 F.3d 1080, 108-88 (9th Cir. 2019) (finding error when the district court raised the defendant's waiver *sua sponte* after the government failed to argue it). This is particularly true where, as here, there was no procedural default by defendants for the reasons described above.

On this record, the Court should have reached the merits of the Chrisleys' motion and enforced its suppression order. To do so, it should have held the evidentiary hearing requested by the government and resolved any factual disputes about the applicability of its prior ruling. The Court's failure

to take these steps was error. The contested evidence was central to the government's case, and its admission violated the Chrisleys' constitutional rights, rendering the trial fundamentally unfair. A new trial is necessary.

### B. The government failed to establish an exception to the exclusionary rule.

The previously suppressed evidence should not have been admitted at trial without the government proving it met an exception to the exclusionary rule. By failing to establish such an exception, the government waived any right it had to admit the evidence, and a new trial is necessary.

In the alternative, at the very least, the Court should hold an evidentiary hearing to determine whether the contested evidence was properly admitted or whether it was fruit of the illegal warehouse searches. When the Court does so, the government will not meet its burden because the evidence illegally obtained from the warehouse searches was the basis for the government's decision to investigate the Chrisleys, seek the warrants for searches of emails and ESI, and collect the rest of the contested evidence.

Under the fruit of the poisonous tree doctrine, evidence later found in a subsequent search should be suppressed if the search was prompted by what investigators found in the prior unconstitutional search. *Wong Sun v. United States*, 371 U.S. 471 (1963). As a result, the government has an onerous burden requiring it to convince the Court that "no information gained from the illegal

entry affected the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Murray v. United States*, 487 U.S. 533, 539 (1988). Courts "apply a two-part test to determine whether evidence seized during the execution of [a] warrant was discovered independent of [an] initial [illegal search] and is therefore admissible regardless of whether that first [search] violated the Fourth Amendment." *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012).

For example, as to the Google and AOL search warrants, the government must first establish that the affidavits established probable cause independent of any information gained during the initial illegal search of the warehouses. *See United States v. Garcia*, No. 12-11994, 2013 WL 10509665, *4 (11th Cir. June 3, 2013) (citing *Noriega*, 676 F.3d at 1260). If the government meets this initial burden, it then must establish that it would have sought the warrants regardless of the initial illegal searches. *See id.* (citing *Noriega*, 676 F.3d at 1260-61). Put more simply, "if the search-warrant affidavits do not independently establish probable cause, or [if] the officers' decision to seek the warrant was 'prompted by' [the illegally seized Warehouse documents], the independent source exception does not apply and the evidence is inadmissible." *Id.*

This burden requires more than mere conjecture or verbal assurances from government agents. Indeed, "the mere assertion by law enforcement that

the information would have been inevitably discovered is not enough." *United States v. Virden*, 488 F.3d 1317, 1322-23 (11th Cir. 2007). The government must also show that "the lawful means which made discovery inevitable were being actively pursued *prior* to the occurrence of the illegal conduct." *See id.* (citation omitted). This second requirement "is especially important. Any other rule would effectively eviscerate the exclusionary rule, because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." *See id.* (citing *United States v. Hernandez-Cano*, 808 F.2d 779, 784 (11th Cir. 1987)).

Applying these standards here, the government cannot meet its burden. The IRS's criminal investigation began in earnest after its review of the financial records DOR illegally obtained at the warehouses. The evidence the government obtained after that point all should have been suppressed.

1. *The criminal investigation began because of the illegal warehouse searches.*

IRS Special Agent Larry Arrow ("S.A. Arrow") was responsible for opening the criminal investigation into the Chrisleys. His internal memorandum dated April 21, 2017 stated that the investigation was "predicated upon information received from the local news media **as well as Georgia Department of Revenue**." (Apr. 15, 2021 Tr. of Suppression Hr'g at

50-51) (emphasis added). The record further indicates that the DOR had reviewed the documents and been in contact with S.A. Arrow prior to his opening of the investigation. (*Id*. at 122:19-128:4 (Testimony of LaShaun Wright); 52:5-21 (Testimony of S.A. Arrow).)

Further evidence that DOR's illegal warehouse searches prompted the IRS's criminal investigation can be more fully provided at an evidentiary hearing. The burden remains on the government, however, to show that its investigation was not prompted by the DOR's illegal searches.

2.   *The ESI search warrants were explicitly based on the illegally obtained evidence from the warehouse searches.*

On February 1, 2018, a year after the illegal warehouse searches and seizures, S.A. Arrow obtained a search warrant for the documents the DOR obtained from the warehouses. (Docs. 36-1, 36-2, 36-3, and 36-4.) On February 7, 2018, S.A. Arrow obtained and reviewed the illegally seized materials from the DOR. (Doc. 36-5.) On March 1, 2019, S.A. Arrow obtained a search warrant for materials related to Todd and Julie Chrisley from Google and America Online ("AOL"). (Doc. 52-1, 52-2.) On May 24, 2019, S.A. Arrow obtained another search warrant for materials related to the Chrisleys from Google. (Doc. 58, Ex. A.) S.A. Arrow's Affidavit supporting these search warrants states: "[w]hen reviewing the search warrant materials obtained through the Georgia Department of Revenue, investigators found cut and pasted 2014 bank

statements in the name of Julie Chrisley and 7C's Production. Investigators also obtained two 'requests for mortgage assistance' that Todd Chrisley submitted to claim he had difficulty repaying mortgages." (Doc. 52-1, 52-2 at pp. 16-17.) The Affidavits supporting the search warrant further admitted that "[a]gents have not yet determined whether or not these cut and paste 2014 banking statements were ever sent to a financial institution." (Doc. 52-1, 52-2, at p. 16, n.6.)

As S.A. Arrow admitted, the search warrants for Google and AOL were sought only *after* his review of the illegally seized warehouse documents and because of that review. In addition, S.A. Arrow admitted in his affidavit that:

> I have learned that the Georgia Department of Revenue has had an investigation into the Chrisleys as a result of their failure to file state tax returns during years that they potentially lived in the State of Georgia . . . [I]n July 2017 [sic], Georgia Department of Revenue officials traveled to the Suwanee [sic] storage facility where they executed the levy and seized the Subject items [the Warehouse seizure].

> Pursuant to the their agency's policy, the Georgia Department of Revenue officials inventoried the Subject Items . . . during the course of inventory, the officials determined that there were a number of financial records within the Subject Items, to include, but not limited to, boxes of the following types of financial records: bank records, mortgage documents' personal and business checkbooks; ledger books; receipt books; insurance records; records showing Chrisley's and his wife's income; correspondence between Chrisley and his accountant covering tax years 2006-2013; and individual and business tax records. Additionally, the Subject Items included a number of electronic devices and storage mediums . . .

As this lays out, S.A. Arrow admits in his affidavit that the primary source of information for the government's investigation into the Chrisleys was the documents that DOR illegally seized from the warehouse. Indeed, S.A. Arrow's (and the government's) subsequent investigation of the Chrisleys stemmed from this tainted information, and they would not have pursued it but for what investigators discovered there.

In other words, the evidence shows that the unconstitutional search, and what was found there, influenced the government's decision to seek the Google and AOL search warrants and, later, take additional investigative steps. Under the fruit of the poisonous tree doctrine, evidence later found in a subsequent search should be suppressed if the search was prompted by what investigators found in the prior unconstitutional search. *Wong Sun*, 371 U.S. at 487-88. The government has an onerous burden requiring it to convince the court that "no information gained from the illegal entry affected the law enforcement officers' decision to seeks a warrant or the magistrate's decision to grant it." *Murray v. United States*, 487 U.S. 533, 539 (1988). They cannot meet that burden here.

An evidentiary hearing will likely provide even more evidence linking other aspects of the investigation of the Chrisleys to the initial unlawful search and seizure that began this case. As a result, any of the documents obtained in this investigation were fruits that had been excluded under the Court's prior

suppression order, and it was error for this Court to permit the government to rely on them at trial without proving an exception to the exclusionary rule.

CONCLUSION

WHEREFORE, for the reasons detailed above, as well as the facts and arguments presented at a hearing on this Motion, which the Defendants specifically request on both issues, the Defendants request that the Court grant their motion for a new trial.

Respectfully submitted,

J. Alex Little (TN Bar #29858)
alex.little@burr.com
        *Pro Hac Vice*
Zachary Lawson (TN Bar #036092)
        *Pro Hac Vice*
Burr & Forman LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: 615-724-3203
Facsimile: 615-724-3303
*Attorneys for Todd and Julie Chrisley*

Christopher S. Anulewicz (GA Bar #020914)
canulewicz@balch.com
Balch & Bingham LLP
30 Ivan Allen, Jr. Boulevard, N.W., Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656
*Attorney for Todd and Julie Chrisley*

Bruce H. Morris (GA Bar # 523575)
bmorris@fmattorneys.com
Finestone, Morris & White, LLP
Suite 2540 Tower Place
3340 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 262-2500
*Attorney for Todd Chrisley*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of August, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ J. Alex Little*
_____
J. Alex Little