The following is the PDF of an official transcript. Official transcripts may be filed in CM/ECF only by the official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

United States District Court

1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

UNITED STATES OF AMERICA,    )
4                        )
        PLAINTIFF,      )
5   V.                )   DOCKET Number
                       )   1:19-CR-00297-ELR-JSA
6 TODD CHRISLEY,         )
  JULIE CHRISLEY, and     )
7 PETER TARANTINO       )
                       )   **Volume 13**
8     Defendants.     )
  _____)
9
                Transcript of Jury Trial
10         before the Honorable Eleanor L. Ross
           United States District Judge
11            June 3, 2022, 9 a.m.

12
  A P P E A R A N C E S:
13

14 For the Government:        Thomas J. Krepp, Esq.,
                        Annalise Kathleen Peters, Esq.
15
  For Defendant Todd Chrisley:  Bruce Howard Morris, Esq.,
16
  For Defendant Julie Chrisley: Stephen Michael Friedberg, Esq.
17                        Christopher S. Anulewicz, Esq.
                        Jonathan Deluca, Esq.
18
  For Defendant Peter Tarantino: Daniel Patrick Griffin, Esq.
19                        John James Van Why, Esq.

20

21     Proceedings recorded by mechanical stenography,
  transcript produced by computer.
22 _____

23
              Geraldine S. Glover, RPR
24          Federal Official Court Reporter
        75 Ted Turner Drive, SW, Suite 2114
25        Atlanta, Georgia  30303-3309

           United States District Court

1                    INDEX TO PROCEEDINGS

2                                                 PAGE

3    Charge of the Court                          3185

4    Closing Argument

5      By Mr. Krepp                      3221, 3312

6      By Mr. Morris                          3257

7      By Mr. Anulewicz                       3275

8      By Mr. Griffin                         3293

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 United States District Court

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  Please be seated.

3          Anything before we bring the jurors out?

4          And I'll remind you that I do read the charge first.

5          I know it is warm in here.  You-all have probably

6   been told, there's been some issue throughout the building

7   with the air-conditioning breaking yesterday.  It apparently

8   is repaired, but it's going to take time to work our way back

9   up to the proper temperature.  So I apologize.  If it were any

10  other day I'd say, hey, take your jackets off, attorneys, if

11  you want.  But it's closing argument, so I know that would not

12  work.  Probably wouldn't work other days either.  My

13  apologies.

14          Anything before we bring them out?  Government?

15          MR. KREPP:  No, your Honor.  Thank you.

16          THE COURT:  Defense?  Anybody on the side of the

17  defense.

18          MR. MORRIS:  Thank you.  No, your Honor.

19          MR. ANULEWICZ:  No, your Honor.

20          MR. GRIFFIN:  No, your Honor.

21          THE COURT:  Let's go ahead and round them up.  Thank

22  you so much.

23          **(The jury entered the courtroom at 8:59 a.m., after**

24  **which the following proceedings were had.)**

25          THE COURT:  The jury is seated.

United States District Court

1        Everyone may be seated.

2        Good morning, ladies and gentlemen.

3        THE JURORS:  Good morning.

4        THE COURT:  First of all, I apologize for the heat in
5   here.  Apparently we had an air-conditioning problem last
6   night.  It's been repaired, but it is going to take some time
7   to get the temperatures back to where they need to be.  So my
8   apologies.  We'll take a couple of short breaks throughout so
9   that you can stretch and keep from melting and all of that
10  good stuff.

11       As I told you yesterday, we are going right into
12  closings today.  However, before we do that, I do need to
13  charge you on the law.  And as I also told you yesterday, this
14  charge is pretty long for this case, so please just bear with
15  us.

16       Again, you can jot down notes if you'd like.  There
17  are going to be some legal concepts here.  But you are
18  reminded that you will have one copy of this jury charge,
19  these instructions, back there with you when you do
20  deliberate.  So I will jump right into that so that we can get
21  right to closing arguments afterwards.

22       Members of the jury, it is my duty to instruct you on
23  the rules of law that you must use in deciding this case.
24  After I've completed these instructions, you will go to the
25  jury room and begin your discussions, what we call your

United States District Court

1   deliberations.  You must decide whether the Government has

2   proved the specific facts necessary to find a defendant guilty

3   beyond a reasonable doubt.  And of course, anywhere I say "a

4   defendant", I am referring to each of the three individual

5   defendants.

6          Your decision must be based only on the evidence

7   presented during trial.  You must not be influenced in any way

8   by either sympathy for or prejudice against the defendants or

9   the Government.

10         You must follow the law as I explain it, even if you

11  do not agree with the law, and you must follow all of my

12  instructions as a whole.  You must not single out or disregard

13  any of the Court's instructions on the law.

14         The indictment or formal charge against a defendant

15  is not evidence of guilt.  The law presumes every defendant is

16  innocent.

17         The defendants do not have to prove their innocence,

18  produce any evidence at all or testify.  A defendant does not

19  have to testify.  So if a defendant chose not to testify, you

20  cannot consider that in any way while making your decision.

21         The Government must prove a defendant's guilt beyond

22  a reasonable doubt.  If it fails to do so, you must find the

23  defendant not guilty.

24         The Government's burden of proof is heavy, but the

25  Government does not have to prove a defendant's guilt beyond

                   United States District Court

1  all possible doubt.  The Government's proof only has to

2  exclude any reasonable doubt concerning the defendant's guilt.

3       Now, a reasonable doubt is a real doubt based on your

4  reason and common sense after you've carefully and impartially

5  considered all of the evidence in the case.  A reasonable

6  doubt may arise not only from the evidence produced at trial

7  but from a lack of evidence.

8       Proof beyond a reasonable doubt is proof so

9  convincing that you would be willing to rely and act on it

10 without hesitation in the most important of your own affairs.

11 If you are convinced that the defendant has been proved guilty

12 beyond a reasonable doubt, say so.  If you are not convinced,

13 say so.

14      As I said before, you must consider only the evidence

15 that I have admitted in the case.  Evidence includes the

16 testimony of witnesses and the exhibits admitted.  But

17 anything the lawyers say is not evidence and is not binding on

18 you.

19      You should not assume from anything I've said during

20 the trial that I have an opinion about any factual issue in

21 this case.  Except for these instructions to you on the law,

22 you should disregard anything I may have said during the trial

23 in arriving at your own decision about the facts.

24      Your own recollection and interpretation of the

25 evidence is what matters.  In considering the evidence, you

United States District Court

1  may use reasoning and common sense to make deductions and

2  reach conclusions.  You should not be concerned about whether

3  the evidence is direct or circumstantial, but I will define

4  each of those again for you.

5       Direct evidence is the testimony of a person who

6  asserts that he or she has actual knowledge of a fact, such as

7  an eyewitness.

8       Circumstantial evidence is proof of a chain of facts

9  and circumstances that tend to prove or disprove a fact.

10 There is no legal difference in the weight you may give to

11 either direct or circumstantial evidence.

12      A defendant must never be convicted on mere

13 assumption, conjecture or speculation.  So if you view the

14 evidence in this case as reasonably permitting either of two

15 conclusions, one of innocence, the other of guilt, you should,

16 of course, adopt the conclusion of innocence.

17      Now, when I say you must consider all of the

18 evidence, I don't mean you must accept all of the evidence as

19 true or accurate.  You should decide whether you believe what

20 each witness had to say and how important that testimony was.

21 In making that decision, you may believe or disbelieve any

22 witness in whole or in part.  The number of witnesses

23 testifying concerning a particular point does not necessarily

24 matter.

25      To decide whether you believe any witness, I suggest

1   that you ask yourself a few questions.  Did the witness
2   impress you as one who was telling the truth?  Did the witness
3   have any particular reason not to tell the truth?  Did the
4   witness have a personal interest in the outcome of this case?
5   Did the witness seem to have a good memory?  Did the witness
6   have the opportunity and ability to accurately observe the
7   things he or she testified about?  Did the witness appear to
8   understand the questions clearly and answer them directly?
9   Did the witness's testimony differ from other testimony or
10  other evidence in the case?  Did the witness admit to lying
11  under oath?

12          You should ask yourself whether there was evidence
13  that a witness testified falsely about an important fact and
14  ask whether there was evidence that at some other time a
15  witness said or did something or didn't say or do something
16  that was different from the testimony the witness gave during
17  the trial.

18          But ladies and gentlemen, keep in mind that a simple
19  mistake doesn't necessarily mean a witness wasn't telling the
20  truth as he or she remembers it.  People do naturally tend to
21  forget some things or remember them inaccurately.  So if a
22  witness misstated something, you must decide whether it was
23  because of an innocent lapse in memory or an intentional
24  deception.  The significance of your decision may depend on
25  whether this misstatement is about an important fact or about

1    an unimportant detail.

2          There may also be evidence tending to show that a

3    witness has a bad reputation for truthfulness in the community

4    where the witness resides or has recently resided, worked or

5    frequented, or that others have a bad opinion about the

6    witness's truthfulness.  You may consider reputation and

7    community opinion in deciding whether to believe or disbelieve

8    a witness.

9          Evidence of a defendant's character traits may create

10   reasonable doubt.  You should consider testimony that a

11   defendant is an honest and law-abiding citizen along with all

12   the other evidence to decide whether the Government has proved

13   beyond a reasonable doubt that the defendant committed the

14   offense.

15         Now, I'm going to talk a little bit about types of

16   witnesses from whom you heard.

17         When scientific, technical or other specialized

18   knowledge might be helpful, a person who has special training

19   or experience in that field, often referred to as an expert,

20   is allowed to state an opinion about the matter, but that

21   doesn't mean you must accept the witness's opinion.  As with

22   any other witness's opinion, you must decide for yourself

23   whether to rely on the opinion.

24         You have heard the testimony of law enforcement

25   agents.  The fact that a witness may be employed by the

                    United States District Court

1 federal government as a law enforcement agent does not mean

2 that his or her testimony is deserving of more or less

3 consideration or greater or lesser weight than that of any

4 other witness.

5      It is your decision as jurors whether to accept the

6 testimony of the law enforcement witness and to give to that

7 testimony whatever weight, if any, you find it deserves.

8      You must consider some witnesses' testimony with more

9 caution than others.  For example, paid informants, witnesses

10 who have been promised immunity from prosecution, or witnesses

11 who hope to gain more favorable treatment in their own cases,

12 may have a reason to make a false statement in order to strike

13 a good bargain with the Government.  So while witnesses of

14 these kinds may be entirely truthful when testifying, you

15 should consider that testimony with more caution than the

16 testimony of other witnesses.

17      Sometimes the parties have agreed that certain facts

18 are true.  Agreements such as this are called stipulations.

19 You must treat these facts as proved for this case.

20      Now, during the trial you heard evidence of acts

21 allegedly done by defendants Todd Chrisley and Julie Chrisley

22 on other occasions that may be similar to acts with which they

23 are currently charged.  You must not consider any of this

24 evidence to decide if defendants Todd and Julie Chrisley

25 engaged in the activity alleged in this indictment.  This

1  evidence was admitted and may be considered by you for the

2  limited purpose of assisting you in determining whether

3  defendants Todd Chrisley and Julie Chrisley had the state of

4  mind or intent necessary to commit the crimes charged in the

5  indictment, whether they had a motive or opportunity, whether

6  they acted according to a plan or in preparation, or whether

7  they acted by accident or mistake.

8          Additionally, if you find the defendants committed

9  allegedly similar acts on other occasions, you may use this

10 evidence to help you decide whether the similarity between

11 those acts and the ones charged in this case suggest the same

12 person or people committed all of them.

13         The defendants are currently on trial only for the

14 crimes charged in this indictment.  You may not convict a

15 person simply because you believe that person may have

16 committed an act in the past that is not charged in this

17 indictment.

18         You have been permitted to take notes during trial.

19 And most of you, perhaps all of you, have taken advantage of

20 that opportunity.  But you must use your notes only as memory

21 aids during deliberations.  You must not give your notes

22 priority over your independent recollection of the evidence.

23 And you must not allow yourself to be unduly influenced by the

24 notes of other jurors.  I emphasize that notes are not

25 entitled to any greater weight than your memories or

United States District Court

1  impressions about the testimony.

2       You may have noticed during the trial that counsel

3  for the defendants have at times consulted with one another or

4  have divided the work of the trial in an effort to facilitate

5  their presentation and to avoid duplication.  The fact that

6  defense counsel have consulted and cooperated with each other

7  in the conduct of their defense is not to be considered by you

8  as having any significance with respect to the issues in the

9  case.  Indeed especially in a case of this length, three

10  weeks, it would be unusual and a waste of time and effort if

11  counsel did not share the burdens of the defense.

12       Although the defendants are being tried together, you

13  must give separate consideration to each defendant.  In doing

14  so, you must determine which evidence in the case applies to a

15  particular defendant and disregard any evidence admitted

16  solely against some other defendants.  The fact that you may

17  find one of the defendants guilty or not guilty should not

18  control your verdict as to any other defendant.

19       Some federal crimes have a statute of limitations.

20  For Count 1, the Government must prove beyond a reasonable

21  doubt that a member of the bank fraud conspiracy committed an

22  overt act on or after April 24th, 2009.

23       For Count 8, the Government must prove beyond a

24  reasonable doubt that a member of the conspiracy to defraud

25  the IRS committed an overt act or -- on or after April 24th,

United States District Court

1    2014.

2         For Count 9, the Government must prove beyond a

3    reasonable doubt that for the charged tax evasion offense an

4    affirmative act occurred on or after April 24th, 2014.

5         Now, ladies and gentlemen, I want to talk about the

6    specific offense instructions, the offenses in the indictment.

7         The indictment charges 12 separate crimes, called

8    counts -- and you will have a copy of the indictment back

9    there, of course. -- against the defendants.  Each count has a

10   number.  You'll be given a copy of the indictment to refer to

11   during your deliberations.

12        Count 1 charges that defendants Todd Chrisley and

13   Julie Chrisley conspired to commit the offense of bank fraud.

14        Count 8 charges that defendants Todd Chrisley, Julie

15   Chrisley and Peter Tarantino conspired to defraud the Internal

16   Revenue Service.

17        First, note that the defendants are not charged in

18   Counts 1 or 8 with committing a substantive offense.  They are

19   charged with conspiring to commit that offense.  I will give

20   you specific instructions on conspiracy in a moment.

21        The remaining counts in the indictment charge that

22   the defendants committed what are called substantive offenses.

23   And I will explain the law governing these substantive

24   offenses in a moment.

25        Counts 2 through 6 charge defendants Todd Chrisley

                 United States District Court

1 and Julie Chrisley with committing bank fraud.

2     Count 7 charges defendant Julie Chrisley with

3 committing wire fraud.

4     Count 9 charges defendants Todd Chrisley and Julie

5 Chrisley with willfully attempting to evade paying Todd

6 Chrisley's 2009 income taxes.

7     Counts 10 and 11 charge Peter Tarantino with

8 willfully aiding the filing of two false corporate tax returns

9 for 7C's Productions.

10     And finally, Count 12 charges defendant Julie

11 Chrisley with obstruction of justice.

12     Where a statute specifies multiple alternative ways

13 in which an offense may be committed, the indictment may

14 allege the multiple ways in the conjunctive, that is, by using

15 the word "and".  And if only one of those alternatives is

16 proved beyond a reasonable doubt, that is sufficient for

17 conviction so long as you agree unanimously as to the

18 alternative.

19     You'll see that the indictment charges that each

20 crime was committed on or about a certain date.  The

21 Government doesn't have to prove, however, that the crime

22 occurred on an exact date.  The Government only has to prove

23 beyond a reasonable doubt that the crime was committed on a

24 date reasonably close to the date alleged.

25     Count 1 charges defendants Todd Chrisley and Julie

1  Chrisley with conspiracy to commit bank fraud along with Mark

2  Braddock.  It is a federal crime to knowingly and willfully

3  conspire or agree with someone to do something that if

4  actually carried out would result in the crime of bank fraud.

5       The word "knowingly" here means that an act was done

6  voluntarily and intentionally and not because of a mistake or

7  by accident.

8       For Count 1, the word "willfully" means that the act

9  was committed voluntarily and purposely with the intent to do

10  something the law forbids, that is, with the bad purpose to

11  disobey or disregard the law.

12       While a person must have acted with the intent to do

13  something the law forbids, before you can find that the person

14  acted willfully, the person need not be aware of the specific

15  law or rule that his or her conduct may be violating.

16       A conspiracy is an agreement by two or more persons

17  to commit an unlawful act.  In other words, it is a kind of

18  partnership for criminal purposes.  Every member of the

19  conspiracy becomes the agent or partner of every other member.

20       The Government does not have to prove that all the

21  people named in the indictment were members of the plan or

22  that those who were members made any kind of formal agreement.

23  The heart of a conspiracy is the making of the unlawful plan

24  itself, so the Government does not have to prove that the

25  conspirators succeeded in carrying out the plan.

United States District Court

1     Defendants Todd Chrisley and Julie Chrisley can be

2 found guilty of this conspiracy offense only if all of the

3 following facts are proved beyond a reasonable doubt:  One,

4 two or more persons in some way or manner agreed to try to

5 accomplish a common and unlawful plan to commit bank fraud as

6 charged in the indictment; and two, the defendant knew the

7 unlawful purpose of the plan and willfully joined in it.

8     A person may be a conspirator even without knowing

9 all the details of the unlawful plan or the names and

10 identities of all the other alleged conspirators.  If the

11 defendant played only a minor part in the plan but had a

12 general understanding of the unlawful purpose of the plan and

13 willfully joined in the plan on at least one occasion, that is

14 sufficient for you to find the defendant guilty.

15     But simply being present at the scene of an event or

16 merely associating with certain people and discussing common

17 goals and interests doesn't establish proof of a conspiracy.

18     Also, a person who doesn't know about a conspiracy

19 but happens to act in a way that does advance some purpose of

20 one does not automatically become a conspirator.

21     Counts 2, 3, 4, 5, and 6 charge defendants Todd

22 Chrisley and Julie Chrisley with bank fraud.  It is a federal

23 crime to carry out or attempt to carry out a scheme to defraud

24 a financial institution or to get money or property owned or

25 controlled by a financial institution by using false

1    pretenses, representations or promises.

2            Defendants Todd Chrisley and Julie Chrisley can be

3    found guilty of this crime only if all the following facts are

4    proved beyond a reasonable doubt -- and there are four

5    listed. -- the defendant knowingly carried out or attempted to

6    carry out a scheme to get money, assets or other property from

7    a financial institution by using false or fraudulent

8    pretenses, representations or promises about a material fact;

9    two, the false pretenses, representations or promises were

10   material; three, the defendant intended to defraud the

11   financial institution; and four, the financial institution was

12   federally insured.

13           The word "knowingly" here means that an act was done

14   voluntarily and intentionally and not because of a mistake or

15   by accident.

16           A scheme to defraud includes any plan or course of

17   action intended to deceive or cheat someone out of money or

18   property by using false or fraudulent pretenses,

19   representations or promises relating to a material fact.

20           A statement or representation is false or fraudulent

21   if it is about a material fact that the speaker knows is

22   untrue or makes with reckless indifference as to the truth and

23   makes with intent to defraud.

24           A state or representation may be false or fraudulent

25   when it is a half-truth or effectively conceals a material

1  fact and is made with the intent to defraud.

2        A material fact is an important fact that a

3  reasonable person would use to decide whether to do or not to

4  do something.  A fact is material if it has the capacity or

5  natural tendency to influence a person's decision.  It doesn't

6  matter whether the decision-maker actually relied on the

7  statement or knew or should have known that the statement was

8  false.

9        To the act with intent to defraud means to act

10  knowingly and with the specific intent to use false or

11  fraudulent pretenses, representations or promises to cause

12  loss or injury.  Proving intent to deceive alone, without the

13  intent to cause loss or injury, is not sufficient to prove

14  intent to defraud.

15        The Government does not have to prove all the details

16  alleged in the indictment about the precise nature and purpose

17  of the scheme.  The Government also doesn't have to prove that

18  the alleged scheme actually succeeded in defrauding anyone.

19  What must be proved beyond a reasonable doubt is that the

20  defendant knowingly attempted or carried out a scheme

21  substantially similar to the one alleged in the indictment.

22        Good faith is a complete defense to a charge that

23  requires intent to defraud.  A defendant is not required to

24  prove good faith.  The Government must prove intent to defraud

25  beyond a reasonable doubt.

1    An honestly held opinion or an honestly formed belief
2  cannot be fraudulent intent even if the opinion or belief is
3  mistaken.  Similarly, evidence of a mistake in judgment, an
4  error in management, or carelessness can't establish
5  fraudulent intent; but an honest belief that a business
6  venture would ultimately succeed doesn't constitute good faith
7  if a defendant intended to deceive others by making
8  representations the defendant knew to be false or fraudulent.

9    Count 7 charges defendant Julie Chrisley with wire
10  fraud.  It is a federal crime to use interstate wire, radio or
11  television communications to carry out a scheme to defraud
12  someone else.

13    Defendant Julie Chrisley can be found guilty of this
14  crime only if all the following facts are proved beyond a
15  reasonable doubt -- and there are four. -- one, the defendant
16  knowingly devised or participated in a scheme to defraud
17  someone by using false or fraudulent pretenses,
18  representations or promises; two, the false pretenses,
19  representations or promises were about a material fact; three,
20  the defendant acted with the intent to defraud; and four, the
21  defendant transmitted or caused to be transmitted by wire some
22  communication in interstate commerce to help carry out the
23  scheme to defraud.

24    The word "knowingly" here means that an act was done
25  voluntarily and intentionally and not because of a mistake or

United States District Court

1  by accident.

2          A scheme to defraud means any plan or course of

3  action intended to deceive or cheat someone out of money or

4  property by using false or fraudulent pretenses,

5  representations or promises.

6          A statement or representation is false or fraudulent

7  if it is about a material fact that the speaker knows is

8  untrue or makes with reckless indifference to the truth and

9  makes with the intent to defraud.

10          A statement or representation may be false or

11  fraudulent when it is a half-truth or effectively conceals a

12  material fact and is made with the intent to defraud.

13          A material fact is an important fact that a

14  reasonable person would use to decide whether to do or not to

15  do something.  A fact is material if it has the capacity or

16  natural tendency to influence a person's decision.  It doesn't

17  matter whether the decision-maker actually tried -- excuse me,

18  actually relied on the statement or knew or should have known

19  that the statement was false.

20          To act with intent to defraud means to act knowingly

21  and with the specific intent to use false or fraudulent

22  pretenses, representations or promises to cause loss or

23  injury.  Proving intent to deceive alone, without the intent

24  to cause loss or injury, is not sufficient to prove intent to

25  defraud.

                    United States District Court

1          Again, the Government does not have to prove all the
2     details alleged in the indictment about the precise nature and
3     purpose of the scheme.  It also doesn't have to prove that the
4     material transmitted by interstate wire was itself false or
5     fraudulent or that using the wire was intended as the specific
6     or exclusive means of carrying out the alleged fraud, or that
7     the defendant personally made the transmission over the wire.
8     And the Government does not have to prove that the alleged
9     scheme actually succeeded in defrauding anyone.

10          To use interstate wire communications is to act so
11    that something would normally be sent through wire
12    communications in the normal course of business.  Each
13    separate use of interstate wire communications as part of the
14    scheme to defraud is a separate crime.

15          Again, good faith is a complete defense to a charge
16    that requires intent to defraud.  A defendant isn't required
17    to prove good faith.  The Government must prove intent to
18    defraud beyond a reasonable doubt.

19          An honestly held opinion or an honestly formed belief
20    cannot be fraudulent intent even if the opinion or belief is
21    mistaken.  Similarly, evidence of a mistake in judgment, an
22    error in management, or carelessness can't establish
23    fraudulent intent; but an honest belief that a business
24    venture would ultimately succeed does not constitute good
25    faith if the defendant intended to deceive others by making

1    representations the defendant knew to be false or fraudulent.

2           Count 8 charges defendants Todd Chrisley, Julie

3    Chrisley and Peter Tarantino with conspiracy to defraud the

4    Internal Revenue Service by impeding, impairing, obstructing

5    and defeating the law functions of the IRS from approximately

6    2010 until on or about February 2nd of 2018.  The Government's

7    contention is that defendant Peter Tarantino joined the

8    conspiracy in February of 2016.

9           It is a federal crime for anyone to conspire or agree

10   with someone else to defraud the United States or any of its

11   agencies.

12          Again, ladies and gentlemen, this language is

13   repeated for these different counts to which it applies.

14          To defraud the United States means to cheat the

15   Government out of property or money or to interfere with any

16   of its lawful government functions by deceit, craft or

17   trickery.  To impede or obstruct is to consciously attempt to

18   act or to take some step to hinder, prevent, delay or make

19   more difficult the proper administration of the Internal

20   Revenue laws.

21          A conspiracy is an agreement by two or more persons

22   to commit an unlawful act.  In other words, it is a kind of

23   partnership for criminal purposes.  Every member of the

24   conspiracy becomes the agent or partner of every other member.

25   The Government does not have to prove that all the people

1  named in the indictment were members of the plan or that those

2  who were members made any kind of formal agreement.

3      The heart of a conspiracy is the making of the

4  unlawful plan itself, so the Government does not have to prove

5  that the conspirators succeeded in carrying out the plan.

6      The Government does not have to prove that the

7  members planned together all the details of the plan or the

8  overt acts that the indictment charges would be carried out in

9  an effort to commit the intended crime.

10      Defendants Todd Chrisley, Julie Chrisley and Peter

11  Tarantino can be found guilty of this crime only if all the

12  following facts are proved beyond a reasonable doubt -- and

13  there are four. -- two or more people in some way agreed to

14  try to accomplish a shared and unlawful plan; two, the

15  defendant knew the unlawful purpose of the plan and willfully

16  joined in it; three, during the conspiracy one of the

17  conspirators knowingly engaged in at least one overt act

18  described in the indictment; and four, the overt act was

19  knowingly committed at or about the time alleged and with the

20  purpose of carrying out or accomplishing some object of the

21  conspiracy.

22      The word "knowingly" here means that an act was done

23  voluntarily and intentionally and not because of a mistake or

24  by accident.

25      For this count the word "willfully" means that the

United States District Court

1   act was done voluntarily and purposely with the specific

2   intent to violate a known legal duty, that is, with the intent

3   to do something the law forbids.

4         Disagreement with the law or a belief that the law is

5   wrong does not excuse willful conduct.

6         An overt act is any transaction or event, even one

7   which may be entirely innocent when viewed alone that a

8   conspirator commits to accomplish some object of the

9   conspiracy.

10         A person may be a conspirator even without knowing

11   all the details of the unlawful plan or the names and

12   identities of all the other alleged conspirators.

13         If the defendant played only a minor part in the plan

14   but had a general understanding of the unlawful purpose of the

15   plan and willfully joined in the plan on at least one

16   occasion, that is sufficient for you to find the defendant

17   guilty; but simply being present at the scene of an event or

18   merely associating with certain people and discussing common

19   goals and interests does not establish proof of conspiracy.

20         Also, a person who doesn't know about a conspiracy

21   but happens to act in a way that advances some purpose of one

22   does not automatically become a conspirator.

23         Again I charge you on good faith.  Good faith is a

24   complete defense to Count 8 since good faith on the part of

25   the defendant is inconsistent with willfulness and willfulness

1    is an essential part of this charge.  A good-faith belief is

2    one that is honestly and genuinely held regardless of whether

3    the belief is reasonable.

4    For Count 8, if a defendant acted in good faith,

5    sincerely believing him or herself to have complied with the

6    Internal Revenue laws, then that defendant did not

7    intentionally violate a known legal duty, that is, the

8    defendant did not act willfully.

9    The burden of proof is not on the defendant to prove

10   good-faith intent because the defendant does not need to prove

11   anything.  The Government must establish beyond a reasonable

12   doubt that the defendant act willfully as charged.

13   Intent and motive must not be confused.  Motive is

14   what prompts a person to act.  It is why the person acts.

15   Intent refers to the state of mind with which the act is done.

16   If you find beyond a reasonable doubt that the

17   defendant specifically intended to do something that is

18   against the law and voluntarily committed the acts that make

19   up the crime, then the element of willfulness is satisfied.

20   Evidence that a defendant in good faith relied on the

21   advice of a qualified accountant would be inconsistent with

22   such an unlawful intent.  Therefore, unlawful intent has not

23   been proved if the defendant before acting consulted in good

24   faith with an accountant whom the defendant considered

25   competent, made a full and accurate report to that accountant

United States District Court

of all material facts of which defendant had the means of
knowledge and then acted strictly in accordance with the
advice given by that accountant.

It is also a complete defense to Count 8 if the tax
violation was the result of a failure of an accountant to
exercise due care or diligence and not the result of a
defendant's own actions.

Due care requires an accountant to discharge
professional responsibilities with competence and diligence.
It imposes the obligation to perform the professional services
to the best of his ability with concern for the best interest
of those for whom services are performed and consistent with
the accounting profession's responsibility to public.

Accountants should be diligent in discharging
responsibilities to clients. Diligence imposes the
responsibility to render services promptly and carefully, to
be thorough and to observe an applicable, technical and
ethical standard.

Additionally, evidence that the defendant in good
faith followed the advice of counsel would be inconsistent
with unlawful intent. And, of course, by "counsel" here we
mean an attorney.

Unlawful intent has not been proved if the defendant
before acting made a full and complete good-faith report of
all material facts to an attorney he or she considered

1  competent, received the attorney's advice as to the specific

2  course of conduct that was followed, and reasonably relied

3  upon that advice in good faith.

4       Moving forward to Count 9, which charges defendants

5  Todd Chrisley and Julie Chrisley with attempting to evade

6  payment of Todd Chrisley's 2009 taxes.

7       It is a federal crime to willfully attempt to evade

8  or defeat paying federal income taxes.  Defendants Todd

9  Chrisley and Julie Chrisley can be found guilty of this crime

10  only if all of the following facts are proved beyond a

11  reasonable doubt -- and there are three. -- that defendant

12  Todd Chrisley had a substantial income tax deficiency; two,

13  that the defendant made an affirmative attempt to evade or

14  defeat the payment of the income tax; and three, that the

15  defendant acted willfully.

16       The Government does not have to prove the precise

17  amount of tax due, but it must prove beyond a reasonable doubt

18  that the defendant knowingly attempted to evade or defeat

19  paying a substantial part of the tax.

20       For this count the word "willfully" means that the

21  act was done voluntarily and purposely with the specific

22  intent to violate a known legal duty, that is, with the intent

23  to do something the law forbids.  Disagreement with the law or

24  a belief that the law is wrong does not excuse willful

25  conduct.

1        The word "knowingly" means that an act was done

2   voluntarily and intentionally and not because of a mistake or

3   by accident.

4        The word "attempt" indicates that the defendant knew

5   and understood that during the particular tax year involved

6   defendant Todd Chrisley had income that was taxable and that

7   he had to report by law, but the defendant tried to evade or

8   defeat paying the tax or a substantial portion of the tax on

9   that income.

10       Good faith is a complete defense to Count 9 since

11  good faith on the part of the defendant is inconsistent with

12  willfulness and willfulness is an essential part of this

13  charge.  A good-faith belief is one that is honestly and

14  genuinely held regardless of whether the belief is reasonable.

15       For Count 9, if a defendant acted in good faith,

16  sincerely believing him or herself to have complied with the

17  Internal Revenue laws, then that defendant did not

18  intentionally violate a known legal duty, that is, the

19  defendant did not act willfully.

20       The burden of proof is not on the defendant to prove

21  good-faith intent because, again, the defendant does not need

22  to prove anything.  The Government must establish beyond a

23  reasonable doubt that the defendant acted willfully as

24  charged.

25       Intent and motive must not be confused.  Motive is

                    United States District Court

1  what prompts a person to act.  It is why the person acts.  And
2  again, intent refers to the state of mind with which the act
3  is done.

4      If you find beyond a reasonable doubt that the
5  defendant specifically intended to do something that is
6  against the law and voluntarily committed the acts that make
7  up the crime, then the element of willfulness is satisfied.

8      Evidence that a defendant in good faith relied on the
9  advice of a qualified accountant would be inconsistent with
10 such an unlawful intent.  Therefore, unlawful intent has not
11 been proved if the defendant before acting consulted in good
12 faith with an accountant whom the defendant considered
13 competent, made a full and accurate report to that accountant
14 of all material facts of which defendant had the means of
15 knowledge, and then acted strictly in accordance with the
16 advice that given -- given by that accountant.

17     Ladies and gentlemen, you will hear a lot of
18 repetition in this charge, but the parties have restated this
19 language under each area where it applies, so that's the
20 reason for this.  So you will see this in your copy of the
21 charge as well.

22     Due care requires an accountant to discharge -- I'm
23 sorry.  I'm not sure if I read this part.  It is a complete
24 defense to Count 9 -- did I read that already?  If so, I'll
25 read it again. -- if the tax violation was the result of a

failure of an accountant to exercise due diligence or care and not the result of a defendant's own actions.

Due care requires an accountant to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of his ability with concern for the best interest of those for whom services are performed and consistent with the accounting profession's responsibility to the public.

Accountants should be diligent in discharging responsibilities to clients. Diligence imposes the responsibility to render services promptly and carefully, to be thorough and to observe applicable, technical and ethical standards.

Additionally, evidence that the defendant in good faith followed the advice of counsel would be inconsistent with unlawful intent. Unlawful intent has not been proved if the defendant before acting made a full and complete good-faith report of all material facts to an attorney he or she considered competent, received the attorney's advice as to the specific course of conduct that was followed, and reasonably relied upon that advice in good faith.

Counts 10 and 11 charge defendant Peter Tarantino with aiding or assisting in preparing a false document under the Internal Revenue laws. It is a federal crime to willfully aid or assist to prepare under the Internal Revenue laws a

1  document that is false or fraudulent as to any material

2  matter.

3       For these counts, the word "willfully" means that the

4  act was done voluntarily and purposely with the specific

5  intent to violate a known legal duty, that is, with the intent

6  to do something the law forbids.

7       Disagreement with the law or a belief that the law is

8  wrong does not excuse willful conduct.  The defendant can be

9  found guilty of this crime only if all the following facts are

10 proved beyond a reasonable doubt -- and there are five

11 here. -- one, that the defendant aided in, assisted in or

12 counseled or advised on the preparation or presentation of a

13 document in connection with any matter arising under the

14 Internal Revenue laws; and two, this document falsely stated

15 the 7C's Production generated no income and made no

16 distributions; three, the defendant knew that the statement in

17 the document was false; four, the false statement was

18 material; and five, the defendant did so with the intent to do

19 something the defendant knew the law forbids.

20      It is not necessary that the Government prove that

21 the falsity or fraud was with the knowledge or consent of the

22 person authorized or required to present the document.

23      Ladies and gentlemen, let me just have you stand up,

24 stretch, breathe, whatever before we go on.  I see you.  I

25 feel you.  Go ahead and get up, yes, please.  Anyone else too.

United States District Court

1       As soon as you stretch adequately -- and we still got
2  about ten more pages to go.

3       Again, the parties have elected to repeat certain
4  language on each part to which it applies, so I have to read
5  it again.

6       A declaration is false if it is untrue when it is
7  made and the person making it knows it is untrue.

8       A declaration contained within a document is false if
9  it is untrue when the document is used and the person using it
10 knows it is untrue.

11      A declaration is material if it relates to a matter
12 of significance or importance as distinguished from a minor or
13 insignificant or trivial detail.

14      The Government does not have to show that it was
15 deprived of any tax because of the false return or that
16 additional tax is due.  It only has to prove that the
17 defendant aided and abetted the filing of a material false
18 return when the defendant knew -- I'm sorry, which the
19 defendant knew violated the law.

20      Good faith is a complete defense to Counts 10 and 11
21 since good faith on the part of the defendant is inconsistent
22 with willfulness and willfulness is an essential part of these
23 charges.  A good-faith belief is one that is honestly and
24 genuinely held regardless of whether the belief is reasonable.
25      For Counts 10 and 11, if the defendant acted in good
                    United States District Court

1  faith, sincerely believing himself to have complied with the

2  Internal Revenue laws, then the defendant did not

3  intentionally violate a known legal duty, that is, the

4  defendant did not act willfully.

5       The burden of proof is not on the defendant to prove

6  good-faith intent because the defendant does not have to prove

7  anything.  The Government must establish beyond a reasonable

8  doubt that the defendant acted willfully as charged.

9       Intent and motive must not be confused.  Motive is

10  what prompts a person to act.  It is why the person acts.

11  Intent refers to the state of mind with which the act is done.

12       If you find beyond a reasonable doubt that the

13  defendant specifically intended to do something that is

14  against the law and voluntarily committed the acts that make

15  up the crime, then the element of willfulness is satisfied.

16       And Count 12 charges Julie Chrisley with obstruction

17  of justice.  It is a federal crime to try to influence,

18  obstruct or impede the due administration of justice

19  corruptly.  In order for you to find the defendant guilty of

20  this charge, the Government must prove both of the following

21  elements beyond a reasonable doubt, one, the defendant

22  attempted to obstruct, influence or impede the grand jury

23  proceeding; and two, the defendant acted corruptly.

24       To act corruptly means to act voluntarily,

25  deliberately and dishonestly with the specific intent to sway,

1 change or prevent some action likely to be taken in the grand

2 jury.

3        The Government does not have to prove that the grand

4 jury proceeding was in fact influenced or obstructed or

5 impeded in any way.  It only has to prove that the defendant

6 corruptly tried to influence, obstruct or impede the due

7 administration of justice and that the natural and probable

8 effect of the defendant's acts would be to sway, change or

9 prevent some action likely to be taken in the grand jury

10 proceeding.

11        Now, I'm now going to give you additional guidance

12 about conspiracy.

13        During a conspiracy, if a conspirator commits a crime

14 to advance the conspiracy toward its goals, then in some cases

15 a coconspirator may be guilty of the crime even though

16 coconspirator did not participate directly in the crime.  This

17 means that if you have first found defendants Todd Chrisley or

18 Julie Chrisley guilty of the crime of bank fraud conspiracy as

19 charged in Count 1, you may also find that defendant guilty of

20 any of the substantive crimes charged in Counts 2, 3, 4, 5 or

21 6, even though that defendant did not personally participate

22 in the crime, if you find beyond a reasonable doubt, one,

23 during the conspiracy a conspirator committed the additional

24 substantive crime charged to further the conspiracy's purpose;

25 two, the defendant was a knowing and willful member of the

United States District Court

1   conspiracy when the substantive crime was committed; and

2   three, it was reasonably foreseeable that a coconspirator

3   would commit the substantive crime as a consequence of

4   conspiracy.

5        Additionally, if you have first found defendants Todd

6   Chrisley or Julie Chrisley guilty of the crime of conspiracy

7   to defraud the IRS as charged in Count 8, you may also find

8   that defendant guilty of tax evasion as charged in Count 9 if

9   you find beyond a reasonable doubt, one, during the conspiracy

10  a conspirator committed the additional substantive crime

11  charged to further the conspiracy's purpose; two, the

12  defendant was a knowing and willful member of the conspiracy

13  when the substantive crime was committed; and three, it was

14  reasonably foreseeable that a coconspirator would commit the

15  substantive crime as a consequence of the conspiracy.

16       This does conclude my instructions to you regarding

17  conspiracy.

18       Next, I instruct you that it is possible to prove a

19  defendant guilty of a crime even without evidence that the

20  defendant personally performed every act charged.  Ordinarily

21  an act -- excuse me.  Ordinarily any act a person can do may

22  be done by directing another person or agent or it may be done

23  by acting with or under the direction of others.

24       A defendant aids and abets a person if the defendant

25  intentionally joins with the person to commit a crime.  A

United States District Court

1  defendant is criminally responsible for the acts of another

2  person if the defendant aids and abets the other person.  A

3  defendant is also responsible if the defendant willfully

4  directs or authorizes the acts of an agent, employee or other

5  associate.

6      But finding that a defendant is criminally

7  responsible for the acts of another person requires proof that

8  the defendant intentionally associated with or participated in

9  the crime, not just proof that the defendant was simply

10  present at the scene of a crime or knew about it.  In other

11  words, you must find beyond a reasonable doubt that the

12  defendant was a willful participant and not merely a knowing

13  spectator.

14      If a person conspires to defraud the IRS or commits

15  an act with the willful intent to evade the payment of tax,

16  later actions do not nullify the completed crime.

17      Accordingly, if you find that the Government has

18  proved beyond a reasonable doubt the defendants Todd Chrisley

19  and Julie Chrisley -- or Julie Chrisley willfully attempted to

20  evade payment of tax, any later payment of tax does not erase

21  the crime.

22      And if you find that the Government has proved beyond

23  a reasonable doubt that defendants Todd Chrisley, Julie

24  Chrisley or Peter Tarantino willfully conspired to defraud the

25  IRS, any later filing of tax returns does not erase the crime.

1       On the other hand, the evidence of tax filings or tax
2  payment may be considered by you in determining whether in
3  fact the defendants acted willfully to conspire to defraud the
4  IRS or attempt to evade payment of tax.

5       In determining a defendant's intent based upon their
6  later filing of tax returns or tax payments, you may consider,
7  among other things, what they knew when they filed the tax
8  returns and when the payment was made.  Whether the defendants
9  acted with the necessary criminal intent is solely for you to
10 determine based upon all of the evidence in the case.

11      Lastly, in some cases it is a crime to attempt to
12 commit an offense even if the attempt fails.  In this case,
13 defendants Todd Chrisley and Julie Chrisley are charged in
14 Counts 2 through 6 with bank fraud or attempting to commit
15 bank fraud.  Defendant Julie Chrisley is charged in Count 7
16 with wire fraud or attempting to commit wire fraud.  Defendant
17 Julie Chrisley is also charged with obstruction of justice or
18 attempting to obstruct justice.

19      The defendant can be found guilty of these crimes
20 only if the elements I have previously instructed you on
21 regarding each substantive offense are proved beyond a
22 reasonable doubt.

23      The defendant can be found guilty of an attempt to
24 commit those offenses only if both of the following facts are
25 proved beyond a reasonable doubt:  Number 1, that the
                    United States District Court

1  defendant knowingly intended to commit the crime of bank

2  fraud, wire fraud or obstruction of justice; and Number 2, the

3  defendant's intent was strongly corroborated by his or her

4  taking a substantial step toward committing the crime.

5       A substantial step is an important action leading up

6  to committing of an offense, not just an inconsequential act.

7  It must be more than simply preparing.  It must be an act that

8  would normally result in committing the offense.

9       Each count of the indictment charges a separate crime

10  against one or more of the defendants.  You must consider each

11  crime and the evidence relating to it separately and you must

12  consider the case of each defendant separately and

13  individually.

14       If you find a defendant guilty of one crime, that

15  must not affect your verdict for any other crime or any other

16  defendant.  I caution you, ladies and gentlemen, that each

17  defendant is on trial only for the specific crimes charged in

18  this indictment.  You are here to determine from the evidence

19  in this case whether a defendant is guilty or not guilty of

20  those specific crimes.

21       You must never consider punishment in any way to

22  decide whether a defendant is guilty or not guilty.  If you do

23  find a defendant guilty, the punishment is for the judge alone

24  to decide later.

25       Ladies and gentlemen, the last thing I want to tell

United States District Court

1  you at this part -- there will be like a very brief part after
2  the attorneys argue that I will go over with you as far as
3  selecting your foreperson, but the only other thing for now is
4  I tell you that there is a verdict form.  It simply lays out
5  each of the counts.  Just states Count 1, Count 2, Count 3 as
6  to each of the respective defendants.  And for each count,
7  there is a place to check "not guilty" if that is your
8  finding, then there is a place to check "guilty" if that is
9  your finding.  And on the last page, there is a place for your
10  foreperson to sign and date.  I reference that only because
11  the attorneys may during their closing argument refer to the
12  verdict form in assisting you.

13      All right.  Ladies and gentlemen, that was a long
14  charge, but there's a lot of law and there are a lot of counts
15  in this case.  So thank you for hanging in there with us.

16      We are going to take a five-minute -- and when I say
17  five minutes, unless you really, really need to do more, I
18  really do mean five-minute break, come back and start with our
19  first argument.

20      Thank you so much.  You may go to the jury room.

21      Attorneys, please be back within five minutes.  If
22  you choose to talk to someone in the gallery, please be right
23  back here within five minutes.  Thank you so much.

24      **(The jury exited the courtroom at 9:52 a.m., after**
25  **which the following proceedings were had.)**

United States District Court

1          THE COURT:  All right.  Everybody ready for the jury
2     to come back in?
3          One thing, attorneys, before the jurors come out,
4     they -- I think multiple ones -- and Ms. Beck, correct me if
5     I'm wrong. -- said, tell the judge we'd like to leave by 4
6     o'clock today.  So you-all have heard me explain to them that
7     today they should be prepared to go as long as they want to
8     deliberate.  But that's what the request was.
9          **(The jury entered the courtroom at 9:57 a.m., after**
10    **which the following proceedings were had.)**
11         THE COURT:  All right.  The jury is in place.
12         Everyone may be seated.
13         On behalf of the Government, are you ready to proceed
14    with opening -- excuse me, with closing statement? -- we're
15    not going to start over, ladies and gentlemen -- with closing
16    arguments.
17         MR. KREPP:  We are, your Honor.  Thank you.
18         THE COURT:  All right.  You may proceed.
19         MR. KREPP:  Thank you, your Honor.
20         Nearly three weeks ago, my colleague, Ms. Peters,
21    stood before you and she told you that this was a case about
22    two things, fraud and tax evasion.  Now you've seen the
23    evidence; you've listened to the witnesses; you've heard the
24    fraud; you've heard the evidence that these defendants took to
25    cheat the IRS out of money.

                    United States District Court

1    Todd and Julie Chrisley earned good money working in
2  the real estate foreclosure business.  But that wasn't enough
3  for them.  Because of their greed, they had to have more.  And
4  so what did they do?  They partnered up with Mark Braddock.
5  They partnered up with Braddock to defraud multiple banks
6  located throughout the metro Atlanta area, getting tens of
7  millions of dollars.  And for what?  For Bentleys and for
8  cross country trips for Todd to get his hair cut?  It's
9  because of pure greed.

10    But did the fraud stop there?  No.  After they parted
11  ways with Braddock in 2012, the same scrapbooking continued.
12  Julie Chrisley sent scrapbooked bank statements, scrapbooked
13  credit report to a realtor, the same thing she learned to do
14  working alongside Mark Braddock years beforehand.

15    But that's not the end of the story; because as you
16  know, Todd Chrisley owed roughly $500,000 for the 2009 tax
17  year.  Didn't pay it when he filed the return.

18    And eventually the Chrisleys got famous.  They got
19  their reality television show and they started earning
20  millions of dollars.  But what happened?  They met Peter
21  Tarantino.  And make no mistake about it, though his name did
22  not come up during the bank fraud evidence, Peter Tarantino
23  was an active and willing participant in the conspiracy to
24  defraud the Internal Revenue Service.  The Chrisleys, working
25  alongside Mr. Tarantino, took substantial steps to conceal

1  material information from revenue officers.  They hid Todd's
2  income in bank accounts first controlled by Julie Chrisley
3  then Todd's own mother.

4          And then on February 2nd, 2018, what happened?  Agent
5  Ryskoski interviews Mr. Tarantino and Mr. Tarantino lies
6  through his teeth.  Tells Agent Ryskoski he doesn't know how
7  Todd earned his income.

8          Was that the end of the story?  No.  Because what
9  happened during the grand jury investigation?  Julie Chrisley
10 knew the grand jury was investigating her and her husband for
11 tax crimes.  She remembered that she had transferred ownership
12 of her corporate bank account to her mother-in-law back in
13 March of 2017.  So what did she do?  She tried to obstruct the
14 grand jury investigation to try to stop this day from
15 happening by transmitting a sham, backdated, fraudulent
16 document to the grand jury.

17         Ladies and gentlemen, this case isn't just about
18 fraud and it's not just about tax evasion.  It's about greed,
19 it's about arrogance and it's about three defendants who think
20 they are above the law.

21         So what I want to do now is take things in stages,
22 walk through a little bit of the law.  And I promise I'm not
23 going to repeat everything Judge Ross just said.  You'll have
24 the charge, as she said, when you go back to deliberate.  I
25 want to take this in stages in the order that the Government
                   United States District Court

1   presented the evidence at trial.

2           So first we're going to talk about the tax crimes --

3   that was the first week of trial. -- then we're going to talk

4   about -- I'm sorry, and we're going to talk about obstruction

5   of justice, the sham document that Julie Chrisley gave the

6   grand jury, then we'll talk about Mark Braddock and the bank

7   fraud conspiracy.  And finally, we'll talk about wire fraud

8   and the false document that was sent to the realtor in

9   California.

10          So there are three things that I ask you to remember

11  when it comes to the tax charges.  Number 1, all three

12  defendants were repeatedly put on notice of their obligations

13  to comply with the tax laws.  This is not a case of the big,

14  bad evil IRS coming down on somebody because they were a day

15  late and a dollar short on paying their taxes.  The IRS sent

16  notice after notice after notice to all three of these

17  defendants.  And what did they do?  All three defendants

18  willfully took affirmative steps to conceal material

19  information from the IRS.  And Number 3, when the IRS started

20  asking questions, March 2017, the defendants tried to obstruct

21  the collection process.

22          So the judge has read through the charges.  And I

23  promised you I wouldn't reread them, so I'll just put them on

24  the screen.  You'll have them when you deliberate.

25          The first charge, though, is the conspiracy charge.

United States District Court

1   And that involves all three defendants.  There's a word in

2   here that I'm going to focus on in a little bit.  It's the

3   word "willfully".  And Judge Ross read to you what that meant.

4   You're going to hear that word come up over and over again

5   with these charges.

6           But essentially, this is conspiracy, an unlawful

7   agreement by these three defendants.  They willfully joined

8   and they committed what are called overt acts, which we're

9   going to talk about, to further that conspiracy.  And the

10  conspiracy's objective was to defraud the IRS.

11          Now, Todd and Julie Chrisley are charged with tax

12  evasion.  And make no mistake, this has nothing to do with the

13  2013 return, the 2014 return, the 2015 or the 2016 return that

14  they didn't even bother filing until after they learned they

15  were under investigation.  This count relates solely to the

16  2009 return that Todd Chrisley signed saying that he owed

17  hundreds of thousands of dollars.  So this charges Todd and

18  Julie Chrisley with willfully attempting to evade the payment

19  of those taxes.

20          And finally, Mr. Tarantino is charged with filing

21  false tax returns.  And this relates to those blank corporate

22  tax returns that I went through with Mr. Salinski on the stand

23  yesterday, the corporate tax returns that showed that Julie

24  Chrisley got no distributions.

25          So let's take this one step at a time.  Because a lot

United States District Court

1  of the evidence that I'm going to be talking about applies to

2  all sets of these charges.

3        So the first thing I want to talk about is

4  willfulness.  Now, as Judge Ross just told you, willfulness

5  means that the act was done voluntarily and purposely with the

6  specific intent to violate a known legal duty, that is, with

7  the intent to do something the law forbids.  But disagreement

8  with the law or a belief that the law is wrong does not excuse

9  willful conduct.

10        So what is the evidence of willfulness in this case?

11  All three defendants were well aware that Todd Chrisley owed

12  hundreds of thousands of dollars in unpaid taxes from 2009.

13  All three defendants knew that the Chrisleys had not filed or

14  paid any taxes for 2013 through 2016.  And the IRS sent

15  repeated notices to all three defendants about these

16  outstanding tax bills, about their obligations to comply with

17  the law.

18        So we entered a number of exhibits in this trial.

19  Most of the tax documents are going to be found between

20  Government's Exhibits 1 and 99.  And you will see the notices

21  in there that were sent out that the revenue officers

22  testified that they sent out to all three defendants.

23        You know when it's time to say I better just ante up

24  and pay my bills with the IRS?  You know when it's time to say

25  maybe I should get a new accountant?  You know when it's time

United States District Court

1  to say to your clients pay your taxes?  When the IRS has to

2  mail you a pamphlet entitled "Why do I Have to Pay my Taxes"?

3  But did they pay their taxes after this?  No.  They continued

4  to hide money.  That is the essence of willfulness.

5       What about the defendants' public statement?  Did

6  they think they had an obligation to pay?  They certainly did.

7  Todd Chrisley in February of 2017 has the arrogance to go on

8  the radio and say:  "Obviously the federal government likes my

9  tax returns because I pay 750,000 to a million dollars just

10 about every year so the federal government doesn't have a

11 problem with my taxes."  That was a boldface lie.  But it

12 shows that Mr. Chrisley knew he had an obligation to pay

13 taxes.

14       And it wasn't just this one-off instance.  You heard

15 in opening statement that this is just part of a sizzle.  This

16 is part of a scheme to defraud the IRS.  This is the essence

17 of willfulness.

18       We went through this with Mr. Salinski yesterday.  In

19 2015 when the Chrisleys are earning over a million dollars

20 from their television show, Todd Chrisley files a hardship

21 application for his lake house in South Carolina.  And what

22 does he claim on there?  Lo and behold, that he's paying

23 $5,200 a month in income taxes.  Another lie.  More evidence

24 of willfulness.  More evidence that the defendants knew they

25 had to file and pay their taxes.

                    United States District Court

1        What about Julie Chrisley?  You heard a lot, that,
2   well, we didn't think we were going to owe anything for those
3   earlier tax years so there was no rush.  That's not what Julie
4   Chrisley was telling the banks.  In 2015 Julie Chrisley sends
5   a tax return to a bank that says she is going to owe over a
6   quarter million dollars.  Julie Chrisley knew this return had
7   not been filed.  Julie Chrisley knew she had not paid that
8   money to the IRS.  This is the essence of willfulness.

9        What about Mr. Tarantino?  We'll talk about the
10  transmissions he made in January of 2018 with tax filings.
11  But those weren't the only ones.  In 2016 he's sending copies
12  of the Chrisleys' tax returns.  And look what's highlighted
13  there.  "I am attaching the 2013 and 2014 tax filings."
14  Mr. Tarantino was a trained certified public accountant.  Look
15  at his training records.  They're in the 600 series, 600
16  through 602.  He knew the Chrisleys had an obligation to pay
17  their taxes.  He knew these returns had never been filed.
18  That is the essence of willfulness.

19        And what else is going on during this timeframe?  The
20  IRS is filing lien after lien not just in Georgia but in South
21  Carolina, in Tennessee, in Florida, trying to get a dollar out
22  of the Chrisleys.  And what are they doing during this
23  timeframe?  Hiding money in Julie Chrisley's bank account and
24  then moving it over to Todd's mother.  This, ladies and
25  gentlemen, is the essence of willfulness.  This shows the

                United States District Court

1  defendants knew what the law was.  This was not an accident.
2  There was no good-faith mistake here.

3          The defendants were repeatedly put on notice of their
4  obligations to comply with the Internal Revenue laws and then
5  they just turned their back on it and hid their money.

6          Now let's talk about a couple of different things.
7  So for the conspiracy charge, as Judge Ross just told you, the
8  Government has to prove there were certain overt acts.  For
9  the tax evasion, the Government has to prove that there were
10 certain acts of evasion.  So to simplify things, I'm going to
11 go through the evidence here.  But remember that this evidence
12 applies to both of those prongs.

13         Number 1, Todd and Julie Chrisley kept Todd's name
14 off of 7C's Productions' bank accounts.  As Agent Ryskoski
15 testified yesterday, from 2013 through 2018 Todd Chrisley's
16 name was not on any 7C's bank account that the FBI was able to
17 find.

18         This is one of the key accounts in this case, the
19 original Bank of America account in the name of 7C's
20 Productions.  Julie Chrisley is the signer.  But look at the
21 exhibits that were admitted yesterday through Agent Ryskoski.
22 They're primarily in the 200 series and the 300 series.  They
23 show that while Todd Chrisley's name may not appear on the
24 signature card, he was the controller of this company.  He
25 directed when payments should be made.  He ordered Julie

1  Chrisley when to send wires.

2       Todd Chrisley was the puppet master, but he kept his

3  name off of the bank documents for one simple reason.  He did

4  not want the IRS to know about the millions of dollars he was

5  earning.  Just from 2015 and 2016 when this money was flowing

6  into bank accounts under the control of Julie Chrisley with

7  her name on the signature card, $3 million, $3 million that

8  went into those accounts.

9       And what happened next?  Well, you heard from Officer

10  Carter.  Revenue Officer Carter was the first revenue officer

11  that testified.  And she told you that she started to get

12  suspicious that the Chrisleys might be hiding money.  So what

13  did she do?  She sent a request in March of 2017.  Then all

14  hell breaks loose.  Because what happens next?  Todd and Julie

15  Chrisley then know the IRS is onto them, so they take the

16  affirmative step of hiding money in Todd's own mother's name.

17       Look at the exhibits in the 100 series.  The 100

18  series go through the Bank of America transactions in March of

19  2017.  The 100 series explain exactly what occurred after

20  revenue Officer Carter reached out to Mr. Tarantino and

21  requested copies of the Chrisleys' bank statements.  The

22  difference in this request was Officer Carter wanted Julie

23  Chrisley's statements as well.

24       So what happens the very next day?  You heard from

25  Lisa Stone from Bank of America.  She was one of the

United States District Court

1  Government's first witnesses.  Ms. stone testified that the

2  dot here where the Chrisley home was located is where they

3  were living outside of Nashville.  Julie Chrisley went to that

4  branch, indicated as Bank of America Number 1, took out over

5  $50,000 in cashier's checks from the 7C's corporate bank

6  account, then she got her mother-in-law and walked into Bank

7  of America Branch Number 2 -- that's Lisa Stone's branch. --

8  where Lisa Stone saw her.

9       And what did Lisa Stone testify to?  She had a vivid

10 memory of that day.  She remembered that Julie Chrisley came

11 in with a purpose.  And that purpose was to get her name off

12 of the account and put Elizabeth Faye Chrisley's name on it.

13 And that's exactly what happened.  Julie's name is removed

14 from the account and Elizabeth's name is added.

15      But that's not the end of the story because a brand

16 new account is opened up, a brand new account.  And that is

17 where the studios start sending money to.  This brand new

18 account had never been touched by Julie Chrisley.  It's pure

19 as the driven snow, so the IRS would not know about it.

20      But that's not the end of the story; because while

21 Julie Chrisley is in the bank with her mother-in-law, Todd

22 Chrisley is taking steps himself.  Todd Chrisley sends this

23 e-mail to a production agent saying:  "Please refrain from

24 sending any deposits to the account you have on file, as that

25 account has been compromised.  We will be sending you another

United States District Court

1  new account number tomorrow or Thursday morning."  Todd
2  Chrisley knew the IRS had compromised that bank account, and
3  that is why he sent this e-mail.

4      And what happened after this?  Let's not even talk
5  about 7C's Productions and who owns 7C's Productions.

6      As you heard from Agent Ryskoski, Todd Chrisley was
7  getting money from a company called Express Smile.

8      I apologize, your Honor.  I don't know if there's a
9  technical issue.

10     THE COURT:  That's okay.

11     MR. KREPP:  What happened in March?  After March 6th,
12  2017, all of the money went into Elizabeth's account.

13     THE COURT:  Ms. Peters to the rescue.  Thank you.

14     Go ahead.

15     MR. KREPP:  So the very next day -- I'm sorry, a few
16  days later, you see this wire from Express Smile.  That was a
17  company that was paying Todd money.

18     Let's Go back to Agent Ryskoski's chart.

19     THE COURT:  Ladies and gentlemen, give us one second.
20  Could you-all all step into the room, except for Ms. Lacey.
21  Could you remain out here with us.

22     We'll be with you in one second.  Thank you.

23     **(The jury exited the courtroom at 10:19 a.m., after**
24  **which the following proceedings were had.)**

25     Ms. Lacey, if you can come back around here.

United States District Court

1        You-all may be seated.  Thank you.

2        MR. KREPP:  I apologize, your Honor.

3        THE COURT:  No.  It's okay.

4                        **(brief pause)**

5        THE COURT:  And you-all may be seated.

6        I have noticed, ma'am, that you have been having

7   difficulty throughout the trial staying awake, including

8   today.

9        Is there something going on?  I see you with your

10  head all the way down.

11       JUROR LACEY:  I wasn't sleep.  I was listening.

12       THE COURT:  Okay.  I have been looking at you, like,

13  a lot of the trial.  And it's my position throughout the trial

14  that you have not -- that you've been sleep enough so that I

15  am concerned.  And I am inclined to excuse you from your

16  service because I think your ability to judge this case is

17  impaired a little bit by that.

18       JUROR LACEY:  I wasn't sleep.

19       THE COURT:  Attorneys -- and I apologize for this

20  interruption.  This is only like the second time I've had to

21  do this as a judge.  But I'll give you the opportunity to make

22  any objection, but I'm inclined to excuse Ms. Lacey From

23  service.

24       Any position by the Government?

25       MR. KREPP:  We would defer to the Court.

                   United States District Court

1          THE COURT:  Anything from the defense?

2          MR. MORRIS:  I'm sorry.  Did the juror say that she

3    had been following?

4          THE COURT:  She said she had not been sleep.

5          JUROR LACEY:  Yes.  I have not been sleep.  I've just

6    been listening.  And I closed my eyes --

7          MR. MORRIS:  Then I do object to her being released.

8          MR. ANULEWICZ:  I object as well.

9          MR. GRIFFIN:  I believe I would object also.

10         THE COURT:  Objection is noted.

11         Thank you for your service, ma'am.  I'm going to

12   excuse you at this time.  If you can hold off.

13         If you can bring the other jurors back out.

14         And once they come out, you can retrieve your

15   belongings and you're excused.  Thank you for your service.

16         JUROR LACEY:  Okay.

17         THE COURT:  Thank you for your service, ma'am.

18         You-all may reenter.

19         **(The jury entered the courtroom at 10:22 a.m., after**

20   **which the following proceedings were had.)**

21         THE COURT:  All right.  The jury is seated.

22         Everyone else may be seated.

23         Mr. Krepp, are we back in pocket now?

24         MR. KREPP:  Yes, your Honor.

25         So again, backing up, March 7th, the day after

                    United States District Court

1  Officer Carter's request, this brand new 7C's account is
2  opened up.
3         You heard from Elizabeth Chrisley; she had nothing to
4  do with 7C's Productions.  She just signed whatever documents
5  her daughter-in-law gave her.
6         But now let's talk about what Todd was doing.
7  Because as I just said, Todd Chrisley is frantically e-mailing
8  his production -- his agent saying that the account had been
9  compromised.  The IRS had compromised the account.
10        So what happens after that?  You heard from Agent
11 Ryskoski that Mr. Chrisley was getting payments from a company
12 called Express Smile.  That money started going into his
13 mother's personal bank account.  This has nothing to do with
14 7C's Productions and had nothing to do with Lisa Stone or what
15 happened at the bank.  You will see Government's Exhibit 1202.
16 Look at the wires from Express Smile.  You will see, in 2015
17 they're going into 7C's, in 2016 they're going into 7C's.
18 None of that money is going into Elizabeth Faye Chrisley's
19 account until 2017.  That is when the transfers happened.
20 Because again, Todd Chrisley knew the IRS was onto him.  He
21 knew the account had been compromised.
22        Lisa Stone had a vivid memory of that day.  Lisa
23 Stone testified that Julie Chrisley or Elizabeth Chrisley
24 never came back on March 8th with that handwritten document
25 we're going to talk about.  Lisa Stone testified that Bank of
                    United States District Court

1  America records to this day show that Elizabeth Faye Chrisley
2  is the owner of that account.  This was done as an overt act
3  in furtherance of the conspiracy and it was done as an
4  affirmative act to evade paying Todd's 2009 taxes.

5       Now let's talk about Mr. Tarantino; because make no
6  mistake, he played a critical role in this conspiracy.
7  Mr. Tarantino lied to revenue officers.  And you heard him lie
8  to Agent Ryskoski and IRS Special Agent Larry Arrow.

9       Let's talk about the revenue officers first.  He
10 falsely told one revenue officer -- and you'll recall this
11 with Officer Jagiella.  She was very nervous, super nervous,
12 about being in court.  But she had a very vivid memory of one
13 thing.  She remembered that Mr. Tarantino told her that the
14 Chrisleys' daughter owned 7C's Productions.  And when she
15 asked which daughter, he refused to provide more information.

16      You heard from another revenue officer that
17 Mr. Tarantino said he didn't know where the Chrisleys banked.
18 But you know from the evidence in this trial that he had the
19 login information to the Bank of America account.
20 Mr. Tarantino lied because he hoped he could help the
21 conspiracy continue.

22      And finally, he lied again on February 2nd, 2018.
23 And you heard that recording.  We played it in its entirety
24 for you.  I want to focus on a key part of that recording.
25 Agent Ryskoski asked a very simple question.  Along those same

United States District Court

1  lines, kind of the income and how it flows through 7C's, what
2  about Todd's income?  And what does Mr. Tarantino say in
3  response?  I don't know how Todd gets his income.  And Agent
4  Ryskoski says, okay, but let's get the full context and
5  continue the conversation.

6         Agent Arrow breaks in.  And then Mr. Tarantino
7  states, I don't recall seeing any checks from 7C's to Todd.
8  And finally, Agent Ryskoski asks:  "Did he get a 1099"?  And
9  remember, a Form 1099, as you heard, is a tax form that is
10 given to independent contractors.  So a loan-out company like
11 7C's Productions, perfectly legitimate to have a loan-out
12 company.  Nobody from the Government has said one word
13 otherwise.

14        But 7C's Productions was responsible for issuing
15 1099s to the Chrisley family members.  Mr. Tarantino, as the
16 accountant, was responsible for doing so.  He knew he hadn't
17 prepared these 1099s.  But he also saw the money flowing into
18 the bank accounts.  So when he told Agent Ryskoski I don't
19 know how Todd gets his income, that was a flat out lie.  And
20 it was done to further the conspiracy's objective.

21        Remember, when Mr. Tarantino was speaking to Agent
22 Ryskoski, he had access by that point to the 7C's bank
23 account.  He had sent copies of the Chrisleys' tax returns to
24 a bank and a car dealership just two weeks before the
25 interview.  And Mr. Tarantino had frequent e-mail

1 │ correspondence with the production companies and with the

2 │ Chrisleys about the payments that Todd was getting.

3 │ Mr. Tarantino knew he was telling a lie to Agent Ryskoski.  He

4 │ knew how Todd earned his income.

5 │         But was that the end of it?  No.  Let's talk about

6 │ these false corporate tax returns.  These false corporate tax

7 │ returns were done as overt acts in the conspiracy.  As Judge

8 │ Ross just told you, Mr. Tarantino is alone charged with filing

9 │ the false corporate tax returns for 2015 and the false

10 │ corporate tax returns for 2016.

11 │         So let's look at these returns.  As you saw, these

12 │ returns were blank.  They showed no income coming in -- no

13 │ revenue coming into 7C's Productions.  And importantly -- and

14 │ this is what is critical -- this Schedule K-1, this is what

15 │ should show money going to the owner, Julie Chrisley.  But

16 │ what does it show?  No income.  So the IRS is being told that

17 │ Julie Chrisley didn't earn any income from 7C's Productions.

18 │ Mr. Tarantino knew that was a lie.

19 │         Look at the date on when this return was filed.  This

20 │ return was filed in September of 2017.  What happened just a

21 │ few months later?  As you saw me go through on the stand with

22 │ the defendant's investigator, Bill Salinski, yesterday,

23 │ Mr. Tarantino is e-mailing a Porsche dealership copies of

24 │ those same tax returns.  And lo and behold, when they're

25 │ trying to get financing for a car, do we see zero dollars, do

1   we see blanks?  No.  We see gross receipts of well over a
2   million dollars.  Mr. Tarantino knew that 7C's Productions
3   didn't earn zero dollars in 2016.  He knew that was a false
4   statement.  He knew it was material and he knew it went to the
5   IRS.

6         Let's talk about the 2015.  It's the same issue.  The
7   2015 return is blank and it shows no distributions to Julie
8   Chrisley.  Let's look at the date again, the date this was
9   filed.  And let's be clear on this, these returns were filed a
10  year apart.  This is not a case where somebody just
11  accidentally hit a button and something got transmitted to the
12  IRS.  Mr. Tarantino did this on two separate occasions during
13  the conspiracy, first in 2016 and then again in 2017.

14        Now, this return was filed in September of 2016, this
15  return showing that 7C's had no gross receipts.  And what
16  happened just two months before this?  Government's
17  Exhibit 668.  This is where both Todd Chrisley and Peter
18  Tarantino confirm they had access to the 7C's bank account.
19  Mr. Tarantino saw the money flowing through that account.  He
20  knew how much they were earning.  He knew that the Chrisleys
21  through 7C's Productions were getting money.  But he chose to
22  file those blank returns.  He chose to file returns showing no
23  distributions.

24        I realize his name did not come up during the bank
25  fraud conspiracy.  And it shouldn't have.  He's not charged

United States District Court

1  with it.  He didn't know the Chrisleys back then.  But make no
2  mistake about it whatsoever, Peter Tarantino was an active and
3  willing participant in this conspiracy to defraud the IRS.
4          So to summarize the tax charges, when you're
5  reviewing the evidence, remember these three things:  All
6  three defendants were repeatedly put on notice of their
7  obligations to comply with the tax laws, all three defendants
8  willfully took affirmative steps to conceal material
9  information from the IRS, and all -- and when the IRS started
10  asking one too many questions, the defendants tried to
11  obstruct the collection process.
12          Now let's pivot and talk about obstruction of
13  justice.  This is the count that only Julie Chrisley is
14  charged with.  So as the judge instructed you on the law,
15  there's two elements to this offense, the first being that the
16  defendant attempted to obstruct, influence or impede the grand
17  jury proceeding; and two, the defendant acted corruptly.  And
18  what corruptly means is to act voluntarily, deliberately and
19  dishonestly with the specific intent to sway, change or
20  prevent some action likely to be taken in the grand jury.
21          Remember the dates.  We've already talked about March
22  2017.  That's one of the most important dates in the case.
23  Right.  That's when Elizabeth Chrisley and Julie Chrisley
24  walked into Lisa Stone's branch and 7C's Productions was
25  transferred over to Todd's mother Elizabeth.

1          February 2nd, 2018, is another critical date.  That

2     is the date that Agent Ryskoski is interviewing Peter

3     Tarantino and it's the date that 7C's Productions was served

4     with a grand jury proceeding -- I'm sorry, with a grand jury

5     subpoena.

6          But what happens in 2019?  Julie Chrisley knew what

7     the grand jury was looking into and she transmits this sham of

8     at document with crossed-out lettering saying that, oh, we

9     actually sent this over to the bank, Julie Chrisley is

10    actually 100 percent owner.  She signed this under penalty of

11    perjury and transmitted it to the grand jury that was

12    investigating her and her husband.

13         Julie Chrisley knew the grand jury was investigating

14    both her and her husband, Todd Chrisley, for potential tax

15    crimes and she also knew that she had moved money and accounts

16    to her mother-in-law in March 2017.  Julie Chrisley corruptly

17    sought to impede the investigation by sending a sham,

18    backdated document to the grand jury.

19         Now, ladies and gentlemen, you are going to get a

20    very specific -- you got a very specific instruction from the

21    Court, and that is, that the Government bears the burden of

22    proof in this case.  And it's a heavy one.  It's our

23    responsibility to prove that the defendants committed the

24    crimes.  The defendants have no burden.

25         But what did the defendants say -- you also got the

                    United States District Court

1  other instruction, that you are to disregard what attorneys
2  say and only rely on the evidence.  What you were told in
3  opening statements by Mr. Friedberg was that a guy named Chad
4  Bryant stumbled upon this document in the back of Julie's car
5  and then Julie Chrisley found it and turned it over.  You were
6  told you would hear from Chad Bryant.  Chad Bryant never
7  appeared in front of you.

8          But who did appear?  Lisa Stone.  Lisa Stone
9  testified the fraudulent, backdated document was never
10 accepted at her branch on March 8th, 2017.  And when pressed
11 on cross-examination, she said she had faith in her team
12 members, she had worked at Bank of America for over ten years,
13 had never seen a document like that being accepted.  She said
14 with confidence that that fraudulent, backdated document would
15 never have been accepted at Bank of America.  And most
16 importantly, Bank of America records confirm that Julie
17 Chrisley was never added back to the 7C's bank account.

18         What is the theory here?  That Bank of America and
19 Lisa Stone conspired with Mark Braddock now to try to defraud
20 the Chrisleys?  What dog does Lisa Stone have in this fight?
21 She testified with a clear memory of what actually happened in
22 March 2017.

23         And again, what the attorneys say is not evidence.
24 Chad Bryant never testified that this document was found in
25 the back of Mrs. Chrisley's car.  Lisa Stone and Bank of

America's records confirm that this document was never presented to the bank. This was a sham, backdated document. And Julie Chrisley sent it knowing this was a key issue in the grand jury's investigation. She sent it with the corrupt intent to impede the grand jury's investigation.

Now let's talk about the bank fraud charges and Mark Braddock. So the judge went through the law. And again, I won't reread all of it to you. There are a few points I want to mention, the last one, that the object of this has to be toward a financial institution that was federally insured. And during the course of trial, I read a stipulation that the parties had agreed to that all the banks at issue here were federally insured during the timeframe of the indictment. Okay.

The crimes here are pretty simple. They were sending false documents to banks to get money.

They're also charged with conspiracy. And conspiracy law is that there's two or more persons in some way or manner agree to try to accomplish a common and unlawful plan to commit bank fraud as charged in the indictment and that the defendant knew the unlawful purpose of the plan and willfully joined in it.

So let's talk about the bank fraud evidence. Julie and Todd Chrisley conspired with Mark Braddock to defraud dozens of banks. You have seen the documents. You've seen

1   the money.  This was money that the Chrisleys used.  It's

2   money that Todd used to buy Bentleys.  Money that Julie and

3   Todd used for their lake house, their beach house.  It's, of

4   course, money they used to pay back old loans to keep this

5   scheme going.

6          Mark Braddock's testimony and e-mails are

7   corroborated by independent evidence.  The bank fraud case

8   that the Government brought does not rise and fall with the

9   testimony of Mark Braddock.  And let's be clear about Mark

10  Braddock.  Mark Braddock is a criminal.  Mark Braddock earned

11  millions of dollars from the loan fraud scheme.  Mark Braddock

12  lied to banks, attorneys and others throughout the conspiracy.

13  And Mark Braddock got immunity from prosecution back in 2012

14  before the Chrisleys were even famous.

15         You should hate the fact that Mark Braddock got

16  immunity.  You shouldn't like that.  You shouldn't trust Mark

17  Braddock.  You got an instruction on that from Judge Ross.

18         But let's look at the corroborating evidence that

19  backs up what Mr. Braddock told you on the witness stand.  It

20  is not in dispute.  You heard from bankers that these personal

21  financial statements were sent by Braddock on Todd Chrisley's

22  behalf to the banks.  Look at Government's Exhibit 808.  That

23  is a compilation exhibit.  Seventeen different times personal

24  financial statements were sent to banks claiming that Todd

25  Chrisley had anywhere from 3.6 to $4 million sitting in a

1  Merrill Lynch bank account.  And you, of course, heard that
2  was just false.  Todd didn't have that much money.  The income
3  information filled out at the top here, all false.

4          So the 800 series, when you're looking for a document
5  that Mark Braddock provided, the e-mails, they're going to be
6  in the 800 series.  And let's look at one of those e-mails.
7  Todd, using the AOL e-mail account, says:  "Please get her the
8  financials and I will get her the rest."  And Mr. Braddock
9  tells him:  "I don't have financials on any of these, she has
10 tax returns."  And what does Mr. Chrisley say in response?
11 "Stop telling me this shit.  Create them like you always have.
12 If I don't get her these, they won't renew the loans."

13         Now, let's talk about Donna Cash just briefly.  The
14 only honest thing that Donna Cash said on that witness stand
15 was when she spelled her name for the court reporter.  Donna
16 Cash's story was ludicrous.  Just imagine this happening as a
17 crime is unfolding.  All right.

18         Mr. Braddock is trying to get the Chrisleys millions
19 of dollars in loans behind their back.  He's doctoring up
20 these bank statements and then he's sending an e-mail from
21 Todd's account, deleting the e-mail before Todd can see it,
22 then going, waiting, going to his, his, Mark Braddock's
23 account, replying back, then jumping back to Todd Chrisley's
24 account, all the while sending damning e-mails that implicate
25 both of them in a massive bank fraud conspiracy, apparently

1   with the expectation that maybe one day this scheme will

2   collapse and I'll want to turn this all over to the federal

3   government.

4         That story is absurd.  It's nonsensical.  Everything

5   you heard from Donna Cash is not only nonsensical, it's

6   illogical.

7         She comes back and works for the Chrisleys after all

8   that and then she keeps doctoring up statements behind their

9   back, but this time to help them.  You shouldn't believe a

10  word that Donna Cash told you.

11        What else corroborates Mark Braddock's story?  The

12  financial benefit to the Chrisleys.  You heard from Alina

13  Clerie.  She testified that CAM, Chrisley Asset Management,

14  had financial issues because Todd Chrisley took and spent all

15  of the money.  What did she say she told Todd?  You can't get

16  blood from a turnip.

17        And Ms. Clerie produced e-mails.  And look in the

18  1100 series.  Any e-mail in the 1100 series was not produced

19  by Mark Braddock.  Those were produced by Alina Clerie.  She

20  produced e-mails showing that Todd Chrisley was draining all

21  of the company's funds.  She confirmed Braddock's stories that

22  Chrisley was buying Bentleys, traveling to California on a

23  monthly basis for his haircut, all the while sending e-mails

24  like this where they can't even make payroll.  He sends an

25  E-mail in 2010.  "I'm sick of getting these fucking e-mails.

1  Pay the fucking Bodker Ramsey and skip payroll.  No other

2  agent is to be paid until the shit I have asked to get paid is

3  paid.  And if they are, then we will have less to cover in

4  payroll."  This was an e-mail provided by Alina Clerie.  It

5  shows that the Chrisleys were getting the benefit of this loan

6  fraud scheme.

7       And the financial analysis, the analysis done by

8  Agent Ryskoski, confirms that the Chrisleys benefited from the

9  fraudulent loans.

10       Government's Exhibit 1224, this showed when Chrisley

11  got a nine hundred -- a roughly $900,000 loan.  And how long

12  did it take to spend that?  As Agent Ryskoski testified to, it

13  took Chrisley 20 days to spend $700,000, money that went to

14  his lake house, money on their property in Georgia, money on

15  their beach house in Florida, money on their property in

16  California, and, of course, money to pay back old loans.

17       You didn't just hear from Ms. Clerie on this.  You

18  heard from Carmen Barnes.  She worked at Executive Asset

19  Management and then she stayed on after that other gentleman

20  bought the company from Chrisley.  She said that she observed

21  Todd Chrisley instructing Mark Braddock to sign documents.

22  Why would she come in here and lie about that?  She hated both

23  of them.  She told you that.  She wanted nothing to do with

24  them, and that's why she didn't work for them.  But she had a

25  vivid memory of Todd Chrisley instructing Braddock to sign

United States District Court

1  documents.

2       And remember, the bank witnesses that came in,

3  multiple bank witnesses authenticated, they looked at Mark

4  Braddock's e-mails and they said, yep, I got that e-mail.

5  This isn't just something that Braddock doctored up and handed

6  over to the Government.  Multiple bank witnesses confirmed

7  Todd Chrisley was fully involved in the loan process.

8       You remember Simone Flack.  She testified that Todd

9  Chrisley was very involved in the loan application process.

10 James Askew testified that Todd Chrisley understood the items

11 on his personal financial statement.  Stan Kryder testified

12 that he had to regularly remind Todd Chrisley about late loan

13 payments.  And Steve Crowell testified Todd Chrisley was very

14 business savvy regarding the loans.  Each of these four

15 individuals identified Todd Chrisley.  They remembered dealing

16 with him personally.  Not just through an AOL account, not

17 through a phone call of somebody pretending to be Todd

18 Chrisley.  They pointed him out in open court.  They dealt

19 with him.  Todd Chrisley knew what was on these loan

20 applications.

21      So in 2012 right before the scheme collapses, he's

22 sending e-mails like this:  "Can you place this on George's

23 letterhead with his signature and then sign Julie's name below

24 George's."

25      So we talked about Todd.  Let's talk about Julie's

United States District Court

1   role in the conspiracy.  Because make no mistake, Julie was an
2   active and willful participant in this conspiracy.  Remember
3   Mr. Braddock's testimony that Julie commented to him that he
4   scrapbooked documents much better than she ever could.  She
5   had been doing this for Todd all along, only Mr. Braddock knew
6   how to do it better.

7           This is an e-mail from Mrs. Chrisley's AOL account
8   that even Donna Cash says she never saw Mark Braddock
9   accessing.  And what is Mrs. Chrisley directing Mark Braddock
10  to do?  She is directing him to change the postdate on a
11  check.  And what does Braddock do?  He does as he's directed.

12          Remember, the Chrisleys earned tens of millions of
13  dollars from this loan fraud scheme.  And from the defendants'
14  summary chart, what did Mark Braddock get?  He got a lot of
15  money.  Make no mistake, he got over $5 million.  But it's no
16  where near the amount that Todd and Julie Chrisley got.  And
17  of course, what happened, as we heard yesterday from their own
18  witnesses, Todd files for bankruptcy and walks clean away from
19  $20 million, just like they always do.

20          What other corroborating evidence do we have?  Now,
21  in opening statements Mr. Morris played those recordings of
22  Mark Braddock pretending to be Todd Chrisley.  And Braddock
23  said, yes, that was me, I did that.  Braddock probably did it
24  because Todd Chrisley was too busy jet-setting around the
25  country getting his hair cut.  Braddock calls in pretending to

1  be Chrisley.  Fine.  But what else did you hear?  You heard

2  Julie Chrisley calling in to report that someone had, quote,

3  stolen her check.

4       And what's important to remember about when these

5  calls are taking place, these calls from Julie Chrisley are

6  from July, September 2012.  All right.  That is after -- by

7  September of 2012, the Chrisleys and Braddock are dead to each

8  other.  They all hate each other.  But Julie Chrisley is

9  calling to report someone stole her check.  She told the BP

10 Claims Fund that she was entitled to this money.

11      And most importantly, Julie Chrisley never said that

12 Braddock had filed false claims without her knowledge or

13 consent.  Why didn't she say that?  Because she knew he was

14 doing it.  He was doing as the Chrisleys instructed.  He was

15 their puppet.  He was their minion.  He did as he was directed

16 throughout the conspiracy.

17      But did the fraud end when Mark Braddock and the

18 Chrisleys parted ways?  No.  Because what do we see after

19 2012?  We see wire fraud and more scrapbooking.  We see more

20 fabricated bank statements.  We see more fabricated invoices.

21 We see more manipulated e-mails.

22      Let's talk about the wire fraud charge, what Julie

23 Chrisley is charged with.  She's charged with knowingly and

24 willfully submitting scrapbooked bank statements and a

25 fabricated credit report to a realtor.  This is a house they

1  were trying to rent in California.  This is from her maiden

2  name, the Julie Hughes e-mail account.  This is the e-mail

3  going to the realtor.  And remember, the realtor only dealt

4  with Julie Chrisley, didn't know who Donna Cash was.

5          And what's attached to this?  A bank statement and a

6  link to a Google Drive account.  And of course, when I asked

7  Donna Cash about Google Drive, what's her response?  "What's

8  Google Drive"?

9          But that's not it.  Mrs. Chrisley also sent these

10  documents to her husband.  And look at what Agent Ryskoski

11  found in that link there.  That's a link to the Google Drive

12  account.  More scrapbooking.  And you know what.  Mark

13  Braddock was right.  He was much better at scrapbooking than

14  Julie Chrisley.  Look at this thing.  It's off center.  The

15  numbers aren't matching up.  Mark Braddock was much better at

16  scrapbooking, which is why he was the one sending the

17  documents.

18          Julie Chrisley even used her own mother's credit

19  report to try to convince this realtor to give them this

20  property, a realtor, who by the way, never got late payments,

21  yet again somebody else the Chrisleys aren't paying, and was

22  forced to sue the Chrisleys.  And again, where were these

23  documents found?  They were found in the Google Drive account

24  that Julie Chrisley controlled.

25          But was that the end of the fraud?  No, because Todd

                      United States District Court

1  and Julie Chrisley knowingly and willfully sent scrapbooked

2  invoices and banking documents and manipulated e-mails to

3  third parties years after they parted ways with Braddock.

4      Now, Judge Ross just read you an instruction on what

5  are called similar acts. And I want to go through this with

6  you because it's very important. You're going to get -- you

7  got the instruction that they're not charged with what I'm

8  about to talk about, but you can use that evidence to

9  determine whether or not they had the state of mind or the

10 intent necessary to commit the crime charged in the

11 indictment. You can use this evidence to determine whether or

12 not they had a motive or opportunity to commit the acts

13 charged in the indictment. You can use this evidence to see

14 whether or not they acted according to a plan or in

15 preparation to commit a crime. You can use this evidence to

16 determine whether or not they committed the acts charged in

17 the indictment by accident or mistake.

18     And most importantly, you're going to be told this:

19 If you find the defendants committed allegedly similar acts on

20 other occasions, you may use this evidence to help you decide

21 whether the similarity between those acts and the ones charged

22 in this case suggest the same person or people committed them

23 all. So what does that mean? Look at these fake invoices.

24 It's exactly what they were doing with Braddock. They didn't

25 stop doing it when Mark Braddock parted ways. They're making

1   millions of dollars at that point and they're

2   nickel-and-diming production companies, sending fabricated

3   invoices for chairs and furniture.

4           This is the arrogance of these defendants.  They got

5   away with it when they parted ways with Braddock, and they

6   thought, we might as well keep doing it.

7           Was it just these two invoices?  No.  You heard from

8   Agent Ryskoski.  Todd Chrisley in an e-mail that he controlled

9   falsely told his production company that a single Delta ticket

10  cost $2,300.  He's trying to scam his production company out

11  of a measly thousand dollars when the guy is making over a

12  million dollars from his reality television show.

13          Todd Chrisley deleting a reference to where money is

14  coming from when he's trying to satisfy an IRS tax lien.

15          Todd and Julie Chrisley sending the same exact

16  cashier's checks to two different lenders of proof of

17  available cash on hand.  This is when they're trying to buy

18  property for their daughter Savannah and they're trying to buy

19  property for themselves.  Agent Ryskoski walked through the

20  cashier's checks.  And they presented nearly simultaneously

21  the same cashier's checks to both lenders as proof of

22  available cash on hand.

23          But what happens?  Julie Chrisley forwarded the

24  complete set of documents to Todd Chrisley that indicated that

25  the money went actually into their daughter's account.  And

                    United States District Court

1   what does Todd Chrisley tell her?  "this isn't what I asked

2   you to do.  Why would I want to show that the money went into

3   Savannah's account?  How stupid is that?  I merely asked for

4   copies of the damn cashier's checks to show we had the money."

5   This was the same scam, just after Braddock left the picture.

6           You heard from a gentleman named John Murfee.  He was

7   from Private Wealth banking at Bank of America.  Came down

8   from Nashville.  He testified very briefly the first week.

9           Let's go back to the 800 series.  Now, I neglected to

10  mention that the way the counts are structured, Counts 2

11  through 6 are the substantive bank fraud counts.  You will

12  find the corresponding exhibits at Government's Exhibits 802,

13  803, 804, 805 and 806 for each of those substantive counts.

14  But this is a compilation exhibit.  This is just one of the 17

15  personal financial statements that Braddock was sending on

16  behalf of Todd Chrisley claiming falsely that Todd had

17  $4 million at a Merrill Lynch account.

18          And what happens four years later, four years after

19  they parted ways with Braddock, four years after they

20  apparently learned he had committed this loan fraud scheme

21  behind their back?  Julie Chrisley is e-mailing Bank of

22  America saying that to the penny Todd Chrisley had $4 million

23  in cash and marketable securities.

24          Ladies and gentlemen, this evidence corroborates

25  everything Mark Braddock told you.  The Chrisleys were not

 1  somehow victims here.  They were the beneficiaries of a fraud
 2  that they willingly took part in for years.
 3        So what have we heard throughout this trial?  Well,
 4  you did hear from Lindsie Chrisley.  Lindsie Chrisley
 5  testified about her interactions with her father.  She also
 6  testified about an e-mail that she sent to FBI Special Agent
 7  Ryskoski in 2020.  And one of the things she wrote was:  "His
 8  attempts to create conspiracy theories around his current
 9  situation are old and tired."  And they are old and tired.
10  It's Mark Braddock's fault.  It's Alina Clerie's fault.  It's
11  Donna Cash's fault.  It's the Georgia Department of Revenue's
12  fault.  It's our lawyers' fault.  It's the accountant's fault.
13  It's the IRS's fault.  It's Bank of America's fault.
14        What is at the center of all of that?  Todd and Julie
15  Chrisley.
16        This is not just a case about fraud and tax evasion.
17  It's about greed and people who think they are above the law.
18        The last thing that Lindsie Chrisley wrote to Agent
19  Ryskoski was this:  "It really gives you zero hope in the
20  system.  This proves that with a little money and power you
21  can get away with anything."  Well, I'll tell you one thing,
22  Lindsie Chrisley was wrong when she wrote this; because in
23  this country, it doesn't matter if you're a self-made
24  multimillionaire, it doesn't matter if you're a highly trained
25  certified public accountant, and it certainly doesn't matter
              United States District Court

1  if you're a reality television star, the law is the law and
2  everyone must be held accountable when they break the law.

3      So I ask you to do two things.  You've heard a lot of
4  evidence in this case.  I ask you to do two things and two
5  things alone while you deliberate.  Number 1, follow the law,
6  the law that Judge Ross and Judge Ross alone instructed you on
7  earlier.  And weigh the evidence, the evidence that you heard
8  throughout the course of this trial.  I'm confident that when
9  you do those two things you will find each of these defendants
10 guilty of the crimes they're charged with committing.

11     Thank you.

12     THE COURT:  All right.  Thank you.  Ladies and
13 gentlemen, five-minute stretch break and we'll proceed with
14 our next argument.  Thank you so much.  I know there are only
15 a couple of restrooms back there so if it goes a little beyond
16 that, I understand, but as quickly as you can.  Thank you.

17     **(The jury exited the courtroom at 11 a.m., after**
18 **which the following proceedings were had.)**

19     THE COURT:  Five minutes.  11:05, if we can.  11:05,
20 if we can.

21   **(A recess was taken at 11 a.m.)**

22     THE COURT:  You-all may be seated or remain standing.
23 Apparently there's some technological issue up here that we
24 have to address.

25            **(brief pause)**
                United States District Court

1    THE COURT:  All right.

2        **(The jury entered the courtroom at 11:10 a.m., after**

3 **which the following proceedings were had.)**

4    THE COURT:  The jury is seated.

5    Everyone may be seated.

6    All right.  On behalf of Todd Chrisley, are you ready

7 to close?

8    MR. MORRIS:  I am, your Honor.

9    THE COURT:  All right you may proceed.

10    MR. MORRIS:  Thank you, your Honor.

11    May it please the Court.

12    THE COURT:  Yes, sir.

13    MR. MORRIS:  The world we live in is a pretty scary

14 place.  It's more comfortable if we assume that only reckless

15 people get into accidents, only unhealthy people get serious

16 illnesses, and only guilty people have to face going to trial.

17 But, of course, we know that's not true.  Careful people get

18 into accidents, healthy people get sick, and innocent people

19 get indicted.

20    That is why the law requires, requires that we

21 presume people who come into this court are innocent.  And

22 they remain innocent unless and until the Government proves

23 them guilty beyond a reasonable doubt.

24    The Chrisleys do not have to prove their innocence.

25 They come into this courtroom innocent.  And they stay that

United States District Court

1   way.  The Government must prove guilt beyond a reasonable
2   doubt.  And if it fails to do so, your duty is to acquit.

3          Proof beyond a reasonable doubt the Judge will tell
4   you is proof so convincing that you would be willing to rely
5   and act on it without hesitation in the most important of your
6   own affairs.

7          A reasonable doubt is a real doubt based on your
8   reason and common sense after you've carefully and impartially
9   considered the evidence in the case.

10         I suggest to you that Mark Braddock is the very
11  picture of reasonable doubt.  There's only one person in the
12  world that anyone is aware of that says Todd Chrisley wrote
13  those handful of e-mails that were presented to you by Mark
14  Braddock.  He is the only person in the world who produced
15  those e-mails.

16         The e-mails he produced are not in AOL's records.  A
17  search warrant was served on AOL.  They produced all of the
18  records in Todd Chrisley's AOL account, mchrisley1@aol.com.
19  None of those documents that Mark Braddock said were on his
20  hard drive came from that AOL account.

21         This same person admitted sending e-mails as Todd to
22  Fannie Mae.  He is the same person who claimed to be Todd
23  Chrisley in multiple calls to the BP Oil Fund.  He is the same
24  person who sent e-mails fabricated as Jackie Barker.  He is
25  the very person who claimed he was Santiago Arana when it fit

                    United States District Court

1  his purpose to do so.  He is the same person who had others

2  sign his name for him so he would have deniability and say it

3  wasn't me.  He wrote and sent e-mails that were made up as an

4  insurance investigator, Thomas K. Taylor, Jr.  He lied about

5  access to people's passwords and e-mail accounts, including

6  Todd.  You know that from Tonya Claytor.  You know that from

7  Lee Nicholson.  You know that from Donna Cash.

8         He was seen by Donna Cash falsifying e-mails in

9  Todd's AOL account.  He had his own e-mail account on one

10  screen.  He wrote an e-mail.  He sent it to Todd.  He had

11  Todd's e-mail account open on the other screen.  He composed

12  an e-mail from Todd and sent it back to him, saved it, and

13  deleted it from Todd's.

14         How do we know that?  How do we know he deleted it?

15  Because he didn't show up when AOL brought in all the records.

16  The only place it showed up was in the hard drive that Mark

17  Braddock provided to the Government when he came in to protect

18  himself.

19         He created false e-mails that he said Alina Clerie

20  sent.  Alina Clerie got on the witness stand.  She's no friend

21  to Todd.  She was shown e-mails that supposedly Mark Braddock

22  told you he sent to her, she commented and sent back.  She

23  said, I've never seen these.  Someone must have got into my

24  e-mail account.  Well, the only person who could have done it

25  is the person who sent it, Mark Braddock.

United States District Court

1           Mark Braddock is the person who actually committed

2    every single crime in the bank fraud conspiracy count and in

3    the substantive counts.  By his own admission, he is the same

4    person you heard say he would stop at nothing to get revenge

5    against Todd Chrisley.  He is the same person who after Todd

6    Chrisley caught him deceiving him and confronted him in

7    December of 2010, since that time, not a single false

8    financial statement was sent to any bank.  Not a single false

9    tax return was sent to any bank from the day that Todd

10   Chrisley was told about Mark Braddock deceiving him and cut

11   him off.

12           Braddock is the same person who admitted to you that

13   he had perjured himself, lied under oath over and over and

14   over.  He admitted that he lied to the FBI when he met with

15   them multiple times and promised and understood he was to tell

16   the truth.  He lied over and over to you in this trial.

17           Now, how did all this happen?  How could it come

18   about?  As Mr. Braddock himself told you, he meets Todd.  He

19   worms his way into Todd's life.  He impresses Todd with his

20   skills.  He says, Todd, I can run this company for you.  I

21   know what I'm doing.  I can make this happen for you.  And why

22   does he want to do this?  Because he wants to be as close to

23   Todd Chrisley as he can possibly be.  Mark Braddock wants to

24   be the man, Todd's guy.

25           Todd is seeking loans.  The banker says we're going
                    United States District Court

1   to need this information.  Mark Braddock says to Todd and the

2   banker:  I got this.  I'll handle it.  And every banker told

3   you when Todd Chrisley would come in and talk about getting a

4   loan, who was with him?  Mark Braddock.  What would the banker

5   say?  I need this information.  What would happen then?  Todd

6   Chrisley would say to Mark Braddock, take care of it.  Who did

7   the banker talk to after that?  Mark Braddock.  Who sent the

8   documents?  Mark Braddock.  Mark Braddock puts together the

9   paperwork that is necessary with whatever information he puts

10  on there, whatever he makes up to get it done, signs Todd's

11  name, which he admits, and sends it to the bank.  Loans are

12  approved and Mark is the hero.  See, Todd, I got you these

13  loans just like I said I could.  I'm your man.  And Mark

14  Braddock seems as good as he said he was.  He took care of

15  everything, just like he said he would.

16      And then when Todd Chrisley comes back from

17  California in December 2010 and is told of what Mark Braddock

18  has been deceiving him with, Todd says to Mark Braddock:  You

19  stay away from my business and my family's business.  No more

20  are you involved with any of my business affairs.  Mark

21  Braddock is no longer the man.  He has fallen out of favor and

22  Braddock turns on him.

23      He begins to resent Todd.  He plots against him even

24  more and more.  In 2012, June and July, Todd discovers more of

25  the evil that Mark Braddock has done.  He confronts him.  He

1  terminates him.  He makes him leave the building, and he tells
2  him, you're going to be arrested for the fraud that you have
3  committed.

4         What happens immediately after that?  For the first
5  time ever, these fabricated e-mails magically appear, out of
6  thin air, unseen by any human being up until that point,
7  existing only on a hard drive that Mark Braddock has, his hard
8  drive.  Nowhere else.  Why are they only there?  Because
9  that's where they were created by Mark Braddock.  And Mark
10 Braddock runs to the federal government.  He knows he's in
11 trouble.  He brings them 62,000 e-mails and documents that he
12 produced from his personal hard drive.

13        Now, in my opening, I said an expert would come and
14 tell you that it was clear that someone had invaded the
15 e-mails of Todd Chrisley.  We didn't need to bring that
16 expert.  We didn't need to bring that expert because it was
17 clear that Todd Chrisley didn't create these e-mails, that
18 Mark Braddock did.

19        If the e-mails Braddock produced in his hard drive
20 were really from Todd, they would be in AOL's records.  You
21 just can't go on your computer and delete something and make
22 it disappear from AOL or Google or whoever carries your
23 e-mail.  It stays there.  It may not be on your laptop
24 anymore, but it doesn't disappear.  The reason AOL didn't
25 produce it when they responded to the search warrant is

1  because it didn't exist in their records.  This was strictly
2  Mark Braddock.  So AOL documents aren't there.
3      And let's be clear, I have a great deal of respect
4  for the FBI.  When I questioned Agent Ryskoski, I showed him
5  respect that he deserved.  But you know what else that means?
6  My respect for the FBI is so great that I will tell you, if
7  those e-mails that Mark Braddock produced saying were from
8  Todd, you know the Government would have brought in a witness
9  from AOL to say, yes, these are real, we have them in our
10 system.  That didn't happen.
11     You know that if those e-mails were real, you bet the
12 Government would have a forensic computer expert from the
13 fancy laboratory in FBI headquarters in Washington, D.C., come
14 in here to say, yes, we examined and analyzed Mr. Braddock's
15 hard drive and those e-mails are real.  You didn't hear that
16 expert.  No such person testified.  And you know why?  Because
17 those e-mails aren't real.  They never really existed except
18 in Mr. Braddock's computer where he created them.  They are a
19 fantasy creation of Mark Braddock, just like the fantasy
20 creation of Thomas K. Taylor, Jr.
21     May I see that e-mail?
22     Thomas Taylor.  This is the wonderful e-mail that
23 Mr. Braddock sent to Chubb Insurance to try and get Todd
24 Chrisley in trouble after he had gone to the feds and no
25 charges were brought.  He represents himself as an insurance

1   watchdog, Thomas K. Taylor, Jr., a fantasy creation just like

2   his wishful fantasy creation of a personal, intimate

3   relationship with Todd that started in 2003, according to his

4   testimony.  Or was it 2005, as he told the FBI?  And did it

5   last for six months as he told the FBI or did it last for a

6   year, as he told you?

7           It's a fantasy.  There's no evidence.  There are no

8   texts.  There are no love letters.  There are no photographs.

9   There are no videos.  There are no greeting cards.  There are

10  no witnesses.  Nothing but Mark Braddock, or should I say the

11  fantasy human being, Mark Chrisley.

12          May I see that, please?

13          This tells it all.  As late as October of 2021, Todd

14  Chrisley, no, Mark Chrisley with his telephone number.  It has

15  to be him.  You can't do a telegram listing without your own

16  cell phone being used where you verify this is me, this is my

17  cell phone number.  Mark Chrisley, another fantasy of Mark

18  Braddock.

19          You cannot rely on the lies of Mark Braddock as proof

20  so convincing that you would be willing to rely and act on it

21  without hesitation in the most important of your own affairs.

22  Think about that.  Think about that.

23          Would you take this man's word on where to invest

24  your life savings?  Would you?  Of course you wouldn't.  He is

25  unbelievable.

                United States District Court

1      Mark Braddock sold his lies to the Government to save

2  himself.  He admitted that.  Yeah, I went to the Government

3  because I knew I needed to save myself.  He sold his lies to

4  the Government to get revenge against Todd and Julie.  He

5  admitted that on the witness stand.  Do not honor his lies.

6      The Government has made a deal with a bad man back in

7  2012 and they got stuck with him, the man who committed every

8  one of the bank fraud charges and answers for nothing.  No

9  criminal charges against him for bank fraud, perjury, false

10  statements, mail fraud, forgery, wire fraud, Fannie Mae fraud,

11  BP OIL fraud.  No charges.  Not a penny forfeited to the

12  government for what he did.  Not a penny was he required to

13  pay back to any bank.  And he never will be required.  His

14  deal was to blame Todd and Julie and to walk away Scot-free.

15      Do not reward him by believing his story and allow

16  him to ruin these people.

17      Without his story, the Government does not have

18  evidence beyond a reasonable doubt.  There is no other human

19  being in the world who says that Todd Chrisley submitted false

20  information to a bank.  Not a single one of the Executive

21  Asset Management employees ever saw or heard anything from

22  Todd Chrisley about false information and a bank.  It's

23  supposed to be going on rampantly, three to five a month with

24  Mr. Braddock.  No one saw Todd Chrisley do anything like that.

25      Not a single one of the more than 30 employees at CAM

United States District Court

1  ever saw or heard Todd Chrisley do anything like that.  Why?

2  Because Todd Chrisley didn't do it.  Mark Braddock is lying.

3       Most importantly, not a single banker that took the

4  stand ever said Todd Chrisley told me something that wasn't

5  true.  Not a single one.  In fact, two of them said, during

6  the worse financial crisis of the real estate world, when the

7  banker actually described it as the world was on fire and

8  thousands and thousands of borrowers failed and walked away,

9  Todd Chrisley tried to help salvage something for the banks.

10      Mr. Kryder, James Kryder, from the Midtown Bank said

11  Todd helped when everything tanked.  That he ultimately lost

12  everything and had to file bankruptcy is not a crime.  That

13  the investments he made ended up losing all of the money he

14  had borrowed from the banks is not a crime.  If it were,

15  thousands of real estate investors who failed during that time

16  would be in court with us.

17      Maybe Todd should have paid more attention.

18  Unfortunately, he didn't.  But it's not a crime that he was

19  not there at work every day, that he left Mark Braddock in

20  control, that he took careful of his daughter when she was

21  sick and troubled, that he spent time with his son instead of

22  being at the office when his son was fighting a drug

23  addiction, that he stayed and nursed his wife when she had

24  breast cancer and mastectomy surgery, that he spent what time

25  he could with his father while his father was dying.

1    He's not charged with maybe he should have known,

2  maybe he could have known.  He's not charged with being

3  careless.  He's being charged with deliberately defrauding

4  banks in a conspiracy with Mark Braddock.

5    There simply was no conspiracy with Mark Braddock to

6  defraud banks.  There is no evidence of an agreement with Mark

7  Braddock.  In fact, the evidence contradicts that.  Mark

8  Braddock is lying to Todd Chrisley.  He's falsifying e-mails.

9  He's keeping him in the dark.  He's telling others to lie to

10  him.  He is stealing money from him.  He is signing his name

11  without his knowledge.  He went behind his back to start a

12  competing business.  These are not the acts of brothers in a

13  conspiracy together.

14    Mr. Braddock, I submit to you, is the very definition

15  of reasonable doubt.  He's been terrorizing Todd and Julie

16  Chrisley now for ten years.  This misguided prosecution has

17  imposed a terrible burden on Todd and wreaked havoc with his

18  life and the lives of his family.

19    But you are jurors in an American courtroom and,

20  thankfully, you have the right and the duty and the power to

21  right this wrong, to lift this terrible burden, by reaching

22  the only verdict justice requires with regard to these bank

23  fraud charges 1 through 6, and that is a verdict of not guilty

24  for Todd Chrisley.

25    As to the tax charges, Count 8 of the indictment

 1  charges Todd and Julie and Peter Tarantino with conspiracy to
 2  defraud the IRS, to cheat the government.  Count 9 charges
 3  Todd and Julie with trying to cheat the IRS out of the payment
 4  of Todd's 2009 tax debt.

 5          Let's go back a minute.  Todd Chrisley filed his 2009
 6  return.  George Grimsley filed it in September of 2010.  He
 7  owed a bunch of money.  He believed at that time that $250,000
 8  had been sent in by Mark Braddock from CAM toward paying the
 9  taxes that were owed.  He was told that.  George Grimsley
10  worked to set up a payment plan for the balances that was
11  owed.  What Todd didn't know is the $250,000 hadn't been sent.
12  It was a lie.  And when he asked for proof of it later, Mark
13  Braddock gave Donna Cash a dummied up check to give to Todd to
14  make it look like it had been paid.  So here he is not knowing
15  that he's in serious debt to the IRS.

16          And then what happens immediately thereafter?  The
17  bottom fell out of the real estate industry.  Todd is
18  insolvent.  He goes to a lawyer, Robert Furr, and says:  Do I
19  need to file bankruptcy?  I'm upside down.  I can't pay these
20  things.  And this gentleman says, yes, you can file
21  bankruptcy.  You can wipe everything out but your taxes.  But
22  if you wait a little while, you can even wipe out your taxes.
23  But you'll still have to deal with the bigger creditors.
24  You've got $20 million staring at you from Rialto Capital.  My
25  advice is to take care of that first, worry about the taxes

1   later.

2          So even though he could have waited and wiped out the

3   tax debt, he chose to do what the lawyer recommended, which

4   was to take care of the biggest creditor first and work for

5   the taxes later.

6          So he files bankruptcy.  And from 2012 to 2015 he is

7   in bankruptcy.  And the trustee has all of his assets,

8   whatever is left, and the money and it's frozen and it's

9   unable to be paid to the IRS because the trustee won't release

10  it.  And, in fact, the trustee didn't release it until 2018

11  when he allowed $93,000 to go to the IRS.

12         So he's in bankruptcy.  2011 and 2012 he has hardly

13  any income.  He is introduced to Peter Tarantino.  Peter

14  Tarantino is now going to try and handle and straighten out

15  their finances and get their tax returns prepared and filed.

16  Because of all the losses that Todd has incurred, both he and

17  Julie believed that they're really not going to owe any taxes

18  for 2013 and 2014.  And it turns out they were correct.  They

19  didn't owe anything for those years.

20         Mr. Tarantino is working to organize information that

21  he has.  He's having difficulty getting information that he

22  needs to complete returns.  Mr. Furr tries to help him get

23  some documents from the bankruptcy court.  Mr. Grimsley tries

24  to help.  Mr. Tarantino is, indeed, very slow in his work.

25  And in all honesty, too slow.  Not diligent.

1    The returns were not completed and filed on time.
2 But there is no conspiracy among and between Mr. Tarantino and
3 the Chrisleys to cheat the Government or willfully evade
4 paying taxes.  Some taxes are paid, even though returns are
5 not filed.

6    Properties are sold.  Todd works with the sale of the
7 properties to get money to IRS when liens are put on there.
8 Monica Gilroy testified Todd was most interested in trying to
9 make sure whatever funds he could get out of sales of these
10 properties went to the IRS.

11    Agent Carter asks for information from the Chrisleys.
12 Mr. Tarantino says to the Chrisleys, would you give me this
13 information.  They get him the information.  The information
14 is given to Agent Carter.

15    Not only is there no evidence of a conspiracy to
16 cheat or evade, there are numerous e-mails that Mr. Salinski
17 and I went through yesterday.  You'll find them in the 900
18 series of the defense exhibits.  But in essence, it's Todd or
19 Julie contacting Mr. Tarantino and asking:  What else do you
20 need from us to complete the returns?  What's the status of
21 our returns?  When will the returns be ready?  How much do we
22 owe?  How can we get it paid?

23    And Peter responded, maybe not promptly, probably
24 should have admitted I'm a little overwhelmed here, I'm over
25 my head, I haven't finished it yet, I'm working on it, but he

1  didn't.  Unfortunately, there was no way for Todd Chrisley to

2  work out with the IRS a payment plan for what he owed from

3  2009 because, as Agent Carter told you, you can't work out a

4  plan until all of your tax returns are filed.  And 2013, '14

5  and '15 had not been completed by Mr. Tarantino and were not

6  filed, so he couldn't work out a payment plan.

7          Well, Mr. Tarantino keeps working trying to get the

8  right numbers, trying to find out from the IRS exactly how

9  much is owed.  Again, some payments are made.  The plan is to

10 sell a warehouse full of furniture, auction it off, take the

11 money you get, turn it into the IRS, pay down to 2009 taxes.

12 Whatever doesn't sell, you donate to the charity and you get a

13 current deduction for that.

14         Unfortunately, the Georgia Department of Revenue

15 grabbed it, held onto it, and made it impossible to sell.

16         Is it true that they didn't act quickly enough?  Yes.

17 But that's not what they're charged with.  Is it true that

18 they may not have paid enough attention to getting it done?

19 Yes.  But that's not what they're charged with.  They are

20 charged with a concerted effort to evade and they did not.

21         Peter Tarantino worked to get things done.  Todd and

22 Julie Chrisley followed his advice and asked him what do we

23 need?  What do you need?  What do we need to do to get this

24 done?

25         January of 2018, Mr. Tarantino finally sends what he

United States District Court

believes are the final returns for 2013, '14 and '15. They are received by Todd and Julie and they are all wrong.

A conspiracy? He had not included a huge deduction to the benefit of the Chrisleys. Now, if he's conspiring with them to beat the IRS out of money, he would have put that deduction in there because it favored the Chrisleys and hurt the IRS. It's not there. So they're wrong.

So he works on them again. And they're still not right. And then the IRS and the FBI issue the grand jury subpoenas and Todd and Julie and Peter Tarantino know this has got to get done ASAP. And they work faster.

Peter does another draft return and files it. Turns out it's wrong. It has to be amended. It has to be amended again. And it took a long time. But the taxes were fully paid, penalties and interest.

Bruce Seckendorf told you they even overpaid a little bit. Betty Carr said she thought maybe they owed something. I said, how much? She said, I don't know. I said, if you find evidence of that, please bring it back and show us. She didn't come back because they don't owe anything.

It's not a crime that they were slow. It's not a crime to rely on your CPA and your attorney. The judge will tell you it is a complete defense to rely on the advice of your attorney and your CPA.

Maybe they should have paid sooner, but failing to

1  pay on time is not a crime.  Should they have been penalized

2  and charged interest?  Yes.  They were, and they paid it.  Do

3  you have to agree that it was okay for them to spend money on

4  other things and not prioritize paying taxes?  No, you don't

5  have to approve of that, but that is not a crime.  They are

6  charged with willful conduct.  And they did not in any way

7  conspire willfully to commit any criminal offense.

8       Members of the jury, when you go back to deliberate,

9  I want you to keep in mind that a jury is not a democracy

10 where a majority rules.  Your beliefs and doubts belong to you

11 and cannot be taken away for the sake of compromise.

12      The judge will instruct you don't give up your honest

13 beliefs just because others think differently.  When you folks

14 filled out your questionnaires, you promised to be truthful,

15 to be fair, to decide this case on the evidence, to hold the

16 Government to its burden.  You said you would and we believed

17 you.

18      When you came into this courtroom for follow-up

19 questioning and you said you would abide by that, you said you

20 would and we believed you.  When we selected you as jurors and

21 the judge swore you in, you swore you would hold the

22 Government to its burden and we believed you.  We believed you

23 then and we believe you now.

24      This day is incredibly important.  But as important

25 as this day is to you, as time goes by, what you do today will

1  be a memory that dims and might even go away.  But I promise
2  you this:  What you do today will never be forgotten by Todd
3  Chrisley.  From the day of his birth to the day of his death,
4  this is the day that he will remember most.  This is the day
5  that he will live with, your decision, whatever it is.
6          On his behalf, based on the evidence in this case, I
7  ask you to make this a day of freedom.  I ask you to find him
8  not guilty of all counts with which he is charged.
9          Thank you.
10          THE COURT:  Thank you.
11          Ladies and gentlemen, step out for five minutes so
12  that we can get set up for the next argument.
13          Thank you so much.
14          **(The jury exited the courtroom at 11:43 a.m., after**
15  **which the following proceedings were had.)**
16          THE COURT:  You-all may be seated if you would like.
17  Thank you.  About five minutes.
18      **(A recess was taken at 11:44 a.m.)**
19          THE COURT:  We're going to go ahead and line them up
20  to come back in.
21          **(The jury entered the courtroom at 11:47 a.m., after**
22  **which the following proceedings were had.)**
23          THE COURT:  All right.  The jury is seated.
24          Everyone may be seated.
25          And on behalf of Julie Chrisley, you may proceed.

1      MR. ANULEWICZ:  Thank you, your Honor.

2      Ladies and gentlemen of the jury, thank you for your

3 attention over these past three weeks.

4      Julie Chrisley has been accused by the Government of

5 committing crimes she has not committed.  She has been accused

6 of committing things that she would never dream of committing,

7 and certainly not anything that the Government has proved

8 beyond a reasonable doubt.

9      Mark Braddock is a dangerous person.  He is a scary

10 person.  He is a twisted person.  He lies with practiced ease.

11 He lied to you on the stand and he lied to the Government.  He

12 lies, as he just said to you on the stand, just to lie.  He

13 does so for his own purposes.

14      He worked his way into the Chrisley's lives, stole

15 their identities, to enrich himself and take over what he

16 thought he was owed.  He targeted and went after Todd Chrisley

17 but also Julie Chrisley and Todd Chrisleys' kids.

18 Unfortunately, Mark Braddock had the ability, the smarts and

19 the drive to do these things.

20      Every single witness that appeared on that witness

21 stand testified that Mark Braddock had complete and absolute

22 access to all financial records, personal records and other

23 account information for the Chrisleys, including their e-mail

24 accounts.

25      Every single person that got on the stand testified

                  United States District Court

1   that Mark Braddock pretended to be Todd Chrisley.  People got

2   on the stand.  It wasn't just Todd Chrisley.

3        Lee Nicholson testified that Mark Braddock used his

4   e-mail account to pretend to be Lee Nicholson and send

5   fraudulent information.

6        Donna Cash testified that she saw Mark Braddock doing

7   these things and he used her e-mail to send fraudulent

8   information.

9        Dawn Marie O'Connor testified that Mark Braddock

10  tried to send fraudulent information to Freddie Mac.  Todd

11  Chrisley is the one that stopped it and blew a huge deal that

12  would have kept Chrisley Asset Management alive because it was

13  the wrong thing to do.

14       George Grimsley sat up there and testified to you

15  that Mark Braddock used his identity to create information

16  appearing like George Grimsley.  It was not just Donna Cash.

17       And Ms. Cash sat up there and testified to you.  She

18  has given that testimony for the past 12 years.  She has told

19  that Mark Braddock has done these things.  She has sworn to

20  them in affidavits.  She has put them in depositions and she

21  was uncontradicted on the stand.  She did this without any

22  promise, favor, or immunity.  She put herself at risk for

23  doing those crimes along with Mark Braddock that had

24  irreparably harmed these good people.

25       Now, these people that were on the stand also
                    United States District Court

1  testified that Mark Braddock spied on the Chrisleys and that

2  they were unaware of his conduct.  They were told to lie

3  regarding the business.  They were told to lie regarding the

4  accounts.  They didn't have access to it.  The Chrisleys were

5  naive in trusting him.  They misplaced their trust.

6      Now, with regard to Julie Chrisley, the only person

7  that ever said Julie Chrisley was involved in a conspiracy was

8  Mark Braddock.  Not one other person on that stand testified

9  that Julie Chrisley had done a thing wrong.  The only

10 documents, as Mr. Morris pointed out, that the Government used

11 are ones on Mark Braddock's hard drive, the fake QuickBooks,

12 the fake e-mail accounts, the fake dummied-up document that he

13 used.  Where did they get them?  Mark Braddock.  Nowhere else.

14      They have the power of the federal government to

15 issue search warrants, subpoenas.  They looked at this case

16 for ten years and that's all they had.  They knew about Donna

17 Cash for ten years.  Lee Nicholson.  George Grimsley.  They

18 never picked up the phone to call her.  Why?  Because it

19 wasn't the story they wanted to tell.

20      That story began when Todd and Julie Chrisley found

21 out about the fraud.  They blew the whistle in 2012.  They cut

22 Mark Braddock off.  They went to the police.  They filed

23 lawsuits.  They put into the public record what was going on.

24 Ask yourselves why would they have done these things if they

25 were complicit and guilty?  They were not.

United States District Court

1          Now, the Government, in addition to not looking into

2    Donna Cash, not looking into these other things, you heard

3    them testify.  Alina Clerie, he sent documents that were

4    forged by me, false checks, false bank statements, false

5    financial statements, false accounting records.  And it says

6    from Alina Clerie.

7          I asked Agent Ryskoski, did you look into this?  No.

8    Did you look into any of the other frauds that were going on

9    to determine whether or not Mr. Braddock was a suitable person

10   to base your case on?  Didn't do that.  Did you look at

11   whether and why Braddock cut a $10,000 check to Alina Clerie

12   after the scheme was discovered and before she talked to the

13   FBI?  Didn't look into that.

14         The Government was so focused on trying to get Todd

15   and Julie Chrisley that they ignored what you saw on that

16   stand with Mark Braddock.  They ignored the lies.  They

17   ignored the hate from this man.  And they tried to put these

18   people and have them convicted.

19         He lied to the Government in their interviews in

20   2012, 2019.  He lied to you on the stand.  What did they

21   promise you?  If you lie you're going to jail.  He's not going

22   to jail.  They've put up with his lies for ten years.  If he

23   had to change his story, which he did, they're okay with that,

24   so long as the story comports with putting Todd and Julie

25   Chrisley in this courtroom.

                    United States District Court

1          Now, unfortunately, all this occurred at the same

2     time that, as Mr. Morris told you, we had the worse financial

3     crisis.  Todd and Julie Chrisley were in the real estate

4     business and their business and their real estate holdings

5     flushed out just like everybody else's during that time.

6          But remember what Mr. Morris said.  You heard

7     bankers.  They brought in bankers.  And they said -- not one

8     of them said that the Chrisleys lied to them.  In fact, every

9     one of them said they didn't deal with Julie Chrisley at all.

10    There is no evidence that Julie Chrisley did anything.

11         Now I want to talk to you about the specific counts

12    of the complaint.  It is critical for you to look at the

13    indictment that goes back with you and see what the Government

14    actually charged.  Because we have spent three weeks here

15    listening to tons of evidence that isn't in the indictment.

16         Count 1, conspiracy to commit bank fraud.  The Judge

17    has instructed you, and the indictment says, that Todd and

18    Julie Chrisley conspired with Mark Braddock to commit bank

19    fraud.  How are they conspiring with the person who has set

20    out to destroy them, with the person that is lying to them,

21    with the person who is giving them false information about

22    their finances?  They're not.  They're not conspiring with

23    that person.  He's acting against them.

24         The Government in its indictment doesn't point to one

25    piece of evidence that Julie Chrisley did anything wrong.  We

                    United States District Court

1 heard Mr. Krepp say that there's a document, an e-mail, where

2 Julie says postdate is the only thing that needs to be

3 changed.

4       Now, that came from who? Mark Braddock. From his

5 hard drive. But moreover, what does that mean? There's no

6 crime there. If that's what they're relying on, my God.

7       Julie Chrisley was not aware of Braddock's fraud.

8 She didn't participate in it and there is not one shred of

9 evidence that she did.

10       Counts 2 through 6 are the substantive bank fraud

11 claims. Those are easy. Those are easy. They say that in

12 Counts 2, 3, 4, and 6, it alleges that Julie Chrisley or Todd

13 Chrisley -- it doesn't really say -- provided false personal

14 financial statements on certain specified dates to Midtown

15 Bank, Gulf State Bank, United Community Bank and RBC Bank.

16       Not one piece of evidence that Julie ever submitted a

17 personal financial statement for any loan. Not one piece of

18 evidence that she did anything. Not one banker got up there

19 and told you that she did, because she didn't. I don't even

20 think Golf State Bank or UBC appeared in this case.

21       Count 5 says that Julie Chrisley provided a

22 fraudulent audit to RBC Bank. No evidence Julie Chrisley did

23 that. Never provided an audit to anybody. Every single

24 person that got up here and testified said: I didn't deal

25 with Julie on financials. I didn't deal with Julie. She

                United States District Court

1  wasn't around.  Every person said that.  Every person also
2  said that whenever accounting information and financials were
3  coming about, it was Mark Braddock was the one that was giving
4  them.

5         Counts 2 through 6 clearly show that Julie Chrisley
6  was not involved.

7         With regard to that audit, I ask you to remember
8  George Grimsley.  George Grimsley said, I never did an audit
9  of Chrisley Asset Management, just a half year one.

10        But when Todd Chrisley and his legal team discovered
11 the fraud in 2012, what did they do?  Did they go and hide it
12 and put it in a box?  Did they put it in Mark Braddock's
13 little box that he took to the Government?  No.  They took
14 those audited financial statements and said, hey, I found
15 these in Mark Braddock's office.  I found these.  George, are
16 these real?  George is like, heck, no, they're not real.

17        Why in the world would Todd Chrisley and his lawyers
18 show Mark Braddock that if he had participated in it.  What
19 did George Grimsley do?  He picked up the phone and he called
20 the police.  And Todd Chrisley said yes.  That's the act of a
21 conspirator?  No.  No, it is not.

22        The Government also says that Julie Chrisley
23 committed wire fraud.  Y'all remember that the Chrisleys were
24 going to have a house in California where they were going to
25 film a television show.  And Julie Chrisley filled out a

1  rental application and then she charged Donna Cash -- and it's

2  at the jhughes account -- to provide the information to the

3  real estate people.  Donna Cash said she did that.  She said,

4  I am the one.  No promise, no favor, admitted to a crime right

5  there on the stand.

6          And she said:  Listen, I didn't think I was doing

7  anything wrong.  The production company was on my behind.  I

8  had to make sure that we got this place rented so that we

9  could start filming.

10          What did she do?  She cut corners.  She did things

11  she ought not to have done, but she also said I did it, it was

12  not Julie Chrisley, because it wasn't.

13          They can snipe at Donna Cash.  You saw her.  She had

14  no reason to lie.  She put herself at risk.  And she has been

15  telling these stories for 12 years.

16          Moreover, the Government did not put on the jury

17  stand the owner of that house.  But we got into evidence that

18  the owner got paid $86,000 for a time that the Chrisleys

19  weren't even there and that he relet the house and doubled his

20  money.  That was Donna Cash.  It was not Julie Chrisley.

21          Conspiracy to defraud the IRS, Count 8.  Julie

22  Chrisley did not do it.  They say that 7C's Productions

23  company was set up to avoid the IRS knowing about Todd's

24  income.  You had a lawyer, Leron Rogers, say, no, this is the

25  type of company that needs to be set up because it is what the

1 production companies require and demand.  Leron Rogers then

2 said with 7C's we also had a separate talent contract that

3 Todd Chrisley signed, and that was the appropriate thing to

4 do.  And Todd and Julie Chrisley listened to Leron Rogers and

5 to George Grimsley and set that up.

6 You also heard from Robert Furr yesterday, the

7 bankruptcy lawyer.  Todd called him and said, should I put

8 7C's in my name?  No, you ought not to.  You have Rialto

9 Capital out there.  You have all of these other problems

10 and -- with regard to your creditors, and, no, Todd you ought

11 to just put it in Julie's name.

12 Asked point-blank one of the most respected

13 bankruptcy lawyers in this country did the issue of hiding

14 money from the IRS come up, he was like, heck, no.  That was a

15 minuscule debt compared to the other things we're doing, but I

16 advised him to do it and he did it.

17 Moreover, they say, well, it was hiding.  They hid

18 the stuff from the IRS with regard to 7C's.  Not true.  You

19 heard that Peter Tarantino and the Chrisleys when asked by the

20 Government to provide them with information, in fact, did it.

21 They provided them with all their accounts.  They provided

22 them also with what?  Pay stubs from Bright Roads.  That's the

23 production company that pays them for Chrisley Knows Best.

24 The Government had that information.  The IRS had

25 that information.  They knew where Todd Chrisley was getting

1  paid from.  They just simply didn't do anything with the
2  information.  But it's not because it wasn't provided.  They
3  had it.  No lies.
4        The Government also says, well, with regard to CEG,
5  who does the social media accounts, well, they put that money
6  into Faye's account hiding it.  Not true.
7        Bruce Secondorf on the stand yesterday, what did he
8  testify to?  He said that the money that went into Faye's
9  account was treated on the books and records of 7C's as 7C's
10 money.  The Faye tax return, the Schedule C, shows that money
11 going in the social media account and it says reported to
12 7C's.  The IRS knew it.  Nobody is hiding.  They told the IRS,
13 the people that are saying they were defrauded, they told them
14 where the money was.  And then it was reported on the 7C's
15 account and it was reported on whose account?  The Chrisleys'
16 tax statements.  All of it disclosed.  All of it in the open.
17 All of it.
18       Now, the Government also says, well, there's tax
19 evasion because Julie Chrisley had Faye Chrisley added as a
20 signatory on the 7C's account in March of 2017.  Oh, the
21 horror.
22       First of all, they say that the purpose of that was
23 to prevent the Government from finding Todd Chrisley's money.
24 7C's was set up in 2013.  Todd Chrisley has never been on that
25 account.  He has never been an owner of 7C's.  He has never
                    United States District Court

1  had a relationship with that.  So even when Faye is added to

2  the account, it has nothing to do with the Government looking

3  for Todd Chrisley.  It changed nothing, nothing.

4         And what does the evidence show?  The evidence shows

5  that the bank account was set up in order to allow Ms. Faye

6  Chrisley to sign checks for an ongoing project while the

7  Chrisleys were in California filming another show.  There is

8  no dispute with regard to that.  But there's also no dispute

9  that she was listed on the account, required by the bank to

10  provide these documentations to show that she had a right to

11  be there.  And that was as president of the company.  But in

12  all events, the bank showed that Julie Chrisley was still the

13  contact person.  E-mail, jchrisley1@aol.com.  She was the

14  person that the bank talked to.  She was the person that the

15  bank dealt with.  She was the person that the bank e-mailed

16  about 7C's.  The bank knew who owned 7C's.  And it was 7C's on

17  the account.  Faye was listed there in order that she could

18  cut checks.

19         Now, they say, well, wait a minute.  There had to be

20  an amendment to that board resolution.  My goodness, there's

21  something wrong.  No.  No, there's not.

22         You heard Bill Abbott, you heard Lindsie Chrisley and

23  Faye Chrisley, they testified that they went into that bank

24  with the documents that the bank told them to have and

25  Mr. Abbott, who pulled it off Legal Zoom, did something wrong.

United States District Court

1   And they fixed the thing that had to be fixed and brought it
2   into the bank the next day on March the 8th.  There is no
3   evidence to the contrary.

4        Mr. Krepp says, well, the bank didn't have records.
5   The bank didn't have records of anything.  They didn't have
6   records of the first board resolution.  They didn't have
7   records of the second board resolution.  And they don't have
8   it because, as the bank testified, that's not information that
9   they keep.

10       Mr. Krepp said, but what about Lisa Stone, the vivid
11  memory of Lisa Stone?  Ms. Faye Chrisley testified, as did
12  Bill Abbott, that they first went to the bank more than a week
13  before in order to try to do that.  Nobody was there.  They
14  had to go back March the 7th.

15       Ms. Stone said no, no, no.  They went back on March
16  the 6th.  I am positive.

17       What did we show you?  We showed you a production
18  schedule un-rebutted that showed that Julie Chrisley was in
19  production the entire day of March the 6th.  Faye Chrisley
20  testified to that.  Bill Abbott testified and Faye did that
21  they had gone the prior week.  There's no deception.

22       Ms. Stone, I am sure she is just misremembering.  As
23  we know, when people start to believe something, it kind of
24  firms in their mind.  But the evidence showed that she was
25  wrong.

                    United States District Court

1    Moreover, Ms. Stone said on the stand:  You know, I
2  wasn't the one dealing with Faye and Julie Chrisley on this.
3  I was just the lady that stood in the front of the bank.

4    Who dealt with Faye and Julie Chrisley?  A fella
5  named Benjamin Stranahan.  His name was mentioned.  Did they
6  bring Benjamin Stranahan here to talk?  No.  Why?  Because he
7  wouldn't fit their story.  He didn't come.

8    They also say that the Chrisleys in '15 and '16, you
9  know, filed tax returns without information.  You know, they
10 were working with Mr. Grimsley to get that done.  Todd
11 Chrisley was coming out of bankruptcy.  You heard multiple
12 people testify that CAM was still in bankruptcy and that
13 getting information was difficult, that they didn't have full
14 information to get their loans.  But in every single e-mail
15 between Todd Chrisley and Julie Chrisley and Peter Tarantino,
16 it said, get this done.  We want to get it out of the way.
17 Should it have gotten done earlier?  It should have.  It
18 didn't.  But they were not trying to avoid it.

19   Moreover, the Government says, well, what about these
20 draft bank accounts, the draft 2013 and 2014 tax returns?
21 What is the unequivocal thing that we know about those?  They
22 were grossly, grossly wrong.

23   The Chrisleys were telling Mr. Tarantino, listen, I
24 don't owe anything for these years, zero dollars.  What did
25 they end up owing for '13 and '14 undisputed?  Zero dollars.

United States District Court

They're trying to get that straight before they get the tax returns filed.

They next say, Count 9, tax evasion, that they evaded Todd Chrisley -- they evaded taxes by doing what in 2009?  A, there's no dispute that what they filed in 2009 was a correct statement of the Chrisleys' income.  Zero dispute.  But they say that because Todd and Julie Chrisley filed separately, married but filing separate, that's a crime.  It's a crime to take a form that the IRS provides to elect to do that thing that your accountant tells you is the right thing to do that year in order to save money on your taxes?  And they say that's tax evasion.  I mean, I better never fill out a form that the IRS gives me again.  They allow it.  It's allowed.  How is it tax evasion?  It is not.

The bottom line on the taxes is that Julie Chrisley owed nothing in '09, '13 or '14.  She had a little bit in some of the other years.  All of the taxes have been paid.  As Mr. Salinski talked to you, as Mr. Morris said, the Chrisleys, in fact, paid over $700,000 more than they owed in taxes.

Now, they didn't do that out of the kindness of their hearts.  It was a penalty.  That is what happens.  If you file late, you have to pay a penalty.  And they paid a huge penalty.  And that's where it ought to end.

Again, the obstruction is the same issue about setting up the Bank of America account.  There is no evidence

United States District Court

1  that the amended board documents were done on any other day

2  than the evidence shows that they were, March the 8th.  It is

3  absolute pure and utter speculation by the Government to say

4  otherwise.  They didn't put one person on the stand, didn't

5  give you one document, didn't do one thing to meet their

6  burden on that case.

7        Now, because they didn't have any of this evidence,

8  the Government flooded you with what they say is, well, these

9  are similar circumstances that you can look at.  None of them

10  are charged.  I think they're all pretty easily dealt with.

11        First of all, the Right-hand Man, Mr. McClendon I

12  think his name was.  They said, well, there's a false

13  statement that the Chrisleys sent, false invoice.  He got up

14  there and said, no, these are my invoices, I got paid.

15        You had Delta Bank, Pineapple House and Ken Knight.

16  Those were costs that the Chrisleys actually incurred -- two

17  pieces of broken furniture and a flight for Todd Chrisley and

18  his wife.  All right.

19        Donna Cash was being told by the production company

20  we've got to close our books.  She did something she ought not

21  to have done, and she created these invoices.  The invoices

22  said what Ken Knight, Pineapple House, and Delta actually

23  owed.

24        And fascinatingly enough, that the woman they brought

25  out from the production company that testified here, like the

1  bankers who never said that Todd or Chrisley did anything
2  wrong, she didn't say I was fooled, we didn't owe this money,
3  this wasn't something that was due to be reimbursed.  She
4  never said that.

5       Donna Cash took a shortcut that she should not have
6  taken.  But she also testified:  I did it on my own.  Julie
7  Chrisley didn't do it.  And, again, I thought that I was doing
8  it because the production company was pushing me to do it.
9  But that is not a crime that Julie Chrisley committed.

10      They point to this issue with regard to a wire to
11 Grayson, Todd's son.  What does the e-mail show that
12 Mr. Morris pointed out on cross-examination?  Look at the RE
13 line of the e-mail.  Grayson's wire, it says it right there.

14      The checks for Lindsie Chrisley, the bank wanted to
15 know the source of funds here.  The source of funds, this is
16 where we have it.  Made a loan to Lindsie.  She paid it back.
17 There's nothing there either.

18      All of this, all of this, is based upon speculation.
19 The Government didn't do anything in this case for ten years.
20 Mark Braddock came to them.  We're not listening.  Comes back
21 a couple of years later when he starts his campaign, going to
22 Channel 2 News, Jodie Fleischer, going to the insurance
23 company, going to the Department of Revenue, saying, you got
24 to go get the Chrisleys.  They're famous now.  They've got a
25 TV show.  Maybe makes them a little bit better target.  But

1  they do nothing for all these years.

2         The only evidence that they have is from Mark

3  Braddock.  And you heard every witness get up there and say

4  he's the one that did it.  Todd and Julie Chrisley didn't

5  know.  Should they have been more mindful?  Yes.  When they

6  were more mindful, what happened?  When they found it out, all

7  of this stopped.  When Braddock's out of the picture, it

8  stops.  No bank loans.

9         The tax issues they worked out.  They should have

10  been more diligent.  Mr. Tarantino should have been more

11  diligent.  But they were all paid.  There was no attempt to

12  evade.  In fact, the witnesses said that Todd didn't want to

13  discharge the $500,000 owed to the IRS.  He wanted to go ahead

14  and not have these houses go into foreclosure so that the IRS

15  could be paid.  He called Tarantino and said, listen, we've

16  got to get this done.  Julie Chrisley is not implicated in any

17  of that.

18         The Government has a massive burden in this case.  It

19  is to show that the Chrisleys are guilty beyond a reasonable

20  doubt.  That burden is on the Government, and they have not

21  met it.  We don't have a burden.  But what I will suggest to

22  you is that the evidence that came into this courtroom -- and

23  you sat there and you listened and you looked at the documents

24  and you evaluated the evidence.  And this is in your hands.

25  But it does not prove what the Government said.

         United States District Court

1          They picked something here.  They picked something

2    there.  They raised their voices and said this looks bad.  The

3    only things that were actually perhaps bad came from Mark

4    Braddock and his computer.  I asked him on the stand:  Is

5    there anybody in the known universe that can say this other

6    than you?  No.  I mean, I guess he told the truth that one

7    time.  I said:  Is there any document that you have to prove

8    what you have been telling the Government?  No.  But his

9    stories kept changing.

10          I ask you on behalf of Julie Chrisley to come back

11   with a verdict of not guilty on every single count because she

12   is not guilty and because the Government has not proven beyond

13   a reasonable doubt that she is.

14          Thank you.

15          THE COURT:  Thank you.

16          Attorneys, let me have you approach very quickly.

17          Be with you in just a second, ladies and gentlemen.

18          **(A discussion was held at the bench between the Court**

19   **and counsel, after which the following proceedings were had.)**

20          THE COURT:  All right.  Ladies and gentlemen, step

21   out.  Can we make this one four minutes instead of five?  All

22   right.  I know.  We're just trying to push through.  Thank you

23   so much and thank you for your patience.

24          **(The jury exited the courtroom at 12:20 p.m., after**

25   **which the following proceedings were had.)**

                    United States District Court

1          THE COURT:  Okay.  You-all may be seated.  We'll take

2     a couple of minutes.  I might call them back in in three

3     minutes, but I'm trying to avoid splitting up these last

4     arguments.  But I do have to send the jurors to lunch.  And I

5     have to do it, of course, that gives them time before the

6     cafeteria closes.  We're checking to see if we can get the

7     cafeteria to stay open just a few minutes longer for us.

8          So let's just take a quick stretch break.  Again, I'm

9     going to try to have them reenter in about three minutes, if

10    that's enough time for Mr. Griffin to get set up.  And no

11    attorney by that do I want to feel rushed at all.  We'll work

12    this out.

13         MR. GRIFFIN:  I appreciate that.

14      **(A recess was taken at 12:21 p.m.)**

15         THE COURT:  If you can get them back out.

16         **(The jury entered the courtroom at 12:24 p.m., after**

17    **which the following proceedings were had.)**

18         THE COURT:  All right.  The jury is just about

19    seated.

20         Everyone may be seated.

21         And you may proceed -- thank you -- on behalf of

22    Peter Tarantino.  Thank you so much.

23         MR. GRIFFIN:  So this happens to me a lot.  I come up

24    at the end.  But thank you for listening to me.  I now you

25    have listened to me.

                    United States District Court

1        You know, I'm going to give you my closing.  And you
2   need to know that Mr. Krepp, he's got 30 minutes to stand up
3   and argue in response to what you have just heard.  We don't
4   have another chance to get up and say anything.

5        I told you there would be days when you didn't hear
6   about Peter Tarantino.  So now is my opportunity to tell you.
7   And I'm asking you to listen to me again so that I can tell
8   you why Peter Tarantino is not guilty.

9        While it wasn't his burden to prove anything, I want
10  to point out some things that the evidence showed and that we
11  believe we proved.

12       If I said to you right now, look, a squirrel, that's
13  just a diversion tactic.  If someone says squirrel, it's a
14  diversion tactic.  And there are some squirrels in this case.
15  It's a diversion.  It has nothing to do with the charges
16  against Mr. Tarantino.  It has nothing to do about the charges
17  about taxes.  I'll point out the squirrel that I know about.
18  There may be more.  I have to count on you to recognize the
19  squirrels in this case.

20       Judge Ross instructed you as to what the law is.
21  She's told you that beyond a reasonable doubt is proof so
22  convincing that you would be willing to rely and act on it
23  without hesitation in the most important of your affairs.
24  Rely on it in the most important of your affairs, that means
25  health issues for your children, your spouse, yourself, the
                    United States District Court

1    most important issues in your life.

2         Count 8 of the indictment charges all three

3    defendants with conspiracy to defraud the IRS by impeding,

4    impairing, obstructing, and defeating the lawful functions of

5    the IRS.  What does that mean?  The essence of a conspiracy is

6    an unlawful agreement.  If there's no agreement, there can be

7    no conspiracy.  If there's no agreement to do something

8    illegal, there can't be a conspiracy.

9         Now, Judge Ross also told you that in order to find

10   Peter guilty, the Government must prove beyond a reasonable

11   doubt that Peter entered into an agreement to accomplish

12   something illegal.  In other words, proof beyond a reasonable

13   doubt that he willfully joined an unlawful plan with the

14   Chrisleys to cheat the IRS by deceit and trickery.

15        You were also told that what that means is proof that

16   Peter consciously attempted to hinder, prevent, or make it

17   more difficult to administer the IRS laws, all with the

18   specific intent to violate the law.

19        There was no illegal agreement with the Chrisleys.

20   There was no conspiracy.  All of the IRS revenue officers

21   agreed, every one of them -- you know, there was really only

22   three IRS people who testified who had any knowledge about

23   Mr. Tarantino.  They all agreed, Tarantino cannot provide

24   documents to them if he doesn't have them from his client.

25        Good faith, you've heard a lot.  Judge Ross repeated

1  the good faith instruction.  But it is important to Peter

2  Tarantino.  He acted in good faith.  I want to stress to you

3  what good faith is.  It is a complete defense to the counts

4  that Peter is charged with.  That's 8, 10 and 11.  Since good

5  faith on the part of a defendant like Peter is inconsistent

6  with willfulness, and willfulness is an essential part of

7  charges, a good-faith belief is one that is honestly and

8  genuinely held, regardless of whether that belief is accurate

9  or reasonable.  It's what is in that person's mind.

10        If Peter acted in good faith, then he did not

11  intentionally violate a known legal duty, that is, he did not

12  act willfully.

13        The burden of proof is on the Government.  Peter does

14  not have to prove that he didn't act willfully.  But as I

15  progress through this, I'm asking you to ask yourself has

16  there been proof that Peter willfully did something that he

17  knew was against the law.

18        The Government must establish beyond a reasonable

19  doubt that he acted willfully.  And that is proof beyond a

20  reasonable doubt that Peter specifically intended to do

21  something that is against the law and he voluntarily committed

22  the acts that make up the crime.

23        Now, I'm done talking about the law.  I want to talk

24  about facts.  Being messy, falling behind in your work,

25  understanding a deduction, not being the best accountant

United States District Court

1  around, does not make Peter a criminal.

2          The top ten reasons why Peter is not guilty.  And as

3  David Letterman would say, in no particular order, Number 1,

4  the $1 million Rialto Capital deduction, Peter didn't

5  understand it.  He wouldn't put it on the tax returns until he

6  got a second opinion, which didn't occur until May 2018, after

7  the IRS agent and FBI agent showed up at his office.  The man

8  dug in his heels.  I'm not going to do it.  That's not the act

9  of at coconspirator.

10         Number 2:  The 56-minute tape that you listened to.

11  You heard Peter live and in action.  You heard his demeanor.

12  He answered the questions.  He explained why the returns -- he

13  said, I've prepared the returns.  They're in the client's

14  hands.  I'm waiting for information from them.  It takes

15  forever.  You know, that's how he talks.  It takes forever to

16  get the information.  You heard him, 56 minutes.

17         So in that 56-minute call, he says, they're slow to

18  provide me information.  What he said to those agents that day

19  is backed up by the documents.

20         Now, here is our documents.  It not a lot of

21  documents.  Ours are in chronological order.  All you've got

22  to do is find the ones with the T, line them up in order and

23  it's chronological for the most part.  Yesterday we got this

24  entire notebook.  This notebook is back there for you to see.

25         The interview also showed this.  Messy, yes.  You
                    United States District Court

1  heard him fumbling around in his files.  Bumbling, maybe.  He
2  referred to -- ten days earlier, he had sent the tax returns
3  to his clients and said, you owe zero for '13 and '14.  Then
4  when he's talking to the agents, he refers to the wrong tax
5  returns saying they're going to owe money for '13 and '14.
6  That's Peter.  They caught him cold.  No preparation.

7        He's not meticulous.  And this is telling.  Remember,
8  Peter is charged with a conspiracy.  In that 56-minute call,
9  Todd Chrisley called him twice.  I suggest to you somebody
10 who's in a conspiracy will look at his phone like, ooh, and
11 try to shoo the agents out of his office.  That is not what
12 Peter did.  Twice.  Peter finally says, oh, he must know
13 you're here.  That is not what a conspirator does.  He's free
14 and open talking to the agents.

15       There was a two hour -- you know, Agent Ryskoski told
16 you, there was another interview where he was basically --
17 talked for two hours.  We didn't hear that interview.

18       Number 3:  Before the agents showed up at his office,
19 Peter prepared and sent tax returns to the Chrisleys for their
20 review and signature.  They were final as far as he was
21 concerned.  That's Exhibit T60.  The e-mail -- you can read
22 his e-mail.  He sent them to the Chrisleys on January 23rd
23 saying:  Please review.  I'll send you the e-signature form.
24 All I need is for you to answer one question.  He was ready to
25 go.  They were done.

United States District Court

1    It's not like the agents came to his office and he
2 said, oh my goodness, we got to get these returns prepared.
3 He'd already prepared them.

4    Now, here's the squirrel.  Four days earlier he sent
5 those same tax returns to a dealership and to a bank and said,
6 enclosed are the tax filings.  First, he had then sent them to
7 the Chrisleys for a second time and said, these are ready to
8 go.  These were ready to go as far as he was concerned.

9    And more importantly, more importantly, Agent
10 Ryskoski, to his credit, said, that has nothing to do with the
11 IRS.  Can't possibly affect the IRS.  Can't impede.  Doesn't
12 do anything to the IRS.  And nobody from the bank, nobody from
13 the dealership was even called to testify about it.  It's a
14 squirrel.

15    Number 4:  There is a hurricane of activity
16 surrounding Peter Tarantino and he is completely unaware of
17 it.  He's got no idea it's going on.  He's not aware of it.
18 And the Government agrees.

19    I was a little troubled by the suggestion that Peter
20 was aware of certain things.  But let me tell you, in 2014 the
21 Chrisleys were leasing something out in California.  Was Peter
22 involved?  No.  Was the CPA dragged into that?  No.  He didn't
23 even know about it.

24    Then in 2015 and 2016, we hear that activity is going
25 on about Faye owns this or Faye owns 7C's and Faye is a plot,

1  you know, her financial information is submitted to some
2  Bentley dealership, or Todd applied for loan relief.  Peter is
3  not involved.  He's not copied.  No one talks to him about it.
4          Then in March of 2017, Peter provides bank statements
5  to revenue Officer Carter.
6          There's allegations about a lot of shenanigans that
7  happened after March 6th or March 7th.  I asked the witness:
8  Are you suggesting Peter knows or is even involved in that?
9  Answer:  No.  Peter is not on those e-mails.  Nobody is
10 suggesting he was aware of it.  He was not.
11         Does that suggest that he's a coconspirator?  Why
12 didn't you -- if there's a conspiracy here, why aren't the
13 coconspirators -- if these allegations are even remotely true,
14 why isn't he being brought into the fold.
15         Number 5:  From Peter's perspective, any suggestion
16 that he's involved in a conspiracy to impede the IRS's ability
17 to collect back taxes is odd and it is wrong.  There's a
18 four-month period of time when Peter is the Chrisleys'
19 accountant.  All of Julie's tax debts are paid.  Right.
20 $36,000 in December.  $83,000 in December.  $55,000 in March
21 of '17.  When I say December, I'm talking about '16.  I think
22 those are Exhibits 20, 21 and 22.  One hundred -- some of
23 those debts, because it was married filing jointly, belong to
24 Todd Chrisley.  It's $170,000.
25         It was Peter Tarantino who called Agent Carter and
                    United States District Court

1    said, hey, Todd is looking to sell the house on Anson Avenue.

2    There will be money for the IRS.  There was money for the IRS,

3    $93,000, and then there were a few checks written after that.

4    So Todd's debt got paid down by $120,000.

5           Peter is the accountant.  He doesn't control their

6    checkbook.  He doesn't cause money to be paid to the IRS.

7    There's no suggestion that he could have paid these debts.

8    These debts existed, according to the Government, long before

9    Peter Tarantino was even on the scene.

10          Number 6:  Where is Agent Larry Arrow?  People flew

11   in from all over the country.  Three testified by zoom.  He

12   couldn't do that?  He was the lead IRS agent on this thing.

13   We did need a fourth person from the IRS.

14          You didn't leave your common sense in the trunk of

15   the car when you walked in here.  I would suggest to you that

16   the reason we didn't hear from Agent Arrow is he would have

17   provided the same type of information that revenue Officer

18   Betty Carter told you about.

19          That's Number 7, revenue Officer Betty Carter.  She

20   told you she didn't have a problem with Peter.  I didn't have

21   a problem with him.  She told you that he called me.  I

22   thought we were trying to impede and impair the IRS.  He

23   called her.  She told you that right out of the shute he said

24   Julie Chrisley owns 100 percent of 7C's.  Right out of shute,

25   he told her that.

                        United States District Court

1          Talked to her about Anson Avenue.  She asked for bank

2    statements.  Peter provided them.  That's Exhibit 30.  There's

3    a whole stack of bank statements.  Every bank statement she

4    asked for that Peter got from the Chrisleys was forwarded to

5    her.

6          Then she asked for financial documents.  Gave Peter a

7    deadline.  He responded.  He got the documents from the

8    Chrisleys, he gave them to her.  It's already been pointed out

9    today.  It's Exhibit 35.  Flip it.  There's a letter from

10   Peter.  He leaves off -- he's a little short on his list, but

11   the documents are there.  But the Number 1 thing are pay stubs

12   for Julie and Todd Chrisley, pay stubs, from the production

13   company that say -- Ms. Carter agreed.  They say 7C's for the

14   services of Todd and 7C's for the services for Julie.  And it

15   showed that in the first two and a half months of 2017

16   combined they made $470,000.

17         Revenue Officer Carter told you this is what she

18   needs.  So she knew where the money was coming from, who it

19   was being paid to, 7C's, and she knew where it was being

20   deposited.  That's all she needed.

21         Because we kind of forget what was said as an aside.

22   If I know where the money is being deposited, I can issue a

23   levy.  It doesn't matter who owns that account, I can just go

24   whack that account and take whatever money we're owed.  She

25   had the information.  This is in April, months before the

                     United States District Court

1  agents show up at Mr. Tarantino's office.

2         You know, let's think about this for a minute.  Peter

3  is in a conspiracy to impede the functions of the IRS?  To the

4  contrary.  He's giving Revenue Officer Carter the information

5  she has requested.  It's highly, highly relevant.

6         The Government claims that after -- while those

7  documents were being provided that a whole bunch of

8  shenanigans are going on in March and April.  Revenue Officer

9  Carter doesn't know that.  Peter Tarantino knows nothing about

10  it.  And there is no suggestion, there is no evidence that he

11  did.

12         Two things.  Because I remember because I had to

13  correct it.  Revenue Officer Carter -- there was a lot of,

14  wouldn't you have liked to have known about these bank

15  statements?  At the end of the day she said, I never asked

16  Tarantino for those.  I didn't ask for them.  Oh, well, didn't

17  you ask where they banked?  She originally said yes, then she

18  had to clarify.  She asked, where does Todd Chrisley bank?

19  Where does Todd Chrisley bank?  Peter answered, I don't know.

20  He didn't know until he had the bank statements, which he

21  turned over.

22         That's alleged in the indictment.  Peter Tarantino

23  lied to the revenue officers when he said he didn't know where

24  they banked.  The testimony is, I asked him where Todd banked.

25  That has nothing to do with 7C's, the one account that Peter

United States District Court

1    knows about.  Nothing to do with it.

2         Number 8:  More than two weeks of testimony of bank

3    fraud and all this stuff, Peter has never talked about, never

4    talked about.  But we see all these e-mails with cuss words in

5    it and attaboy, good job, you're a genius.  Where are those

6    kind of e-mails with Peter Tarantino in this so-called tax

7    conspiracy?  There is are no attaboy e-mails encouraging Peter

8    to do anything wrong.  It shows there's not a conspiracy.

9         Mark Braddock has nothing to do with me, but I can't

10   not comment about this.  This guy got up here and said I lied

11   and I lied and I lied.  Okay.  But I lied to the Government.

12   And then I forgot to tell them things until they confronted me

13   with it.  He has immunity.  He didn't lose the immunity.

14   Because he's on team Government and he is saying because I was

15   in a conspiracy with the Chrisleys.  That's perturbing to me,

16   because I'm out here parsing words about one statement that

17   Mr. Tarantino made.

18        The so-called lie, Number 9.  It's not a lie.  And

19   here's why.  The indictment charges this:  To further the

20   conspiracy, on or about February 2nd, 2018 -- let me stop

21   right there.  That's the last day of the conspiracy.  It's in

22   the last minutes of the conspiracy.  Because as you just

23   heard, the Chrisleys were served with the grand jury subpoena

24   last minute.  Okay.  To further the conspiracy.

25        So the first question is, was there a conspiracy?

                   United States District Court

1  Was there an agreement?  Was there any activity?  So this is
2  out if you find there wasn't a conspiracy as of that day.
3      But here's what it says:  Tarantino knowingly lied to
4  the federal agents employed by the FBI and the IRS Criminal
5  Investigation Division in that Tarantino falsely stated that
6  he did not know how Todd Chrisley earned his money.  Never
7  asked.  Never asked that question.
8      It goes on to say that's false because -- these
9  representations were false because Tarantino then and there
10 knew that Todd Chrisley received income from 7C's Productions.
11 Well, how is that?  7C's was set up before Peter was on board.
12 The studio contracts were negotiated without Peter's
13 involvement.  All of the money -- 7C's doesn't pay taxes.  It
14 is an S Corp., the profits of which flow to the owner, which
15 is Julie Chrisley.
16      By the way, you can look at the transactions.
17 Believe me, you would have heard this, the January 23 returns
18 that Peter sent to Chrisleys.  No money is hidden.  All of the
19 revenue of 7C's is on those tax returns.  We're not hiding --
20 it's a married filing jointly return.  So there is no
21 suggestion that the money is hidden that way.  But it's a lie.
22 It's not a lie.
23      Mr. Tarantino, listen to the question.  As far as
24 7C's is concerned, how does Todd get his income?  I don't know
25 where he gets his income.  I've never seen a check written to

1　him, so I haven't issued him a 1099.  Agent Ryskoski said, no

2　checks are written to Todd.  Yes, Peter as the accountant

3　would be responsible for issuing 1099s.  Oh, speaking of

4　1099s, Exhibits 300 and 400, those are the 7C's 1099s.  The

5　production companies sent those to 7C's.  Doesn't say anything

6　about any actors.  It's just to 7C's.

7　　　　　So the profits do flow through to Julie.  This is the

8　way they did it.  Peter inherited this.  He's answering it

9　like an accountant.  Where does Todd get his taxable income?

10　From 7C's.  He doesn't -- now what did Agent Ryskoski have to

11　say?  Before we talk about Todd, he agreed, access to money

12　does not equal income.  If 7C's did not pay one of the

13　children, the child actors, how much income would they have

14　received that year?  Well, they wouldn't have.

15　　　　　It was only when we got into insert Todd's name

16　instead of child's name, then all of a sudden it becomes a

17　lie.  And you know what, I've been doing this for 35 years.  I

18　know better than to get in an argument with an FBI agent on

19　the stand.  He's been sitting here the whole time.  He's not

20　going to admit, yeah, you're right.  I should have left it at

21　the question about the children and moved on.

22　　　　　But remember when I asked that question about the

23　child not getting paid and the answer was they don't receive

24　income, I said exactly.  I think I caused the antenna to go

25　up.

　　　　　　United States District Court

1    Let me give you a hypothetical.  Enter Tarantino CPA

2 as actually an S Corp.  A lady named Beverly works for him.

3 He's got a number of clients.  He sends Beverly to go work at

4 a client's office for eight hours.  She does the work.  She

5 comes back to the office.  At the end of the month, the S

6 Corp., Tarantino CPA, bills the client for eight hours of

7 Beverly's work.  She did the work.  It's for her services.

8 Thirty days later the client pays the bill.  Peter puts it in

9 his S Corp. bank account.  How much income does Beverly have?

10 It's zero.  Not until a check is written to her is there

11 income.

12    Now, let me talk about the corporate returns.

13 Yesterday -- now, we've heard testimony.  Agent Ryskoski said,

14 absolutely no way if you put a zero on a return then it means

15 that has to be at truth.

16    Yesterday, Exhibit 7, we went through it.  In Peter

17 Tarantino's file, in his file, which there is a letter from

18 the accounting firm for Chrisley Asset Management, and tax

19 returns are in there.  Tax returns are in there for Chrisley

20 Asset Management, filed at the direction of the United States

21 trustee, which Mr. -- I can't remember his name.  He says

22 that's actually a division of the Department of Justice.

23    Okay.  They show that there's -- apparently there's a

24 disagreement about whether you can do -- file zero returns

25 when you don't have enough information to file the return.

1  They filed Chrisley Asset Management returns three times for
2  three years with zeroes on it.  And then when they had better
3  information, they amended the returns with numbers on it.
4  It's T7.  I mean, the first two returns it's on Page 2 and
5  Page 3.  You can see it for yourself.

6          There's also a letter in there, three letters saying
7  this is why we did it.  We didn't have enough information to
8  accurately do this, so we decided we're going to file the zero
9  return until we got more accurate information.

10          Good faith, ladies and gentlemen.  This is right on
11  point.  Peter has this in his file.  He files those two
12  returns, yes, because, as you've heard and you can see from
13  these exhibits, there was a lot of open items for those tax
14  years.

15          Was he slow?  Okay, yes, he was.  But this is about
16  did he willfully violate the law when in his file he's got tax
17  returns where he is seeing the United States trustee did the
18  same darn thing.

19          I'll leave this point by just saying this to you -- I
20  always remember something else.  I'll say this to you:  We've
21  got one person saying you can never do it and then we have
22  somebody else say you can.  That is the definition of why you
23  should have reasonable doubt here.

24          What I was going to add is this:  At least in the
25  2016, remember, Peter unsolicited told Revenue Officer Carter,
                    United States District Court

1  hey, I wanted to let you know -- on September 2017 goes, I
2  wanted to let you know I'm working on these returns.  His mind
3  and his conscience is clear.  He had that conversation after
4  the '16 return was filed.  He did work on it.
5          There was Hurricane Erma.  There's a document
6  entered.  There was an extension that applied to everything
7  and pushed off the '16 returns personal and business until the
8  end of January 2018.  That's what happened.  He worked on the
9  returns.
10         Number 10:  Look at the e-mail correspondence that's
11 here.  Every time the IRS asked for documents, Peter flipped
12 that.  Either sent an e-mail or flipped the document requests
13 itself to the Chrisleys.  He's not holding anything back.  You
14 need to do this.  I need this information.  Again, if he
15 doesn't get it, he can't provide it.
16         But more, importantly, you saw Mr. Salinski hold that
17 spreadsheet.  The e-mails are clear.  Todd Chrisley -- we're
18 dealing with Revenue Officer Carter.  She sends a list.  I
19 want tax returns.  And she's got a big old list too.
20         Todd Chrisley e-mails like a week or two later saying
21 where are the tax returns?  Then he e-mails in May, where are
22 the tax returns?  Peter says, I'll get it back to you before
23 the end of the day.  It was on May 2nd that Peter prepared
24 that massive list.  Look at the list.  There are $5 million in
25 open items.  It covers a number of years.  Right.  Chrisleys

1  respond.  Peter sends out the list in August.  It is exactly

2  what was represented to you.

3          In November, November 25, Peter e-mails Todd Chrisley

4  and said:  I never heard back from you.  I need -- we need to

5  get this done so we can file returns.  That's not a

6  conspiracy.

7          On December 20 when they're in Paris, Peter e-mails

8  again:  I need to get these -- I need to get this information

9  from you so I can prepare the returns.  We need to finalize

10  the returns.  No information.  What's a guy to do?  They want

11  tax returns done in January.  So he says, okay, here they are.

12  Forgot all those expenses that would reduce the taxes.  Yes,

13  maybe they were wrong because the expenses had not been

14  addressed.

15          Now, there's allegations in the indictment.  But most

16  of the testimony you heard, there's no proof that this

17  happened.  It's about the agreement.

18          I will say something about agent Jagiella for 10

19  seconds here.  Obviously what happened here, somehow she said,

20  he told me the daughter owned the company.  Well, he told

21  Agent Carter two months later Julie owns the company.

22  Somehow, someway they got off on the daughter, who owns her

23  own company.  Peter is not her POA.  He can't answer

24  questions.  That must be what happened.

25          Now, I do thank you for listening to me.  I know you
                    United States District Court

1  have.  So I say this to you:  Peter is innocent.  End this

2  nightmare.  Find him not guilty.  Send him home.

3  Thank you.

4  THE COURT:  Thank you.

5  Mr. Krepp, do you need a moment to set back up?

6  MR. KREPP:  Yes, your Honor.

7  THE COURT:  Not a problem.

8  Ladies and gentlemen, let me tell you -- if you can

9  go ahead and start setting up at least -- let me tell you what

10  is happening.  I did not want to break up these arguments.

11  And rather than stopping and sending you to lunch, we pushed

12  through.  This is the last argument.

13  The cafeteria, however -- because we do pay for your

14  lunch on deliberations day -- closes at 1:30.  So we have had

15  someone in jury management to go gather salads and sandwiches

16  and all and bring them up for you.  So if you're concerned

17  about lunch and the hour that it is right now, there will be

18  food for you back there.

19  So I'm going to have you step out for just a moment.

20  I'm going to bring you right back in as soon as we get set up

21  for this last argument.  And then you will go back to

22  deliberate.  And you can eat back there while you're doing

23  that as well.

24  Let me also tell you this -- well, I'll tell you that

25  later.  Because I understand there has been a request to stop

United States District Court

1    at 4 today.  And as I told you earlier this week,

2    deliberations day we need to be prepared to work later than

3    normal.  So I will address that a little later.

4            Go on back.  We'll bring you back out.  Thank you.

5            **(The jury exited the courtroom at 12:58 p.m., after**

6    **which the following proceedings were had.)**

7            THE COURT:  You can be seated for a few minutes.

8            As soon as you're set up, Mr. Krepp, let me know so

9    we can get them back in.

10           MR. KREPP:  Okay.

11                          **(brief pause)**

12           THE COURT:  All right.  Let's bring them out.

13           **(The jury entered the courtroom at 1 p.m., after**

14   **which the following proceedings were had.)**

15           THE COURT:  All right.  The jury is seated.

16           Everyone else may be seated.

17           And you may continue with your argument.  Thank you.

18           MR. KREPP:  Thank you, your Honor.

19           Ladies and gentlemen, I appreciate your patience.  I

20   know you're hungry.  I promise I'll try to get you out of here

21   so you can have your salads and your food.

22           There are a few points I want to talk about based

23   upon the defendants' arguments.  Number 1:  You were

24   instructed on this legal concept called aiding and abetting.

25   There is no doubt that Mark Braddock was the one who

                    United States District Court

1  transmitted these documents to the bank.  It's unquestionable.
2  Julie Chrisley didn't do it.  Todd Chrisley didn't do it.  But
3  the law is that a defendant is criminally responsible for the
4  acts of another person if the defendant aids and abets the
5  other person.  A defendant is also responsible if the
6  defendant willfully directs or authorizes the acts of an
7  agent, employee or other associate.

8         And why do I highlight this?  It doesn't matter that
9  Todd Chrisley wasn't the one who actually transmitted the
10 actual document to the bank.  It doesn't matter that Julie
11 Chrisley wasn't the one who walked into the branch and handed
12 over the false personal financial statement.  Because they had
13 authorized Mark Braddock to do so willfully, because they
14 aided and abetted Mark Braddock, they are guilty of the crimes
15 of bank fraud.

16        Now let's talk about the bank fraud conspiracy.
17 Judge Ross read the law to you earlier.  And the law is that
18 if a defendant played only a minor part in the plan but had a
19 general understanding of the unlawful purpose of the plan and
20 willfully joined in the plan on at least one occasion, that's
21 sufficient for you to find the defendant guilty.  It's
22 unquestionable that Julie Chrisley -- you didn't see --
23 e-mails with Julie Chrisley, but you heard Mr. Braddock, you
24 heard his story about how Julie Chrisley would help with
25 scrapbooking.  We'll show you that e-mail that he produced

1  where Julie Chrisley directs him to alter a check.  And most

2  importantly, you saw that the same fraud continued from Julie

3  Chrisley well after Mark Braddock left the scene.  Julie

4  Chrisley is equally as guilty of bank fraud as her husband.

5        Judge Ross also instructed you that a person may be a

6  conspirator even without knowing all the details of the

7  unlawful plan.  So what that means is, it doesn't matter that

8  Mark Braddock did certain things during the course of the

9  conspiracy without the knowledge of the Chrisleys.  It doesn't

10  matter if the Chrisleys did things without the knowledge of

11  Mark Braddock.  The key goes back to whether the defendants

12  willfully joined in that conspiracy.  And the evidence is

13  overwhelming that they did so, they did so so they could get

14  tens of millions of dollars in fraudulent loans that they used

15  for their own personal benefit.

16        There's one more instruction that Judge Ross went

17  through with you earlier.  And Mr. Anulewicz made the

18  point that, you know, Julie Chrisley -- no banker knew Julie

19  Chrisley, no banker ever dealt with Julie Chrisley.  You got a

20  very specific instruction.  And it will be in the packet that

21  goes back with you.

22        If you have first found defendants Todd Chrisley or

23  Julie Chrisley guilty of the crime of bank fraud conspiracy,

24  you may also find that defendant guilty of the substantive

25  crimes -- those are the bank fraud charges. -- charged in

United States District Court

1 Counts 2, 3, 4, 5 or 6, even though that defendant did not

2 personally participate in the crime.  You will get the full

3 instruction when you go back there.  You can read through it.

4       It doesn't matter that Julie Chrisley didn't transmit

5 each of these documents to the bank.  She was a willing member

6 of this conspiracy, sending false documents to the bank, was

7 part of that conspiracy -- I apologize, folks.  And I

8 appreciate your patience.

9       So again, the fact that Julie Chrisley wasn't

10 involved in sending each and every document to the bank

11 doesn't matter.  She was a willing member of this conspiracy.

12 She benefited from it financially.

13       The fact that Todd Chrisley directed Mark Braddock to

14 send these documents while he's jet-setting around the

15 country, he is guilty of the crimes of bank fraud as well.

16       Now, Mr. Morris made a point about this AOL account.

17 But let's be clear, yet again, what the attorneys say is not

18 evidence.  The only evidence for you to consider is what you

19 heard from witnesses and the documents and other exhibits.

20       Witnesses, a number of witnesses, Simone Flack, James

21 Askew, they authenticated several of the documents in the 800

22 series.  Those are the documents that Mr. Braddock produced.

23       Alina Clerie, she produced well over a dozen

24 documents, e-mails, nothing to do with Mark Braddock.  Those

25 came from Alina Clerie.  And I showed you one of them earlier.

1    Now let's talk about this AOL search warrant.  What
2 Agent Ryskoski actually testified to, the actual evidence was
3 that there were no responsive e-mails from before
4 October 2012, none.  So it's not that he found some e-mails
5 that were responsive, just not the ones that Mark Braddock
6 produced, he found nothing.

7    And Mr. Morris said that e-mails when they're deleted
8 they're still on AOL's server.  What you heard from Agent
9 Ryskoski is that if somebody deletes an e-mail prior to the
10 execution of a search warrant, it's not there anymore.  The
11 simple answer is this:  Todd Chrisley deleted the e-mails
12 after the money dried up and kicked Braddock out.  That is
13 what he did when he threw Braddock out of the office and he
14 knew Braddock had turned on him.  That is why the FBI was not
15 able to find those e-mails from AOL.

16    Now, again, what the attorneys say is not evidence.
17 But I'm going to go back to opening statements.  Mr. Morris
18 said this about what happened in July of 2012:  "So what
19 happens in July of 2012?  CAM employees tell Todd what
20 Braddock has been doing.  And he finds out for the first time
21 about all the cheating that Braddock has done, all the
22 signatures of Todd that Braddock has forged, all the e-mails
23 that he had sent as Todd, and Todd fires him.  Braddock is
24 caught.  He is fired.  Todd is outraged.  Says to him, you're
25 going to go to jail for what you have done.  Julie sues him

1  for stealing money from them and for other crimes."

2          You just heard from Mr. Anulewicz and Mr. Morris.

3  Mr. Morris had a different argument this time and said,

4  December 2010 he learned about it.  Well, the reason that

5  changed is because of the actual evidence in this case.

6          Even if you were to credit a word that came out of

7  Donna Cash's mouth, which you should not, but even if you were

8  to credit a word, she testified that she told Todd Chrisley

9  that Mark Braddock was using his e-mail account in 2010, 2010.

10  Ms. Cash also testified that she never, not once, saw Mark

11  Braddock with access to Julie Chrisley's AOL account.  There

12  was a lot of talk about passwords and accounts.  There is a

13  spreadsheet in evidence that the Government introduced that

14  Braddock had.  But what's not on there?  Todd and Julie

15  Chrisley's AOL passwords.

16          But let's look.  Let's just begrudgingly step into

17  the mind of Donna Cash for a minute and let's imagine she did

18  have this conversation with Todd in 2010.  What happened after

19  2010?  This is an e-mail in 2011 sent from Mr. Chrisley's AOL

20  account:  "Can you reword what George sent in this letter so

21  that it doesn't sound like Julie has only owned the stock

22  since 2008, rather let it show that she owned it from the time

23  EAM sold and was formed from that sale?  Do not send this to

24  Simone until we have reviewed together."  This is a year after

25  Donna Cash claims to have told Todd Chrisley that Mark

1  Braddock was using her e-mail.

2          April 2012, Julie Chrisley sends this e-mail.  Again,
3  Ms. Cash never saw Braddock with access to that account.  And
4  this is two years after she claims to have told Chrisley that
5  Braddock had access to his account.  And what do we see here?
6  This is the instruction:  "The postdate needs to be changed".
7  And then Chrisley giving a directive to Mark Braddock, his
8  puppet, his minion:  "Make sure this is perfect before you
9  send it to Kim, as there can't be a screwup, as she looks at
10  this stuff fairly closely."

11          Ladies and gentlemen, even if you were to credit a
12  word out of Donna Cash's mouth, even if you were to forget
13  about the fact her story about accessing Julie Chrisley's
14  e-mail and somehow sending the statements to the realtor, you
15  heard the recording where she said the exact opposite thing to
16  the defense investigator.  Donna Cash is not to be believed.
17  But even if you credit her story, even if you do credit her
18  story, Todd Chrisley was on notice of the bank fraud
19  conspiracy in 2010.  And look in the 800 series at the e-mails
20  that were sent after 2010.

21          I talked about this earlier, the similar act
22  instruction.  I want to return to it for just a moment.  So if
23  you find the defendants committed allegedly similar acts on
24  other occasions, you may use this evidence to help you decide
25  whether the similarity between those acts and the ones charged
                United States District Court

1    in this case suggest the same person or people committed all

2    of them.

3            And again, what do we see?  2012, that is when

4    everyone is in agreement Braddock is out of the picture.  But

5    we see bank fraud and scrapbooking with Braddock beforehand

6    and then we see wire fraud and more scrapbooking from the

7    Chrisleys after Braddock is out of the picture.  What is the

8    common denominator?  The Chrisleys.  The Chrisleys are the

9    ones who prepared these false invoices after 2012.

10            The Chrisleys learned that Mark Braddock has

11    successfully duped banks into believing that Todd had

12    $4 million.  And lo and behold, four years after Braddock is

13    out of the picture, they're sending the exact same statements

14    to other banks.

15            Now, both Mr. Morris and Mr. Anulewicz talked a bit

16    about 7C's Productions and the business operations.  What you

17    heard throughout this trial, the way the Chrisleys managed

18    both 7C's Productions and Chrisley Asset Management was just

19    lie compounded upon lie.

20            This is the document that Julie Chrisley -- the false

21    document that she transmitted to the grand jury.  Julie

22    Chrisley didn't take that hand-changed, corrected document to

23    the bank on March 8th.  She hadn't made any mistake.  Todd and

24    Julie Chrisley had been doing exactly what they did on

25    March 7th, 2017, for years, telling lies about who owned their

                    United States District Court

1    companies to get whatever they want whenever they want it.

2              Look at the e-mails that were introduced about the

3    ownership structure of Chrisley Asset Management.

4    Government's 1103, Todd e-mailing Alina Clerie and cc'ing Mark

5    Braddock stating, "I want to see exactly how much my

6    70 percent and Mark's 30 percent comes to."  What happens

7    afterwards?  Todd goes into bankruptcy.  And lo and behold,

8    now people are being led to believe that Julie is 60 percent

9    owner.  They change their story whenever it suits their needs.

10             Now we turn to 7C's.  The goal all along was to avoid

11   Todd's delinquent taxes.  There's no crime in setting up a

12   company in Julie Chrisley's name, no crime whatsoever.  But

13   the goal here was to avoid paying Todd's delinquent taxes.

14             But let's look at the games the Chrisleys played over

15   the years with 7C's Productions.

16             In 2014 the goal was to avoid the delinquent taxes.

17             2015, what do they want?  A mortgage.  Who's listed

18   as 75 percent owner of the company?  Elizabeth Chrisley.

19             In 2016, what do they want?  A luxury car.  And how

20   is the company structured now?  Elizabeth Faye Chrisley

21   51 percent and Julie Chrisley 49 percent.

22             2017, what do they want?  They want to hide the money

23   and evade paying their taxes.  Elizabeth Chrisley, 100 percent

24   owner of the company.

25             And then in 2019, what do they want?  They want to

                    United States District Court

1   avoid sitting right here today.

2           And you heard both Mr. Morris I believe and

3   Mr. Anulewicz talk about how Mr. Abbott testified about these

4   documents, how he produced this.  I want you to compare

5   Government's Exhibit 118 to Government's Exhibit 348.  You

6   will see the same legal verbiage, the same language.  The only

7   difference is the way the company ownership was structured.

8           The Chrisleys had been doing this for years.  And you

9   know what, they were good at it, so good at it that they duped

10  banks for years and then they duped the IRS.

11          Let's talk about the tax crimes.  The Government has

12  proved beyond a reasonable doubt that the defendants did not

13  act in good faith when committing the charged tax offenses.

14          The Judge instructed you that a good-faith belief is

15  one that is honestly and genuinely held regardless of whether

16  the belief is reasonable.  And then for the tax charges:  If a

17  defendant acted in good faith sincerely believing him or

18  herself to have complied with the Internal Revenue laws, then

19  the defendant did not intentionally violate a known legal

20  duty.

21          The evidence is overwhelming that the defendants did

22  not act in good faith here.  They got notice after notice from

23  the IRS to get in compliance.  And what were their responses?

24  Moving money into different bank accounts, using their mother

25  to hide their assets.  Again, that is the essence of

1   willfulness and it is the opposite of good faith.

2           The Chrisleys did not rely in good faith on attorneys

3   in evading taxes and defrauding the IRS.  You heard from three

4   attorneys in this case -- Leron Rogers, Monica Gilroy, and

5   Robert Furr.  And what did they all say?  Not one of them

6   advised the Chrisleys that they did not have to file their

7   income taxes.  Not one of them advised the Chrisleys that they

8   didn't have to pay their income taxes, including Todd's

9   delinquent 2009 tax debt.  And no attorney advised the

10  Chrisleys they should keep Todd Chrisley's name off of all

11  bank accounts to hide money from the IRS.

12          You'll recall Mr. Furr's testimony yesterday.  And

13  one of the last things he said on the stand was Todd asked him

14  one simple question about 7C's Productions.  He knew about the

15  $20 million he owed because of the bankruptcy.  And his

16  question to his attorney was:  "Am I exposed if I'm on the

17  bank account"?  And Mr. Furr said:  "Yes, you would be."  So I

18  guess he did follow his advice.  But the advice was not to

19  cheat the IRS.  The advice was not tax advice.  Mr. Chrisley

20  was playing games yet again, trying to keep money from either

21  creditors or the IRS.

22          Look at the instruction on good-faith reliance on

23  accountant or attorney, and you will see that the defendants

24  in no way made a full and complete accurate report to any of

25  their accountants, to any of their attorneys, and they did not

United States District Court

1  rely in good faith upon anything those accountants or
2  attorneys provided them.

3        There are three accountants that you've heard about.
4  Obviously Mr. Tarantino.  You heard from George Grimsley.  And
5  finally, you heard from Mr. Seckendorf.  But let's be clear.
6  Mr. Seckendorf wasn't even engaged until after February 2nd,
7  2018, so he couldn't possibly have given them advice during
8  the course of the conspiracy.

9        No accountant advised the Chrisleys they did not have
10 to file their income taxes.  No accountant advised the
11 Chrisleys they did not have to pay their income taxes,
12 including Todd's delinquent 2009 debt.  And no accountant
13 advised the Chrisleys they should keep Todd Chrisley's name
14 off the bank accounts to hide money from the IRS.

15       The Government has proven beyond a reasonable doubt
16 that the defendants did not act in good faith, that they did
17 not rely in good faith on accountants, they did not rely in
18 good faith upon their attorneys.

19       Now let's talk about Mr. Tarantino for a moment.
20 Mr. Griffin made a point of saying there's no evidence of an
21 agreement, there's no evidence that they worked to get
22 together and defraud the IRS.

23       The instruction that you got on conspiracy is very
24 clear.  There does not have to be a written agreement.  That's
25 not the world we live in.  It's not shocking that criminals

United States District Court

don't typically write down their criminal plans and sign to
it.  Okay.  The evidence here, though, is that the Chrisleys
and Mr. Tarantino had an unlawful agreement to defraud the
Internal Revenue Service.

     And if there's any doubt about this, look at this
e-mail, Government's Exhibit 199.  "The agent also asked some
questions about your current living arrangements.  I avoided
answering them."  That's what Mr. Tarantino told Todd and
Julie Chrisley in September of 2016.  Mr. Tarantino knew the
answers to these questions.  This shows the conspiracy in
play.

     Mr. Tarantino knew that returns had not been filed or
prepared.  And we heard this explanation just now about how
the bankruptcy returns were zeroed out and for that reason
Mr. Tarantino must have believed it was okay to file blank
returns for 7C's Productions.  Well, if that's true, look at
Government's Exhibit 507.  Why is he sending completed
returns, individual income tax returns, in 2016?  Why in 2018
is he sending completed tax returns to the Porsche dealership?
He knew he was breaking the law.  He knew he was lying to the
IRS when he filed those false corporate tax returns.

     Let's be clear about Mr. Tarantino's role.  Tarantino
called the IRS when the Chrisleys wanted to buy or sell their
property.  His concern was to get liens removed.

     Officer Carter testified that it is more difficult to
                United States District Court

1  seize accounts that are not owned by the taxpayer.  So this
2  goes to, sure, there's a new 7C's account.  But Officer Carter
3  testified about what's called a nominee lien.  I know this is
4  a long time ago.  But she said, it's a much more complex
5  process to seize money when the account is not controlled by
6  the taxpayer.

7          And Tarantino's own e-mails confirm he hid
8  information from the IRS.  And if there's any doubt about
9  this, the Chrisleys' own accountant expert, the one person who
10 was qualified as an expert in this case, confirmed that he had
11 never filed a blank corporate tax return.  And there is no
12 evidence that Tarantino relied upon those bankruptcy returns
13 when filing the false corporate returns.

14         Now, you heard in opening and then you heard again in
15 closing that Chrisleys paid their money, they -- you know, why
16 are we here, the Chrisleys paid their taxes?  Well, you got a
17 very specific instruction from the Court.  And you will have
18 it when you go back.  If a person conspires to defraud the IRS
19 or commits an act with the willful intent to evade the payment
20 of tax, later crimes do not nullify the completed -- later
21 actions do not nullify the completed crime.

22         You can't rob a bank and return the money.  The crime
23 happened, and you have to be held accountable.

24         Now, Mr. Morris spoke to you about the importance of
25 today.  And this is an important day.  Mr. Morris said, "Today

1   is a day that Mr. Chrisley will remember for the rest of his

2   life."  But today is the day that you, you should hold

3   Mr. Chrisley, Mrs. Julie Chrisley, and Peter Tarantino

4   accountable for the crimes they have committed.

5           As I said earlier, all I ask is that you follow the

6   law that Judge Ross instructed you on and you weigh the

7   evidence.  And when you do those two things, I am confident

8   that you will find the defendants guilty of each crime charged

9   in the indictment.

10          Thank you.

11          THE COURT:  Thank you.

12          Ladies and gentlemen, your verdict, whether guilty or

13  not guilty, must be unanimous.  In other words, you must all

14  agree.  Your deliberations are secret.  You'll never have to

15  explain your verdict to anyone.  Each of you must decide the

16  case for yourself but only after fully considering the

17  evidence with the other jurors.  So you must discuss the case

18  with one another and try to reach an agreement.

19          While you're discussing the case, don't hesitate to

20  reexamine your own opinions and change your mind if you become

21  convinced that you are wrong, but don't give up your honest

22  beliefs just because others think differently or because you

23  simply want to get the case over with.

24          Remember that in a very real way each of you is a

25  judge.  You are judges of the facts.  Your only interest is to

                    United States District Court

1   seek the truth from the evidence in this case.

2           When you get to the jury room, choose one of your

3   members to act as your foreperson.  The foreperson will direct

4   your deliberations and will speak for you in court.

5           As I previously explained, a verdict form has been

6   prepared for your convenience.  Take the verdict form with you

7   to the jury room.  When you have all agreed on your verdict,

8   your foreperson must fill in the form, sign it, date it, and

9   then you all will return with the verdict to open court and

10  publish it.

11          If you wish to communicate with me at anytime during

12  your deliberations, please write down your message or question

13  and give it to the Court security officer.  It doesn't matter

14  who writes it, but your foreperson needs to sign it.  The

15  Court security officer will bring the note to me and I will

16  respond as promptly as possible, either in writing or by

17  talking to you in the courtroom.

18          But I caution you, at no time should you give me any

19  indication of a numerical breakdown that represents where you

20  are at a particular time.  So please don't at anytime if

21  you're at an impasse come back and say we're six this way, six

22  that way, or anything like that.  Don't give a numerical

23  breakdown, either in writing or when you're in court.

24          Now, a couple of last minute things.  We are going to

25  release you now to the jury room.  There is some food back

1 there. Do not start deliberating yet. What you can do now is

2 you can start eating, you can also have discussions while

3 you're eating about who you want your foreperson to be, but

4 don't discuss any facts of the case at all. Those are the

5 only two things, eat and choosing a foreperson. That will

6 give us some time to gather the items that you need, a copy of

7 the charge, the verdict, the -- a copy of the charges, the

8 verdict and the indictment and the evidence that you need.

9        We're at 1:30. What my plan is is to at 1:50, about

10 20 minutes, see if you've had sufficient time to eat and if

11 so, deliver the items to you back there and tell you, yes, now

12 you can start deliberating. So until you get that, very

13 clearly, do not start deliberating.

14        Also, I wanted to elaborate on the request that was

15 made and I started to discuss with you earlier. I understand

16 there was a request to leave early at 4. I apologize for any

17 misunderstanding I may have caused earlier this week when I

18 said we'll defer to you as far as whether you want to work

19 late. I did not intend that to mean that we'll just let you

20 decide what time you want to leave today.

21        We need to go ahead and work on deliberations. What

22 I meant to convey -- and again, I apologize if I wasn't

23 clear. -- that once it starts getting later in the evening,

24 beyond when we usually stop, we'll ask you if you want to keep

25 going, but I didn't mean that to mean we were considering

1  stopping early.  We are not.  So we will keep going.

2        I want to say that very cautiously, because as you've

3  heard attorneys on both sides say, this is an important case.

4  So nobody should be back there trying to rush anything because

5  you want to get out of here by 4 or because you have other

6  plans.  Again, I apologize if I misunderstood, but this is an

7  important case with a lot of evidence.  So take your time and

8  go through it.

9        And at some point -- we won't keep you here as an

10 all-nighter.  At some point we with come back and say, do

11 you-all need to stop, do you need a break, do you want to come

12 back Monday.  But that point wont be at 4 o'clock.

13        Final thing I want to say is, our two alternates are

14 Ms. Ferrans and Mr. Sleets.  You will be removed from the jury

15 room.  You will not deliberate.  You will take your food to

16 another place.  Ms. Beck will set up comfortably so that

17 should something happen with one of jurors -- we've already

18 had stuff happen to two. -- then you will fill in.  But until

19 then, you will not participate in deliberations.

20        So I'm going to ask if Ms. Farrens and Mr. Sleets

21 will come out first so that you may retrieve your items from

22 the deliberations room and then go with Ms. Beck, who will set

23 you up to, first, get your lunch back there and then go eat

24 it.  And then after they come out, the rest of you can go back

25 and start eating and discussing who your foreperson is.

1      Thank you so much.

2      All right, ladies and gentlemen -- yes.

3      A JUROR:  Can we take our notebooks?

4      THE COURT:  Yes.  Very good point.  At this point you
5  may take your pads with you.  You can go back.  Again, you're
6  just eating now and choosing a foreperson.  We'll come back in
7  about 20 minutes, at 1:50, to see if you are ready to start
8  deliberating.  Thank you so much.

9      **(The jury exited the courtroom at 1:34 p.m., after**
10 **which the following proceedings were had.)**

11     THE COURT:  All right.  Everyone may be seated for a
12 moment.  I need to put a thing or two on the record.

13     Any exceptions, objections to the reading of the
14 charge?  Any objections that you want to renew or perfect from
15 the charge conference?  Anything like that at this time?

16     We'll start with the Government.

17     MR. KREPP:  We would just renew our objection on the
18 deliberate ignorance instruction.

19     THE COURT:  So noted.  Thank you.

20     Any objections again or exceptions to the reading of
21 the charge or anything of that nature on the behalf of Todd
22 Chrisley?

23     MR. MORRIS:  May it please the Court, we'd like to
24 renew the objections we made yesterday.  And I believe I did
25 object yesterday to the remedial charge in the form that you
                United States District Court

1  gave it.  If I did not, I object to it now.

2          THE COURT:  So noted.  Thank you, sir.

3          MR. MORRIS:  Thank you.

4          THE COURT:  On behalf of Julie Chrisley?

5          MR. ANULEWICZ:  I adopt Mr. Morris's objections.

6          THE COURT:  So noted.  Thank you.

7          And Mr. Griffin on behalf of Mr. Tarantino.

8          MR. GRIFFIN:  It's the same response.  I adopt what

9  Mr. Morris just said.

10          THE COURT:  All right.  Thank you so much.

11          All right.  So our alternates are out?

12          COURT SECURITY OFFICER:  Yes.

13          THE COURT:  As I said, we'll go back there at about

14  1:50 to see if they are ready to start deliberating.  In the

15  meantime, in this red folder -- and I'll leave it up here so

16  that you-all can look to make sure it's in proper order. --

17  are the indictment, one copy of the Court's charge and the

18  verdict form, in that order.

19          Also, Ms. Beck tells me that you-all have reviewed

20  the evidence together to make sure it is in proper order to go

21  back.  But when she gets back in and after you've reviewed

22  this, before we send everything back to the jury, we'll put on

23  the record that that is correct, that you-all don't have any

24  issues with what we intend to send back.  So I'll leave this

25  right here.

              United States District Court

1          So we are in recess until -- let's say we'll come

2     back about -- right at 1:50 to go ahead, make sure that we put

3     that on the record and send everything back.  Thank you.

4          **(A recess was taken at 1:36 p.m.)**

5          THE COURT:  You-all maybe seated.

6          We're not bringing the jurors back in right now.

7          Does someone have that red file handy?  We'll start

8     with the red file to confirm that everyone has looked at it.

9     Again, it contains the indictment, verdict form and charges.

10         Any issues or concerns with respect to this file and

11    these items on behalf of the Government?

12         MR. KREPP:  No, your Honor.  Thank you.

13         THE COURT:  Thank you.

14         On behalf of any of the defendants?

15         MR. MORRIS:  No, your Honor.  Thank you.

16         MR. ANULEWICZ:  No, your Honor.

17         MR. GRIFFIN:  No, your Honor.

18         THE COURT:  No from all of them.

19         Then we'll move to the evidence, which I see stacked

20    up in front of Ms. Beck.  I want to get everybody's position,

21    an attorney for each party's position, with respect to whether

22    you are in agreement that the evidence is in proper order to

23    go back to the jurors.

24         On behalf of the Government?

25         MR. KREPP:  Yes, your Honor, we are in agreement.

                    United States District Court

1          THE COURT:  On behalf of Todd Chrisley?

2          MR. MORRIS:  Yes, your Honor.

3          THE COURT:  On behalf of Julie Chrisley?

4          MR. ANULEWICZ:  Yes, your Honor.

5          THE COURT:  And on behalf of Mr. Tarantino?

6          MR. GRIFFIN:  Yes, your Honor.  I think we added T55

7   yesterday.  It's in the box, yes?  And we are good.  Thank

8   you.

9          THE COURT:  It is in the box?

10         MR. GRIFFIN:  Yes.

11         THE COURT:  So the only issue is whether it should

12  have been admitted?  Is there an issue over that?

13         MR. GRIFFIN:  It was admitted.  I think we just had

14  to add it a day late.

15         THE COURT:  Okay.  I don't have any issue with that.

16  I don't hear any other issues with that, so that's fine.

17         Then we will go ahead.  It is about 1:57.  We are

18  going to go ahead and take these items back and tell the

19  jurors that they may begin deliberating.

20         Ms. Beck, I will leave this file with you.

21         If you-all go away from the courtroom or off the

22  floor, or even if you don't, actually, make sure Ms. Beck has

23  your cell number so we can get you back here if we have a

24  question or a verdict.

25         MR. KREPP:  We're doing that now.

                   United States District Court

1          THE COURT:  Ms. Beck, here this is.

2          We're in recess until we hear from the jury.  Thank

3   you.

4       **(A recess was taken at 1:58 p.m.)**

5          THE COURT:  All right.  We are back on the record.

6   We have a note and two what I'll call issues that were just

7   stated, not reflected by note, but stated when Ms. Beck went

8   back to retrieve the note.

9          I'll start with the two issues.  The jurors have

10  indicated they are having much difficulty maneuvering through

11  the exhibits.  They asked if Ms. Dyer could be brought back to

12  show them the exhibits.  And Ms. Beck said, I don't think so,

13  but I'll ask the judge.

14         One of them said -- I don't know what this means. --

15  Tarantino's guys is the only one who showed us stuff in order.

16         So Mr. Griffin, whatever that means, I don't know.

17  That's just what was stated.

18         MR. GRIFFIN:  Write a note back saying we're ready to

19  go.

20         THE COURT:  Remember we have two pregnant jurors but

21  only one is deliberating.  The other is an alternate.  The one

22  that is back there deliberating said that she is stressed and

23  has a headache.  One of the fellow jurors said, yeah, she

24  wanted to know if she could just leave.  But I don't know if

25  that last question was kind of in jest or not, but that is

United States District Court

1  what was stated.

2           Those are the issues.

3           Here's the note.  And it is signed by the foreman,

4  who I think is Mr. Fullerton [sic], the black male that was

5  sitting in front of the jury box last week -- or this week.

6  The whole time.  But we talked about him earlier this week

7  because he sent out another note before they started

8  deliberating.

9           This note says:  "If you had no idea a PFS, personal

10 financial statement, and other documents were fraudulently

11 filed, is that considered to still be conspiring?"

12          That is the note.  So we need some response.

13          MR. MORRIS:  No.

14          MR. ANULEWICZ:  I concur.

15          THE COURT:  From the defense the response is no.

16          MR. KREPP:  Read it again one more time, your Honor.

17          THE COURT:  Certainly.  "If you had no idea PFS and

18 other documents were fraudulently filed, is that considered to

19 still be conspiring?"  That is the question.

20          While you are mulling that over, Ms. Dyer, I'll let

21 you know that there was a request that you be sent back to

22 help them because they're having difficulty going through all

23 these exhibits.  We told them they couldn't get you.  But they

24 wanted you.

25          MR. KREPP:  Your Honor, the Government would just

                   United States District Court

1  request that the bank fraud conspiracy charge and the bank
2  fraud charge be reread to the jury.
3       THE COURT:  When you say those charges, I mean, what
4  portions?  I don't think I have an extra charge in front of
5  me.  Oh, yes I do.  I do.  So tell me what you're suggesting.
6       MR. KREPP:  Sure.  So I think the specific language
7  on our version is on Page 12.  It goes through the elements,
8  goes through the knowledge requirement, continuing
9  through Page 12 and 13.  It specifically details what the
10  Government has to prove for the conspiracy.
11       THE COURT:  And anything else?  Just 12 and 13?
12       MR. KREPP:  We have no objection if the remaining
13  charges, 14 and 15, the substantive, if defendants want that
14  read as well.  But it sounds like the question is regarding
15  conspiracy, so I think the appropriate response is simply to
16  reread the law on conspiracy.
17       THE COURT:  So considering they have the law back
18  there, they have a copy of this, you're asking that I read it
19  versus just referring them back to the charge and saying -- I
20  could refer to a particular portion of the instructions by
21  page number.  I could actually read it.  These are all
22  options.  But I'm just pointing out that I would be reading
23  something that they already have back there with them.
24       So tell me again what with pages -- first of all,
25  what pages you're referring to, 12 and 13.  Is that it?

1          MR. KREPP:  That's it, your Honor.

2          THE COURT:  You're asking specifically that I reread

3    it versus just telling them refer to 12 -- Pages 12 and 13 and

4    what you already have back there in your possession?

5          MR. KREPP:  Or you can do that as well.  That's fine

6    if you just refer them.  But I think that answering yes or no

7    to a question like that is invading the province of the jury.

8          THE COURT:  I don't know that anybody -- I'm not

9    sure.  Mr. Morris may have been serious.

10         MR. KREPP:  That's what I'm worried about.  I took

11   him as serious.

12         MR. ANULEWICZ:  We'll take it if we can get it.

13         THE COURT:  It doesn't hurt to try I guess.

14         MR. KREPP:  I thought that was a serious request,

15   that's the only reason I'm saying all of this.

16         THE COURT:  All right.  So the Government's request

17   is to direct the jurors to Pages 12 and 13 either by my

18   rereading it or simply by my telling them to refer back to

19   those pages?

20         MR. KREPP:  Yes.

21         THE COURT:  What say you, defense?

22         MR. MORRIS:  Can we just look at 12 and 13, your

23   Honor?

24         THE COURT:  Certainly.

25         MS. PETERS:  Your Honor, I would just add -- sorry.

                    United States District Court

1   We're all looking through this in live time.  I should

2   probably consult with Mr. Krepp before I speak for the

3   Government.

4           THE COURT:  Well, I had -- I turned my attention to

5   the defense.  So what say you, defense?

6           MR. MORRIS:  Judge, I believe my preference would be

7   for you to inform them that all of the charges are with them

8   and they should rely on all of them as you directed them to

9   and the answers are there.

10          THE COURT:  All right.  Mr. Anulewicz or whomever

11  wants to speak next.

12          MR. ANULEWICZ:  I concur.

13          THE COURT:  Mr. Griffin, anything else?

14          MR. GRIFFIN:  It doesn't relate to us.  No.

15          MR. KREPP:  Your Honor, we have no objection to what

16  Mr. Morris proposed.

17          THE COURT:  All right.  In that case, I don't know

18  that I need to bring them out for that.  I could write a note,

19  but I certainly could bring them out if we just want to get a

20  feel for how they look being brought out.  So I'll ask that

21  request, request to send the response in written form, which I

22  would run by you-all, or request to bring them out.

23          Government?

24          MR. KREPP:  Written form is fine, your Honor.

25          MR. MORRIS:  Written form is fine, your Honor.

                    United States District Court

1        THE COURT:  Anybody else want to be heard?  All
2   right.
3                        **(brief pause)**
4        THE COURT:  All right.  My response is simply:
5   "Ladies and gentlemen, you will need to refer to the charges
6   you have been provided.  All of the pertinent law is contained
7   therein.  Judge Ross."
8        Anybody want to see it?
9        MR. ANULEWICZ:  No objection, your Honor.
10       MR. MORRIS:  Sounds fine, Judge.
11       MR. KREPP:  No objection.
12       THE COURT:  If you could just hand this to them.  Now
13  they'll really like me, after not letting them leave at 4 on
14  top of that.
15       Thank you-all.  Please don't go too far.
16     **(A recess was taken at 4:15 p.m.)**
17       THE COURT:  We're going to bring them in.
18       **(The jury entered the courtroom at 5:50 p.m., after
19  which the following proceedings were had.)**
20       THE COURT:  Everybody else may be seated.  We're
21  waiting for one to come from the restroom.  Thank you, sir.
22                        **(brief pause)**
23       THE COURT:  All right.  Now I think we've got
24  everybody.  Right?
25       All right.  Ladies and gentlemen, I understand that
                    United States District Court

1  you are ready to stop for the day and come back on Monday.
2  And that is fine.

3       It's no problem for you-all to send out questions, by
4  the way.  Unfortunately, the Court can't answer questions in
5  the way you may think the Court should at times.  Sometimes
6  we're limited on how we can respond.  So our responses are not
7  meant to indicate anything.  But again, we meet, confer, and
8  we respond the best way that we can that everybody is in
9  agreement as far as responding.  So I understand there's some
10 question about whether sending out notes is okay.  It's fine.
11 We want you to send out notes if you need to, but we just
12 respond in the best way that we can.

13      So I want you to have a wonderful and safe weekend.

14      What I am going to do with our two alternates so that
15 you don't have to come all the way down here and sit is, if I
16 can place you on call so that you can assure me that within an
17 hour if needed you would be able to return here.  And then we
18 would let you know when the trial and your service are
19 completed so that you would be off call.  But I will place you
20 on call for Monday.

21      Is that okay with you Mr. Sleets?

22      JUROR SLEETS:  That's fine.

23      THE COURT:  Is that okay with you, Ms. Farrens?

24      JUROR FARRENS:  Yes, ma'am.

25      THE COURT:  And we've all talked about how long it
                    United States District Court

1  would take you to get down here, so I understand.  And it
2  wouldn't be during rush hour that we would call you so that
3  you would be able to get down here.

4          Ladies and gentlemen, you've been at it for a couple
5  of hours.  Get some rest.  I hope you have a wonderful
6  weekend.  I will see you here 9:15 on Monday.

7          You will be able to go to lunch when you choose to on
8  Monday.  Today, again, I didn't want to break up the arguments
9  and so we pulled up some lunches for you so they'd be back
10  there.  But on Monday, since you're still deliberating, the
11  Court will still incur the cost of your lunch.  We'll treat
12  you to lunch.  And you'll be able to go down and get your
13  lunch.  If you want to take time and eat it down there as a
14  break, you can.  If you want to bring it back up and
15  deliberate while you eat, it will be totally up to you.

16          Please be back here at 9:15.  You cannot start
17  deliberating until all of you are present, so please be
18  prompt.

19          And please don't discuss the case with anybody this
20  weekend.  Don't do any research.  Don't watch any television
21  shows related to this this weekend.

22          And when you come back on Monday, do not start
23  discussing the case or deliberating until we see that
24  everybody is back in place.

25          Thank you so much.  Have a wonderful and a safe
                    United States District Court

1  weekend.

2          (The jury exited the courtroom at 5:56 p.m., after

3  which the following proceedings were had.)

4          THE COURT:  All right.  Anything before we depart for

5  the weekend?  Government?

6          MR. KREPP:  No, your Honor.  Thank you.

7          THE COURT:  Thank you.

8          Anything from any of the defense attorneys?

9          MR. MORRIS:  No, your Honor.  Thank you.

10          MR. ANULEWICZ:  No, your Honor.

11          MR. GRIFFIN:  No, your Honor.

12          THE COURT:  I'll see you back on Monday.  Thank you

13  so much.  We don't have any court scheduled on Monday, by the

14  way, so you-all are free to still put stuff down or leave

15  stuff wherever you want.  We don't have hearings until

16  Tuesday.

17          MR. GRIFFIN:  Thank you, your Honor.

18          (The proceedings were adjourned for the day at 5:57

19  p.m., to be reconvened as ordered by the Court.)

20

21

22

23

24

25

                    United States District Court

1

2                          Reporter's Certification

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5
                                    /S/Geraldine S. Glover, RPR
6                                   Official Court Reporter
                                    United States District Court
7                                   Northern District of Georgia

8    Date:   August 24, 2022

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          United States District Court