[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-14074

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PETER TARANTINO,
TODD CHRISLEY,
a.k.a. Michael Todd Chrisley,
JULIE CHRISLEY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:19-cr-00297-ELR-JSA-3

_____

Before ROSENBAUM, NEWSOM, and TJOFLAT, Circuit Judges.

PER CURIAM:

This criminal appeal revolves around three defendants and two schemes: tax evasion and bank fraud.

The tax-evasion scheme involved all three defendants. Defendant Michael Todd Chrisley[1] ("Todd") owed back taxes. Rather than directing his income payments into a personal account, which the Internal Revenue Service ("IRS") could have found and used to satisfy his back taxes, the Chrisleys hid Todd's income payments in an account that Defendant Julie Chrisley owned. And as soon as the IRS started looking into accounts Julie owned, the Chrisleys transferred that account to yet another family member. Meanwhile, the Chrisleys' accountant, Defendant Peter Tarantino, made false statements to federal agents to keep the IRS off the trail. This conduct, and more described below, resulted in convictions for tax evasion and conspiracy to defraud the IRS.

As for the bank-fraud scheme, the Chrisleys and Todd's prior business partner sent fabricated financial documents to banks when they applied for loans, loan renewals, and lines of credit. These

_____

[1] Because this case involves several people whose last name is Chrisley, to avoid confusion, we use these individuals' first names when we speak of one of them. We refer collectively to Todd and Julie as "the Chrisleys."

false financial statements grossly overrepresented the Chrisleys' assets to make the applications more attractive to banks.

After a joint trial, the jury convicted all three defendants on all counts, and the district court sentenced them. The defendants now raise several issues on appeal. First, the Chrisleys argue that the district court erred in denying their motion to suppress certain electronic evidence. Second, the Chrisleys assert their convictions for bank fraud, tax evasion, and conspiracy to defraud the IRS were based on insufficient evidence. Third, all three defendants seek a new trial or evidentiary hearing based on the prosecution's failure to correct allegedly false testimony. Fourth, Julie asserts that the district court erred in sentencing her by holding her accountable for the loss amount of the entire bank-fraud scheme. Fifth, the Chrisleys challenge the restitution and forfeiture money judgments against them. And sixth, Tarantino argues that the district court abused its discretion in declining to sever his case from the Chrisleys'.

After careful consideration, and with the benefit of oral argument, we affirm the district court on all issues except for the loss amount attributed to Julie. The district court did not identify the evidence it relied on to hold Julie accountable for losses incurred before 2007, and we cannot independently find it in the record. So we vacate Julie's sentence and remand solely for the district court to make the factual findings and calculations necessary to determine loss, restitution, and forfeiture as to Julie and to resentence her accordingly.

## I.    BACKGROUND

A grand jury returned a superseding indictment charging the Chrisleys with bank fraud, tax evasion, and various conspiracy counts.  Julie was also charged with wire fraud and obstruction of justice.  As for Tarantino, the indictment charged him with aiding the filing of false tax returns, as well as conspiring to defraud the IRS with the Chrisleys.

After nearly three weeks of trial and three days of deliberations, the jury found the three defendants guilty on all counts.  The district court sentenced Todd to 144 months' imprisonment, Julie to 84 months' imprisonment, and Tarantino to 36 months' imprisonment.  The court also ordered the Chrisleys, jointly and severally, to pay $17,270,741.57 in restitution and the same amount in forfeiture.  The court ordered Tarantino to pay a $35,000 fine.

### A.    The Trial Evidence

We summarize the relevant trial evidence, in the light most favorable to the government.  *United States v. Duenas*, 891 F.3d 1330, 1333 (11th Cir. 2018).

### i.    Evidence Related to Tax-evasion Counts

Todd (but not Julie) owed over $500,000 in taxes for the 2009 tax year.  That year, Todd had filed a married-filing-separately tax return, which meant the IRS could (generally) collect against only Todd and not against Julie as to that amount.

While that tax debt was still due and owing, in 2013, the Chrisleys were hired to make a reality television show called *Chrisley Knows Best*. The Chrisleys' attorney testified that the show's production company required the Chrisleys to set up a loan-out company to receive payments on the Chrisleys' behalf. Successful artists and entertainers use loan-out corporations for the financial benefits their structure allows. *Bozzio v. EMI Grp. Ltd.*, 811 F.3d 1144, 1147 (9th Cir. 2016). More specifically, a loan-out corporation "is a duly organized corporation, typically wholly owned by an artist, the sole function of which is to 'loan out' the services of the artist-owner to producers and other potential employers. The form offers limited personal liability and beneficial tax treatment." *Id.* (quoting Aaron J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 Harv. J. Sports & Ent. L. 55, 72 (2012)) (cleaned up).

The Chrisleys created a loan-out company called 7C's Productions ("7C's"), in the form of a Subchapter S corporation. The IRS describes Subchapter S corporations as "corporations that elect to pass corporate income, losses, deductions, and credits through to their shareholders for federal tax purposes. Shareholders of S corporations report the flow-through of income and losses on their personal tax returns and are assessed tax at their individual income tax rates. This allows S corporations to avoid double taxation on the corporate income." *S corporations*, IRS, https://www.irs.gov/businesses/small-businesses-self-employed/s-corporations [https://perma.cc/FKS3-95MW].

The Chrisleys set up 7C's in Julie's name. Julie had sole sig-
nature authority over the 7C's bank account. The production com-
pany paid the Chrisleys for their performances on the television
show by sending checks for each recipient to 7C's, care of the indi-
vidual who rendered the services. Once the money was in the 7C's
account, Todd and Julie controlled payment to the other family
members who appeared on the show.

To be clear, even though the 7C's account was in Julie's
name, the government presented testimony that Todd had access
to the account. Evidence also showed that Todd shared control
over the account. For example, Todd emailed someone associated
with production and said, "[W]e . . . need to make sure that the
payments for this second season are paid directly to 7C's and not
to the individual so as to give us the control to deal with [my kids]
when they don't want to work[.]" A mortgage broker who inter-
acted with the Chrisleys even testified that Todd told him that "his
wife owned" 7C's but Todd "controlled the business."

The prosecution argued that the defendants used the 7C's
account to hide Todd's income from the IRS because the account
was in Julie's name, and Todd's tax liabilities from 2009 were
against him alone as an individual filer. To show the 7C's bank
account hid Todd's income, the prosecution presented evidence of
personal expenses that were paid out of the account, including pay-
ments for Chick-fil-A, utility bills, shopping, and vacations. And
FBI Special Agent Steve Ryskoski testified that the bank statements
gave the appearance that Todd and Julie were using the 7C's

account as a personal account. IRS Officer Betty Carter also testified that, based on the 7C's bank statements, she deduced that the Chrisleys were living off the 7C's account. She testified that she saw a lot of personal expenses paid through the 7C's account and "very little activity through the personal accounts."

During this same period, the Chrisleys did not file their 2013–2016 tax returns or pay taxes for those tax years, even though the government sent the Chrisleys and Tarantino publications explaining the importance of paying tax liabilities. It wasn't until February 2018—only *after* the Chrisleys became aware they were under criminal investigation by the IRS—that they filed and began paying taxes for those years.

In the meantime, in September 2016, Tarantino spoke with IRS revenue officer Agnes Jagiella to discuss Todd's outstanding tax liabilities. Officer Jagiella testified that Tarantino falsely told her that Julie had no interest in 7C's, but rather, the Chrisleys' daughter owned 100% of the company. And then, Officer Jagiella testified, Tarantino refused to tell her which daughter. After this conversation between Officer Jagiella and Tarantino, Tarantino emailed Todd and Julie a summary of the call and said that Officer Jagiella "asked some questions about your current living arrangements, etc. I avoided answering them."

On another occasion, Tarantino told Officer Carter he did not know where the Chrisleys banked, even though he had their Bank of America log-in information.

Officer Carter and Tarantino also discussed the Chrisleys on March 1, 2017. During that conversation, Officer Carter requested bank statements and canceled checks for all bank accounts on which *Todd* had signature authority. Tarantino complied.

Then, five days later, on March 6, Tarantino told the Chrisleys that the IRS sent a follow-up request seeking bank statements and canceled checks for all accounts on which Todd *or* Julie had signature authority. Todd responded by telling Julie, "Get this taken care of asap."

The next day, Julie transferred ownership of the 7C's bank account to Elizabeth Faye Chrisley ("Faye"), Todd's mother. A new 7C's bank account was also opened in Faye's name. Faye testified that she never ran 7C's and did not even know a company was associated with the 7C's bank account. The same day Julie transferred ownership of the bank account to Faye, Todd emailed his talent agent—copying Julie—and said, "Please refrain from sending any deposits to the account you have on file as that account has been compromised, we will be sending you another NEW account number tomorrow or Thursday morning." With these arrangements taken care of, Tarantino then sent the account information for the first 7C's bank account to the IRS, but he did not mention that the account changed owners or that the Chrisleys' future payments would all be to a new account.

More than ten months passed before January 18, 2018, when Tarantino emailed draft tax returns to the Chrisleys for 2013–2016. In doing so, Tarantino explained that he would be forwarding the

draft returns to a Bentley dealership and a bank the following day. The next day, as promised, Tarantino sent the draft returns to those third parties. But his email to those companies did not explain that the documents were drafts that hadn't been filed. Instead, it simply said, "I have attached the last three years of personal and business tax filings." After that, on January 23, Tarantino sent a reminder to the Chrisleys to sign off on the draft returns so he could officially file them.

On February 2, 2018, FBI and IRS-Criminal Investigation special agents interviewed Tarantino. Tarantino did not tell the agents he had recently sent draft tax returns to third parties. And it wasn't until after this interview that the Chrisleys finally filed their late returns for 2013–2016.

Separately, Tarantino also filed 7C's corporate tax returns for 2015 and 2016, falsely claiming that the company earned zero dollars and made zero distributions during that period. In reality, 7C's earned revenue in 2015 and 2016.

### ii. Evidence Related to Bank-fraud Counts

From the mid-2000s through 2012, Todd owned a company called Chrisley Asset Management ("CAM"). His CAM business partner, Mark Braddock, testified at trial with immunity, explaining how the bank-fraud scheme worked.

Braddock helped the Chrisleys obtain loans and lines of credit for CAM from financial institutions by submitting applications with false information about the Chrisleys' income and assets.

For example, evidence showed that in 2007, when Todd tried to obtain unsecured lines of credit from a bank, the bank requested personal account statements for Todd as a guarantor.  So Braddock sent Todd a document titled, "Your Merrill Lynch Report," showing that Todd and Julie had $776,509.52 deposited at Merrill Lynch. In fact, though, the Chrisleys never had more than $17,000 at Merrill Lynch during the relevant period.  Todd responded to Braddock's doctored document with, "you are a f[]ing genious!!!!  just make it show 4 mil+."  This interaction set the stage for the additional bank fraud that followed.

The government introduced emails and documents Braddock sent to banks on the Chrisleys' behalf.  These communications contained misrepresentations like the one above: for instance, that the Chrisleys had $3.6–$4 million in assets at Merrill Lynch. But Merrill Lynch's records show no member of the Chrisley family had even close to $4 million in an account.

The government also presented an email chain where a bank requested financial information.  Braddock emailed Todd, "I don't have financials on any of these."  And Todd responded, "stop telling me this shit, create them like you always have, if I don't get her these then they [won't] renew the loans."

During Braddock's testimony, the prosecution asked Braddock directly, "[D]id you commit fraud from 2007 onward just on your own?  In other words, was it just you committing fraud?" Braddock answered, "No.  Mr. and Mrs. Chrisley and myself were all three involved."

The government also introduced other evidence against Julie with respect to the bank-fraud scheme.  Braddock testified that in 2012, Julie emailed a scanned image of a check and bank statement to Braddock and Todd, and wrote, "Post date is the only thing that needs to be changed."  Braddock made that edit and submitted it to the bank, with Julie's awareness.  Braddock also testified that Julie's nickname was "ass[] [is] on fire" because she drove all over town paying off late-due loan amounts.  He said that he and Julie "talked about the personal financial statements" and about "scrapbooking," which was their term for editing documents with false information.  Evidence also showed two fraudulently obtained loans from 2007 and 2008 were issued to Julie's own company, Select Real Estate Holdings.

Besides the conviction for conspiracy to commit bank fraud, the jury convicted the Chrisleys of five counts of substantive bank fraud involving Midtown Bank (Count 2), GulfSouth Private Bank (Count 3), United Community Bank (Count 4), RBC Bank USA (Count 5), and Wells Fargo (Count 6).

For Counts 2 and 4 (Midtown and United Community Banks), the government produced witnesses from the victim banks, who testified that "[i]t was very important" for Todd's personal financial statement to include accurate information because it affected "the strategy in how we dealt with [the applied-for] loan and the other loans that the borrower had"; false financial information would "influence decision making on whether or not to renew certain loans"; it was "pretty important" to receive accurate

information on personal financial statements because "that's how [they] assess the risk on whether to approve a loan or not"; and one of the banks required updated financial statements every twelve months to decide whether to continue the credit facility and because it was required to evaluate the risk level of each loan.

Besides the testimony from the employees of two of the victim banks, the government offered evidence from a former vice president of Buckhead Community Bank, who said "a bank does rely on" personal finance statements "to see what your debt to income ratio is. So it's very important to make a loan decision." The former president and CEO of Embassy National Bank also testified that he would have wanted to know if Todd didn't actually have the amount in marketable securities that he represented.

Unlike for the banks in Counts 2 and 4, no employee-witnesses testified from GulfSouth, RBC Bank USA, or Wells Fargo. To support the three substantive bank-fraud counts involving those banks (Counts 3, 5, and 6), the government relied on evidence that Braddock emailed a personal financial statement reflecting inflated assets to GulfSouth and WellsFargo on behalf of Todd, copying Todd. And Braddock emailed a false document to RBC Bank on an accountant's letterhead representing that the accountant had audited financial information for CAM when in fact the accountant had not.

### B. Procedural History

Before trial, and relevant to this appeal, the Chrisleys timely filed two motions to suppress evidence.  The first, filed in December 2019, sought to suppress the evidence that federal agents seized from the Georgia Department of Revenue ("Georgia DOR").  The second relevant motion to suppress, which the Chrisleys filed a couple months later in February 2020, sought to "suppress evidence seized pursuant to the search warrants for emails and electronically stored information."  Unlike the first motion, this second motion did not mention the Georgia DOR search.

The district court granted the first motion to suppress and denied the second.  So the evidence from the warehouse search was suppressed, but the evidence from the electronically stored information ("ESI") searches was not.

More than two years later—and ten days after the deadline for filing motions in limine had passed—the Chrisleys filed a "Motion to Require the United States to Establish Admissibility of Suppressed Evidence" as to the evidence the government collected through the ESI warrants and all evidence the FBI and IRS collected.  The district court denied that motion as untimely, stating that it had already decided the issue of whether the evidence collected through the ESI warrants was admissible when it denied the motion to suppress electronic evidence.

The parties proceeded to trial.  The Chrisleys contend that they had paid off all taxes by the time of trial.  While the prosecution filed a declaration from Officer Carter stating that the

Chrisleys continued to make tax payments even after trial ended, the parties do not now dispute that, at the time of trial, the Chrisleys owed nothing for tax years 2014 and 2015.[2] Even so, Officer Carter testified at trial that the Chrisleys still owed money for 2010, 2011, 2014, 2015, and 2016.

Almost two weeks after Officer Carter's testimony, but still during trial, the Chrisleys produced documents to the government reflecting payments the Chrisleys had made to the IRS. In response, that same day, IRS Agent Brock Kinsler emailed Officer Carter asking about one of the payments described in the Chrisleys' document production. The two of them discovered that a payment the Chrisleys made in January 2022 towards 2016 taxes had not been applied to the couple's outstanding balance. Apparently, Agent Kinsler recalled telling the prosecutors about this email exchange on the morning of June 1, 2022. Conversations between the Chrisleys' accountant and Officer Carter from three weeks after trial show further payments that the Chrisleys made to the IRS but that the IRS database had not yet applied to the Chrisleys' balance at the time Officer Carter testified that they still had outstanding liabilities. In the end, then, it turned out that at the time of Officer Carter's testimony, the Chrisleys did not owe any taxes for at least 2014 or 2015. In other words, Officer Carter's testimony that the

---

[2] Defendants argue that, at the time of trial, the Chrisleys did not owe taxes for *any* tax year before 2017. But the district court pointed out that the Chrisleys were still making payments for tax years 2010, 2011, and 2016 several months after trial ended. No matter. We will assume the Chrisleys' versions of the facts because it does not alter the analysis or its result.

Chrisleys still owed money for at least those two tax years was incorrect.

At the end of the trial, the jury found all three defendants guilty on all counts in which they were charged. The Chrisleys had a joint sentencing hearing, where the district court accepted the government's loss calculations. Those loss calculations supported the Chrisleys' base offense levels, restitution amounts, and forfeiture amounts. The district court allowed defense counsel two weeks after the final restitution and forfeiture orders were docketed to file any motions to amend those orders. Defense counsel did not file any motion to amend either order.

Each defendant filed a motion for a new trial. The Chrisleys argued that certain evidence should have been excluded and that the government unlawfully failed to correct Officer Carter's testimony that the Chrisleys still owed back taxes as of the time of trial. Tarantino moved for a new trial on the ground that he allegedly suffered compelling prejudice because of the district court's decision not to sever his case. Tarantino had previously filed a pre-trial motion to sever, which was denied.

The district court denied each motion in a short order before the sentencing hearing and then issued its full opinion about six weeks after defendants timely filed this appeal.

## II.    DISCUSSION

We divide our discussion into six parts. First, we address whether the district court erred by denying the Chrisleys' motion

to suppress electronic evidence. Second, we consider whether sufficient evidence supported the Chrisleys' convictions on multiple counts. Third, we assess whether the district court abused its discretion in declining to grant a new trial or hold a hearing on the prosecution's failure to correct Officer Carter's testimony. Fourth, we discuss whether the district court erred in holding Julie accountable for the loss amount of the entire bank-fraud conspiracy. Fifth, we address whether the district court committed procedural error when ordering restitution and forfeiture as to the Chrisleys. And sixth, we consider whether the district court abused its discretion in declining to sever Tarantino's case.

### A. The district court did not abuse its discretion in holding that the motion to suppress electronic evidence was untimely.

The Chrisleys argue that the district court abused its discretion when it denied their "Motion to Require the United States to Establish Admissibility of Suppressed Evidence." We disagree.

As an initial matter, even though the Chrisleys styled their filing as a "Motion to Require the United States to Establish Admissibility of Suppressed Evidence," it was, in reality, a motion to suppress. That's so because it argued that the government's acquisition of the challenged evidence violated the Chrisleys' Fourth Amendment rights, and it sought to prevent the government from using that evidence, even though that evidence had not been suppressed. For these reasons, the law governing motions to suppress controls our review.

When a district court denies a motion to suppress evidence because it is untimely, we review for abuse of discretion. *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990).

A defendant who wishes to move to suppress evidence must do so before trial. Fed. R. Crim. P. 12(b)(3)(C). A district court has authority to set a deadline for motions to suppress under Federal Rule of Criminal Procedure 12(c). A motion to suppress is considered untimely if the defendant files it after the deadline, but courts may consider the motion "if the party shows good cause." Fed. R. Crim. P. 12(c)(3).

In this case, the district court gave the Chrisleys until December 20, 2019, to file motions to suppress. Given the timing of the government's ESI search warrants, the court separately allowed the Chrisleys until February 28, 2020, to file any motions to suppress evidence from those searches. As we've noted, the Chrisleys timely filed two motions to suppress that are relevant to this appeal.

The first motion related to a search of Todd's warehouses. Back in March 2017, the Georgia DOR improperly seized hardcopy documents from one of Todd's warehouses without a warrant. Federal agents later obtained a federal search warrant allowing them to seize those documents from the Georgia DOR. This first motion to suppress sought to exclude evidence that federal agents seized from the Georgia DOR that the Georgia DOR, in turn, had originally obtained through the warrantless warehouse search.

The second motion sought to exclude evidence collected under ESI search warrants. The motion argued that the ESI search warrants were overbroad.

Neither motion asserted that evidence the government obtained through the ESI warrants was derived from the warehouse search. And more specifically, at no point did the motion to suppress ESI evidence suggest that the federal government wouldn't have investigated the Chrisleys' emails but for the suppressed Georgia DOR documents or that the government based its ESI warrant applications on tainted information that the agents had only because of the documents that the Georgia DOR illegally obtained (the "fruit-of-the-poisonous-tree argument"). Instead, over two years later and ten days after the deadline for motions in limine, the Chrisleys filed a new motion seeking to exclude ESI evidence as fruit of the poisonous tree.

The district court did not abuse its discretion in denying this motion as untimely. The Chrisleys' motion violated the district court's deadlines for both suppression motions and motions in limine.

We are not persuaded by the Chrisleys' argument that the order granting the motion to suppress evidence collected from the warehouse warrants *and any evidence derived from the warehouse warrants* covered the evidence the government collected through the ESI warrants so that they didn't need to file a motion to suppress the ESI evidence. Motions to suppress "must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural

to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). And here, the motion to suppress evidence from the warehouse warrant, which was titled, "[Defendants'] Motion to Suppress Evidence Seized Pursuant to Search Warrants Executed at 4125 Welcome All Road and 1800 Century Boulevard NE," never mentioned the ESI warrants or electronic evidence at all.

What's more, the Chrisleys filed an entirely separate motion to suppress the evidence from the ESI warrants, implicitly drawing a distinction between the two types of evidence. So the district court did not abuse its discretion in construing its own order granting the motion to suppress evidence from the warehouse warrants as not covering evidence collected through the ESI warrants.

### B. *Sufficient evidence supports the Chrisleys' convictions.*

The Chrisleys raise several challenges to the sufficiency of the evidence supporting their convictions. This section takes each in turn. First, we consider whether sufficient evidence supported the Chrisleys' tax-evasion convictions. Second, we address whether sufficient evidence supported the Chrisleys' convictions for conspiracy to defraud the IRS. Third, we discuss whether sufficient evidence underlies the three substantive bank-fraud convictions where no employee from the victim banks testified. And fourth, we assess whether sufficient evidence supports Julie's convictions on the substantive bank-fraud counts.

We review de novo the sufficiency of the evidence, "taking the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict." *Duenas*, 891 F.3d at 1333. We won't set aside a jury verdict "if there is 'any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015) (quoting *United States v. Friske*, 640 F.3d 1288, 1291) (11th Cir. 2011)).

### i.  Tax Evasion

The elements of federal tax evasion under 26 U.S.C. § 7201 include "(1) willfulness; (2) existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of tax." *United States v. Kaiser*, 893 F.2d 1300, 1305 (11th Cir. 1990). "An affirmative act of attempted evasion may consist of 'any conduct, the likely effect of which would be to mislead' the Government or conceal funds to avoid payment of a valid tax deficiency." *United States v. Hesser*, 800 F.3d 1310, 1323 (11th Cir. 2015) (citation omitted).

The Chrisleys argue that the government failed to prove an affirmative act amounting to tax evasion. As the Chrisleys see things, the prosecution's entire theory was that the Chrisleys used 7C's bank accounts to conceal Todd's income, but the money in 7C's bank accounts was not Todd's income; rather, they assert, it was 7C's income. The Chrisleys analogize to a law firm that collects money from a client for work one of its lawyers performed:

the money the law firm collects does not belong to the lawyer, and the lawyer owes no taxes on it unless and until the firm distributes the money from the firm's account to the lawyer as income.

In furtherance of this argument, the Chrisleys rely on *Hesser v. United States*, 40 F.4th 1221 (11th Cir. 2022). There, the defendant was accused of converting his assets to gold bars and hiding them around his house so the IRS would not find them. *Id.* at 1226. We held that the government did not prove an affirmative act for a tax-evasion charge because it "did not provide enough evidence for a reasonable jury to conclude that the gold was Hesser's beyond a reasonable doubt." *Id.* at 1227. We explained that it was possible that the gold bars could have belonged to a trust that the defendant often invested for. *Id.* at 1227 n.4. So even if the defendant *wanted* to hide the gold bars from the IRS, he was not guilty of tax evasion because the government did not prove the gold bars were his. *Id.* at 1227.

The facts here are unlike those of the law-firm example, where the lawyer does not control the money in the law firm's account and cannot spend any of the money while it is in the law firm's account. The facts also differ materially from those in *Hesser,* where the government did not prove that the gold bars were Hesser's. Here, the government proved that Todd controlled the 7C's account and that he spent money from that account as if it was his own personal account. Todd cannot avoid tax liability by skipping the step of transferring his income from the 7C's account to his own account while treating the 7C's account as if it is his own

account.  *See United States v. Vernon*, 814 F.3d 1091, 1096–97, 1103 (10th Cir. 2016) (in a case where a Subchapter S corporation held payments for the defendant's services, upholding a tax-evasion conviction because "the government's evidence established that [the defendant] exercised complete and total control over [the Subchapter S corporation] and its bank account, rendering [the Subchapter S corporation] simply a conduit through which she derived personal income").

Indeed, sufficient evidence allowed the jurors to reasonably conclude that the Chrisleys were using the money in the 7C's account as their own income, believing it would evade IRS attention. For example, Officer Carter testified that bank statements suggested that the Chrisleys were "living off of" the 7C's account.  She also testified, "I saw a lot of personal expenses paid through the [7C's] account.  I found it unusual that there was very little activity through the personal accounts."  Special Agent Ryskoski testified that, even though Todd did not have signatory power on the 7C's account, Todd still had access to the bank account.  Emails showed that Todd controlled if and when the 7C's account paid money to other family members for their services on the show.  And Special Agent Ryskoski testified that the 7C's account was used to pay for personal activities that income would normally pay for, like going to Chick-fil-A, paying utility bills, shopping, and vacations.  He testified that "it appeared Todd and Julie Chrisley were using [the 7C's] account as a personal account."

So creating an account in Julie's name, directing Todd's income payments to that account, and then using the account for personal expenses qualifies as conduct likely to "conceal funds to avoid payment of a valid tax deficiency." *Hesser*, 800 F.3d at 1323. There's also more. In late 2016, the 7C's account came up in a conversation between Tarantino and an IRS agent. Tarantino told the IRS that Julie had no interest in the 7C's business and one of their daughters owned 100% of it. A jury reasonably could have understood this testimony to mean that Tarantino was attempting to keep 7C's accounts off the IRS's radar so that it wouldn't find Todd's assets.

Then, on March 6, 2017, the IRS expanded its search beyond accounts in Todd's name and requested bank records for any accounts either Todd *or* Julie controlled. The very next day, Julie transferred ownership of the 7C's account to Faye and also opened a new 7C's account in Faye's name. And Todd told his talent agent that same day to stop all payments to the original 7C's account (that the IRS would now be aware of) because it had been "compromised." A reasonable jury could have concluded from this evidence that the Chrisleys arranged for the change in ownership of the 7C's account, for a new 7C's account, and for payments to be made to the new account in Faye's name because they knew the IRS was looking for Todd's assets in his and Julie's accounts. In other words, a reasonable jury could have found that the Chrisleys engaged in these machinations to conceal Todd's assets from the IRS.

24                    Opinion of the Court                    22-14074

In sum, sufficient evidence supported the jury's verdict as to tax evasion.

### ii.    Conspiracy to Defraud the IRS

To convict someone of conspiring to defraud the IRS in violation of 18 U.S.C. § 371, the government must prove that (1) the defendant and at least one other person agreed to impede the functions of the IRS; (2) the defendant knowingly and voluntarily participated in that agreement; and (3) one of the conspirators committed an act in furtherance of the agreement. *United States v. Hough*, 803 F.3d 1181, 1187 (11th Cir. 2015). The government can prove conspiracy to defraud the IRS with circumstantial evidence such as "the parties' concerted actions, overt acts, relationship, and the entirety of their conduct." *United States v. Kottwitz*, 614 F.3d 1241, 1265 (11th Cir. 2010) (per curiam), *vacated in part on other grounds on denial of reh'g en banc*, 627 F.3d 1383 (11th Cir. 2010). The circumstantial evidence must support a finding that the defendants had a "'common design with unity of purpose to impede the IRS' based on 'reasonable inferences.'" *Id.* (emphasis and citations omitted).

The Chrisleys argue that insufficient evidence underlies their convictions for conspiracy to defraud the IRS because the money in the 7C's account was not Todd's income, so he could not have concealed his income using the 7C's account. We have already explained why they are wrong about that. But the Chrisleys further contend that even if 7C's could be used to conceal Todd's income, no evidence supports the conclusion that the Chrisleys

intentionally used the 7C's account as a way to evade taxes, given that the production studio required the Chrisleys to set up the loan-out company.

We disagree. Plenty of evidence supports the jury's conclusion that the Chrisleys conspired to impede the IRS. Why the Chrisleys created a loan-out company in the first place is irrelevant because, as we've already explained, a reasonable jury could have concluded that they decided to misuse that company as a way to conceal Todd's assets.

The government also presented circumstantial evidence that Julie intended to participate in the conspiracy. Julie was the one with signature authority on the 7C's account. And she could see that the account was used for personal spending. Plus, when the IRS thought to ask for bank records from accounts on which Julie had signature authority, Julie was the one who went to Bank of America to transfer the account to Faye. A jury could reasonably infer she did so to hide payments from the IRS.

The government also presented evidence that Tarantino lied to IRS agents. For example, in September 2016, Tarantino emailed both Todd and Julie, "The agent also asked some questions about your current living arrangements, etc. I avoided answering them." An officer also testified that Tarantino lied to her, advising her that Julie had no interest in 7C's and it was owned by the Chrisleys' daughter. Another officer testified that Tarantino said he did not know where the Chrisleys banked, even though he in fact had their Bank of America log-in information. A reasonable juror could

have inferred from this evidence that Tarantino intentionally misled federal officers away from looking into 7C's as a way to impede the IRS's collection of Todd's tax liabilities. Though Tarantino does not challenge the sufficiency of the evidence as to his conviction, this evidence equally supports the verdicts as to Todd and Julie as part of the same conspiracy.

In sum, sufficient evidence supports the Chrisleys' convictions for conspiracy to defraud the IRS.

### iii. Substantive Bank Fraud—Material Misrepresentation

To prove bank fraud under 18 U.S.C. § 1344(2), the government must prove (1) a scheme existed to obtain money, funds, or credit in the custody of a federally insured financial institution; (2) the defendant participated in the scheme by means of materially false pretenses, representations, or promises; and (3) the defendant acted knowingly. *United States v. Dennis*, 237 F.3d 1295, 1303 (11th Cir. 2001). The Chrisleys' appeal concerns the second element—materiality.

"[I]n general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999) (quoting *United States v. Neder*, 527 U.S. 1, 16 (1999)). "Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement." *Id.*

Of course, the focus in fraud statutes, "like any criminal statute, is on the violator," and so "the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc). A representation, misrepresentation, or omission is material if it has "a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." *Martin*, 803 F.3d at 588 (cleaned up).

The parties dispute whether the government's evidence showed that the victim banks in Counts 3, 5, and 6 would have been influenced by defendants' misrepresentations. The Chrisleys argue that not every false statement constitutes fraud—only those that are actually capable of influencing the victim. So whether a misrepresentation is material is a context-specific inquiry. And, the Chrisleys continue, resolving that inquiry requires the government to produce an employee from each victim bank to testify about whether the bank would have been influenced by the misrepresentation.

We disagree. First, the Chrisleys point to no case holding that testimony from a victim bank is necessary to establish a material representation. Instead, they rely on *United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018), which is both not binding on us and, in any case, involved materially different facts than those at issue here. There, the court reversed a conviction for bank fraud because the government failed to prove the defendant made any false statements to Chase Bank, and no Chase Bank witness

testified at trial. *Id.* at 868. The court highlighted that no evidence proved Chase Bank believed any false misrepresentation. *Id.* It also said "generalized observations about banking industry regulations" offered by a financial advisor of another entity were insufficient to support a bank-fraud claim because they were a "far cry from demonstrating" any harm to Chase Bank. *Id.* at 869.

The Chrisleys' case differs significantly. In *Perez-Ceballos*, the government did not prove that the defendant even made any false statements to the bank. Essentially, it failed to prove any connection between the defendant and Chase Bank. Here, in contrast, there is no mystery as to whether the Chrisleys participated in making false statements to the victim banks; they did.

The government presented evidence that the Chrisleys participated in sending false information—specifically, that Todd had $3.6 million in marketable securities (Counts 3 and 6) and a fraudulent audit statement (Count 5)—to the banks named in these counts to obtain loans. And evidence showed the defendants intended to mislead the banks. One email showed Todd complimenting Braddock on his falsified bank statement and asking for additional false edits to be made, and one email showed Todd instructing Braddock to "create" documents because otherwise the bank wouldn't renew their loan. Plus, Braddock testified that he and Julie discussed the need to keep showing banks "the picture being good so that we could keep getting loans, otherwise, the world would kind of come crashing down." In short, the evidence

showed defendants "actually intended to create a scheme to defraud." *Svete*, 556 F.3d at 1165.

The government also produced witnesses from four banks, including the victim banks from Counts 2 and 4, who all testified that financial statements are important in deciding whether or not to extend a loan or credit. This testimony went far beyond the "generalized observations about banking industry regulations" that *Perez-Ceballos*, 907 F.3d at 869, referenced because the witnesses here testified as to how the misrepresentations made in this case actually affected decision making.

As we have explained, "[w]e will not overturn a jury's verdict if there is 'any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" *Martin*, 803 F.3d at 587. Here, for the reasons we've recounted, there is. We affirm the convictions as to Counts 3, 5, and 6.

### iv.    Substantive Bank Fraud—Julie Chrisley

Next, Julie argues that, even if the government proved a material misrepresentation supporting Counts 3, 5, and 6, she cannot be convicted of any of the substantive bank-fraud counts because they predate her participation in the conspiracy. We disagree with Julie's premise that the bank-fraud counts predate her participation in the conspiracy.

"Under well established Eleventh Circuit precedent conspirators are liable for *all of the acts and foreseeable consequences* of the conspiracy." *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir.

2005) (citation omitted) (emphasis in original). In other words, "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof." *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996).

The government can prove a conspiracy through either "direct or circumstantial proof, including reasonable inferences drawn from the statements or conduct of the participants." *Duenas*, 891 F.3d at 1334. "Evidence that the defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud." *United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018). Still, though "conviction may be supported by reasonable inferences," and "mere speculation" does not suffice. *Duenas*, 891 F.3d at 1334.

Here, sufficient evidence allowed a reasonable jury to conclude that Julie participated in the conspiracy as early as 2007, so she could be liable for the substantive bank-fraud counts that took place during the course of the conspiracy in 2009 and 2010. Braddock's testimony supports this conclusion. First, in response to the government's question, "[D]id you commit fraud from 2007 onward just on your own? In other words, was it just you committing fraud?" Braddock responded, "No. Mr. and Mrs. Chrisley and myself were all three involved." On appeal, this testimony is entitled to all reasonable inferences in favor of the jury verdict, including

the inference that Braddock meant Julie was involved at least as of 2007. Email evidence also showed that, in the timeframe around 2008, Julie worked with Braddock and Todd in managing outstanding loans and making loan payments. And Braddock testified that one of Julie's roles was to run around town paying off past-due loans, so it's clear she was well aware of the loans and the overdue payments the conspiracy had to manage to keep its loans intact.

A summary chart introduced by the government also showed that Julie's own company, Select Real Estate Holdings, received two fraudulently obtained loans in 2007 and 2008. Plus, evidence showed that Julie had access to funds from fraudulently obtained loans in 2007, including $35,000 of a fraudulently obtained loan that was transferred into a bank account controlled by the Chrisleys, and $43,000 of a fraudulently obtained loan that was transferred into their joint account.

Julie does not challenge her conviction for participation in the conspiracy from 2012 and onward. But we consider that evidence for what it tells us about Julie's prior involvement in the conspiracy. Evidence supporting Julie's conspiracy conviction included the fact that, during a loan application process in 2012, she emailed a scanned image of a check to Braddock and Todd and said, "Post date is the only thing that needed to be changed." Other evidence from after 2012 showed that Julie fabricated financial documents, including to falsely state that the family had $4 million in cash and marketable securities. These later activities from when

Julie was an undisputed conspirator mirror the activities that happened as early as 2007.

Ultimately, sufficient evidence existed for a reasonable jury to conclude Julie participated in the conspiracy as early as 2007, meaning she'd be liable for foreseeable substantive counts in 2009 and 2010. Because the substantive bank-fraud counts were foreseeable consequences of participating in the bank-fraud conspiracy at that time, we affirm Julie's convictions on Counts 2 through 6.

### C. *Officer Carter's testimony did not amount to a* Giglio *violation or require an evidentiary hearing.*

All three defendants argue that they should be granted a new trial or at least an evidentiary hearing into whether false testimony from Officer Carter constituted a *Giglio* violation. They allege that the government intentionally instructed Officer Carter to review outdated IRS records so that she would present false and misleading testimony at trial, namely that the Chrisleys still owed back taxes at the time of trial. And even if the government didn't do that, they claim that the prosecutors at least failed to correct false testimony even though they knew it was false.

We review a district court's denial of a motion for a new trial for abuse of discretion. *United States v. Stein*, 846 F.3d 1135, 1151 (11th Cir. 2017). We also review a district court's denial of a motion for an evidentiary hearing on an alleged *Giglio* violation for abuse of discretion. *Id.*

Prosecutors must not deliberately introduce false evidence or choose not to correct it when it appears. *Giglio v. United States*, 405 U.S. 150, 153–55 (1972). In *Giglio*, evidence that came out after trial revealed a key witness had been offered immunity in exchange for testifying against the defendant, even though the witness denied any such offer on the stand. *Id.* at 151–52. Because the prosecution's case "depended almost entirely on" this witness, his credibility was an important issue, and the jury was entitled to know of any understanding as to future prosecution because that bore on credibility. *Id.* at 154–55. So the Court granted a new trial. *Id.*

"To prevail on a *Giglio* claim, a petitioner must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material." *Smith v. Sec'y, Dep't of Corrs.*, 572 F.3d 1327, 1334 (11th Cir. 2009) (quoting *Ford v. Hall*, 546 F.3d 1326, 1331–32 (11th Cir. 2008)). False testimony is material under *Giglio* "if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the jury." *Id.* at 1333 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). In other words, it's material unless it's harmless beyond a reasonable doubt. *Id.*

We evaluate the cumulative effect of the false testimony to determine whether it was material. *Guzman v. Sec'y, Dep't of Corrs.*, 663 F.3d 1336, 1351 (11th Cir. 2011). "Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it *against the totality of the evidence that was introduced at the trial.*" *Id.* (quoting *Smith*, 572 F.3d at 1334).

No violation of due process occurs when, even though the prosecution fails to disclose false testimony, defense counsel is aware of the falsity of the testimony but doesn't object. *Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994) (per curiam) (denying the defendant's *Giglio* claim because the defense counsel knew the challenged trial testimony was false based on testimony from depositions and failed to object). Similarly, in general, no violation occurs unless the government suppressed the evidence disproving the challenged testimony. *Stein*, 846 F.3d at 1147. After all, *Giglio* is a species of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* And a *Brady* violation requires, among other things, that the government suppressed evidence. *Id.* at 1145–46 (citing *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002)).

On the other hand, if "the government not only fails to correct materially false testimony but also affirmatively capitalizes on it, the defendant's due process rights are violated despite the government's timely disclosure of evidence showing the falsity." *Id.* at 1147. So in *Stein*, for instance, we credited the fact that the prosecutor did not emphasize or capitalize on the false statement when it rejected the defendant's *Giglio* argument. *Id.* at 1150, 1150 n.13. But in *DeMarco v. United States*, we vacated a defendant's conviction where the prosecution "not only adopted [the star witness's] perjured testimony, but capitalized on it." 928 F.2d 1074, 1076 (11th Cir. 1991).

Defendants argue that they didn't actually owe any taxes for the years before 2017, so Officer Carter's contrary testimony at trial

was false, material testimony. But even if we assume that Officer Carter's testimony was wrong on this point, we cannot conclude that the testimony was material when we compare it against the rest of the evidence. Put simply, even assuming any falsity on this discrete issue, that falsity was harmless beyond a reasonable doubt.

As we've explained in Section II.B.i, ample evidence of tax evasion pervades the record here. To briefly summarize, that evidence includes the Chrisleys' use of the 7C's bank account as the Chrisleys' personal account to collect Todd's income and avoid the IRS's detection, the Chrisleys' changes to the ownership of the 7C's bank account the day after the IRS requested bank statements for purposes of determining Todd's assets, and years of not filing tax returns (even while representing to third parties that filings were up to date), among other evidence. Against the overwhelming evidence, we cannot conclude that Officer Carter's testimony about lingering outstanding tax liabilities at the time of trial could have changed the jury's verdict.

After all, given the evidence showing that the Chrisleys had outstanding tax liability at least as late as February 2018, whether or not the Chrisleys had outstanding tax liability at the time of trial does not bear on whether they evaded taxes through 2018. And while such testimony surely was not helpful to the Chrisleys, when we consider the incorrect testimony against the rest of the evidence, it pales by comparison.

Plus, to the extent that Officer Carter's testimony on this point was incorrect, defense counsel knew that during trial but did

not object.  Indeed, defense counsel produced documents to the prosecution during trial showing the Chrisleys had made significant tax payments.  Defense counsel even introduced evidence that the Chrisleys had, in fact, paid off their taxes for 2010, 2011, and 2014.  They extensively questioned Officer Carter on cross examination about her testimony, and they argued during closing that Officer Carter's testimony was false.  So the record contains no indication that the prosecution suppressed evidence that would have tipped off defense counsel that Officer Carter's testimony was incorrect.  To the contrary, it seems all parties knew or should have known the testimony was incorrect.  And while defense counsel endeavored to disprove the incorrect testimony, they did not assert a *Giglio* objection during trial.

Importantly, the government also did not attempt to capitalize on Officer Carter's incorrect testimony.  Indeed, it was defense counsel who elicited the testimony.  Officer Carter repeatedly answered defense counsel's questions about outstanding back taxes by stating that she reviewed the IRS internal system the day before testifying, and it showed that the Chrisleys still owed for a number of years.  Todd's counsel then asked Officer Carter about whether the Chrisleys owed anything for each year from 2010 through 2016.

The prosecution asked only two open-ended, clarifying questions on redirect:

Q: Now, you also said something about you checked yesterday morning.  And I believe there was a back and forth about

what you were checking and all of that. I want to give you an opportunity to complete your thoughts on that.

A: Yes. I just went and checked on all outstanding balances. And there are additional tax and penalties owed.

Q: To this day?

A: Yes.

Not only was the prosecution's questioning minimal on this issue, but the prosecution's closing statement did not repeat Officer Carter's testimony. To the contrary, the prosecution stated during its closing argument, "[Y]ou heard in opening and then you heard again in closing that [the] Chrisleys paid their money." Taking all of these circumstances into consideration, we affirm the district court's denial of the motion for a new trial based on defendants' *Giglio* claim.

We likewise affirm the denial of an evidentiary hearing into prosecutorial misconduct related to this claim. Defendants argue they need an evidentiary hearing to prove that the prosecutors intentionally had Officer Carter review a database with false information on it so that her testimony based on that database would be *technically* true, but factually false. Because defendants' theory of prosecutorial misconduct hypothesizes that the government engaged in misconduct off the record during preparation sessions, defendants assert that the district court must conduct an evidentiary hearing to learn what really happened. We disagree.

It is "well established" in this Circuit that a district court may generally decide a motion for a new trial upon affidavits without an evidentiary hearing. *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977).[3]  To be sure, "certain unique situations," including alleged prosecutorial misconduct, may call for evidentiary hearings in some cases. *Id.*  But defendants point to no case requiring an evidentiary hearing *every* time a defendant claims prosecutorial misconduct occurred.

Rather, defendants rely on *United States v. Espinosa-Hernandez*, 918 F.2d 911 (11th Cir. 1990).  There, the case agent in charge of the operation that led to the defendant's indictment was the only witness to testify before the grand jury, was in charge of the undercover informants involved in the operation, effectively prevented the defense from contacting an informant, and made undisputedly false statements before the grand jury and in his affidavit in support of the criminal complaint. *Id.* at 913.  Then, after trial, the defense discovered that the case agent had been indicted for making false statements related to drug use on his job application, was under investigation for helping an informant escape from prison, and was under investigation for distributing the same drug involved in the defendant's conviction. *Id.*  We said an evidentiary hearing was necessary because the agent's testimony against the defendant was material, and the agent's involvement in the procedural aspects of

---

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all published cases of the former Fifth Circuit decided on or before September 30, 1981).

the case "had a tremendous impact" on the defendant's conviction. *Id.* at 914.

But this case is nothing like *Espinosa-Hernandez*. For starters, unlike in *Espinosa-Hernandez*, Officer Carter's challenged testimony here did not have the kind of impact on either the procedural or substantive aspects of the arrest, grand jury proceedings, and trial, as did the agent's in *Espinosa-Hernandez*. Nor was the defendant's motion for discovery in *Espinosa-Hernandez* based on pure speculation, like it is here. In *Espinosa-Hernandez*, the agent was apparently indicted for making false statements concerning drug use. But here, defendants claim only that during trial preparation, the prosecutors and Officer Carter *must have* discussed the fact that the database she reviewed "failed to reflect the payments the Defendants had made after 2018 and incorrectly showed outstanding tax balances." And they say the prosecutors told Officer Carter to rely on that database anyway. But that is pure speculation.

And the fact that the prosecution did not ask about these tax liabilities on direct examination or mention them at all in its closing argument belies the suggestion that the prosecution had a grand scheme to prejudice defendants by making the jury incorrectly believe they owed taxes for 2014, 2015, and 2016. So we conclude that the district court did not abuse its discretion in denying an evidentiary hearing.

> D.  *The district court erred in holding Julie Chrisley responsible for losses incurred in 2006 without explaining its basis for doing so.*

Julie asks us to vacate her sentence and remand for resentencing because the court attributed the entire loss amount of the bank-fraud conspiracy to her without making a particularized finding about when she joined the conspiracy.  She also argues that the government could not identify a specific date on which she joined the conspiracy before 2012.  While we agree with the government that the district court properly held Julie liable for losses incurred from 2007 on, the district court's calculations included losses incurred in 2006.  But neither the district court nor the government directs us to any evidence that Julie was involved in the conspiracy by 2006.  So we vacate Julie's sentence and remand for the district court to make factual findings and calculations supporting the loss, restitution, and forfeiture amounts.

We review for clear error the district court's determination of the loss amount for purposes of sentencing.  *United States v. Maxwell*, 579 F.3d 1282, 1305 (11th Cir. 2009).  We must remand when the district court's failure to identify its basis for calculating the loss amount attributable to the defendant renders appellate review impossible.  *United States v. Gupta*, 572 F.3d 878, 889 (11th Cir. 2009).

The government must prove the loss amount by a preponderance of the evidence.  *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997).  That said, the "court need only make a reasonable estimate of the loss" because "[t]he sentencing judge is in

a unique position to assess the evidence and estimate the loss based upon that evidence." U.S. Sent'g Guidelines Manual § 2B1.1 cmt. n.3(C) ("[T]he court's loss determination is entitled to appropriate deference.").

The United States Sentencing Guidelines Manual section 1B1.3(a)(1) provides that the court determines the base offense level by accounting for "all acts and omissions committed, aided, [and] abetted . . . by the defendant; and . . . in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction[.]" Section 2B1.1(b)(1) provides for offense-level enhancements based on the amount of loss in fraud cases. So under the Guidelines, the court determines a defendant's loss amount in a conspiracy based on loss incurred as a result of the defendant's own criminal conduct, as well as the conduct of others that was both: "(1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal activity." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003).

When a defendant is being held accountable for conduct of others in the conspiracy, the Sentencing Guidelines commentary states that "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." § 1B1.3 cmt. n.3(B). So we've said, "to determine a defendant's

liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *Hunter*, 323 F.3d at 1319 (quoting *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993)).

But "a sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support[s] the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002). *See also United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014) ("If the record otherwise supports the court's determination [on the scope of a conspirator's criminal activity], a failure to make specific findings will not require vacating the sentence.").

With these considerations in mind, we review the record here. As an initial matter, Julie's claim that the district court did not make a factual finding about when she joined the bank-fraud conspiracy is not accurate. Julie objected to the factual finding in her presentence investigation report that she conspired to commit bank fraud from 2006 through 2012. The court overruled that objection at the sentencing hearing "based on what this court heard at trial," and it adopted the factual findings in the presentence investigation report. So the district court adopted the fact that Julie was involved in the bank-fraud conspiracy from 2006 to 2012.

The problem is that we have not located the evidence the district court relied on in adopting that finding. As we have already

explained, sufficient evidence proves that Julie was involved in the bank-fraud conspiracy as of 2007. But we are unaware of any specific evidence showing she was involved in 2006. Braddock's testimony that Julie was involved in committing bank fraud was in response to the questions, "[D]id you commit fraud from 2007 onward just on your own? In other words, was it just you committing fraud?" And evidence showed that, starting in 2007, proceeds from fraudulently obtained loans went to Julie's own company's accounts and other accounts that Julie had access to. That evidence, along with other evidence of Julie's longtime involvement in the bank-fraud scheme, sufficed to show Julie's involvement in the conspiracy beginning in 2007.

But our review of the record hasn't revealed evidence to show, even by a preponderance of the evidence, that she was involved in 2006. Indeed, the government's brief concedes that the evidence shows Julie "participated in the bank fraud conspiracy from 2007," not 2006.

Special Agent Ryskoski's testimony at the sentencing hearing that he believed Julie had been involved in the bank fraud conspiracy "the entire time" is not enough to support the district court's adoption of the factual finding that Julie was involved beginning in 2006. That is especially so because the rest of Special Agent Ryskoski's testimony pinned her involvement as starting in 2007.

This matters because the government's loss calculations, which the district court adopted for purposes of establishing the

loss, restitution, and forfeiture amounts, includes loans issued in 2006 and is based, in some cases, on misrepresentations made in 2006. In fact, Special Agent Ryskoski testified at the sentencing hearing that if he removed loans issued before July 11, 2007, which was the first date that a fraudulently obtained loan was issued to Julie's own company, the actual loss and restitution amount dropped to $4.7 million. The district court did not address this or explain why Julie's loss, restitution, and forfeiture amounts included amounts for loans issued before 2007.

The parties do not dispute that sufficient evidence showed Todd's fraudulent conduct stretched back to 2006. So we leave his sentence undisturbed. But we must vacate Julie's sentence so the district court can address the narrow issue of what the proper loss amount attributable to Julie is for purposes of the base offense level, restitution, and forfeiture. The district court should make factual findings about when Julie's involvement in the conspiracy began, and if it concludes Julie's involvement started in 2006, it should identify the evidence on which it bases its finding. In vacating and remanding on this issue, we express no opinion as to what the correct loss amount should be.

E.  *The district court did not procedurally err in imposing the restitution and forfeiture money judgments as to Todd.*

The Chrisleys argue that we must vacate the restitution and forfeiture judgments against them and remand for a hearing on both issues. They assert that the district court failed to explain its

findings supporting the judgments, specifically "how it arrived at its calculations," and did not allow defendants an opportunity to be heard on these issues. Because we have already vacated Julie's sentence, we address our discussion here only to Todd's circumstances.

We review de novo the legality of a restitution or forfeiture order. *United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003). We review factual findings underlying the restitution and forfeiture amount(s) for clear error. *Id.*; *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1340 (11th Cir. 2009).

We begin with restitution. When imposing a restitution judgment, "[t]he district court must explain its findings with sufficient clarity to enable this court to adequately perform its function on appellate review." *United States v. Huff*, 609 F.3d 1240, 1248 (11th Cir. 2010). District courts enjoy "broad discretion in choosing the procedures to employ at a restitution hearing, 'so long as the defendant is given an adequate opportunity to present his position as to matters in dispute." *United States v. Baston*, 818 F.3d 651, 665 (11th Cir. 2016).

We find no merit to Todd's argument that the district court did not explain how it arrived at its calculations for the restitution amount. After receiving written submissions and holding a lengthy sentencing hearing, the district court explained it was accepting the government's loss calculations as set forth in Exhibit 3 to the government's sentencing memorandum as the restitution amount.

Todd's argument that the district court did not provide defense counsel an opportunity to be heard is equally unavailing.  In fact, the court expressly overruled the Chrisleys' objections to the restitution amount at the sentencing hearing.  The court considered written submissions, testimony, and arguments about restitution calculations.  The court even offered defense counsel, "[F]eel free to let me know if there's something I need to be concerned about at this time regarding restitution."  And even then, the court stated it would allow the parties up to two weeks from when it signed the restitution judgment and commitment order and the Clerk's Office docketed those filings for defendants to file any motions to amend restitution.  Yet defendants filed no objections.

In sum, then, the district court explained its restitution findings with enough clarity for us to conduct appellate review of Todd's sentence, and it provided defense counsel with adequate opportunities to present their position on restitution.  So neither of Todd's positions on restitution support vacatur and remand.

As to forfeiture, Todd abandoned any argument that the district court violated Federal Rule of Criminal Procedure 32.2 because he failed to raise the issue in an opening brief.  *See United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004) (per curiam) (collecting criminal cases where we have refused to consider issues raised for the first time in reply briefs).  In fact, the Chrisleys cited no legal authorities related to their forfeiture arguments in the opening brief addressing this issue.  The four cases they cited concern restitution but not forfeiture.  Failure to provide sufficient

argument, including legal authority, as to an issue can preclude appellate review. *United States v. Campbell*, 491 F.3d 1306, 1315 (11th Cir. 2007).

But even if we ignore this deficiency, Todd's only forfeiture-related passing arguments for review on appeal are that the court did not sufficiently explain its findings supporting the forfeiture calculation and did not give defendants an opportunity to be heard. Both arguments fail.

First, the district court's calculation of the forfeiture amount is crystal clear from the record. The government relied on the same calculations for purposes of restitution and forfeiture. The district court confirmed this at the sentencing hearing. Sentencing Hr'g at 63. That means the testimony and court discussion about the loss calculation applied to both the issues of restitution and forfeiture. The district court also explained that it had reviewed the Chrisleys' Memorandum on Loss, Forfeiture, and Restitution before ruling on objections to the presentence investigation report's factual findings. And the district court expressly overruled the Chrisleys' objections to the loss calculation, instead accepting the government's calculations. So given that the restitution and forfeiture amounts turned out to be the same, and based on the court's statements at the sentencing hearing, there is no mystery as to how the district court arrived at the forfeiture amount.

Second, defendants had a sufficient opportunity to be heard as to forfeiture. Defendants were on notice since the time of the first indictment that the government would seek forfeiture. And

the government filed a motion for forfeiture of property a week before the sentencing hearing.  That motion contained the exact amount the government sought in forfeiture.  Plus, the Chrisleys filed a Sentencing Memorandum on Loss, Forfeiture, and Restitution that addressed the government's motion.  And the district court expressly stated it reviewed and took into account these filings when it made its factual findings on loss.

In addition, after the district court told defense counsel it would have two weeks to file any motions to amend the restitution judgment once it was docketed, the government requested, "[I]f the court is going to do that with respect to restitution, to put off delaying the forfeiture order until that time as well." *Id.* at 220. The court granted that request, so defense counsel had two weeks after the forfeiture order was docketed to file any motions to amend.  But defendants filed no motion as to forfeiture.

Our review of the sentencing hearing transcript as a whole also reveals that defense counsel could have raised any concerns or issues with the court's rulings as to the loss calculation, which all parties and the court knew were the foundation of the government's calculations on restitution *and* forfeiture.  The district court gave the Chrisleys' counsel opportunities to raise any objections they may have.

At bottom, the district court sufficiently explained how it arrived at the forfeiture and restitution amounts, and it gave Todd sufficient opportunities to be heard along the way.  For these reasons, we affirm the restitution and forfeiture judgments as to Todd.

### F.  The district court did not abuse its discretion by denying Tarantino's motion to sever his case or receive a new trial.

Finally, Tarantino challenges the district court's denial of his motion to sever his case from that of the Chrisleys and the denial of his motion for a new trial based on prejudice he allegedly suffered as a result of the joint trial.  We review the district court's denial of a motion to sever or its denial of a motion for a new trial based on failure to sever for abuse of discretion.  *United States v. Lopez*, 649 F.3d 1222, 1235–36 (11th Cir. 2011).

Tarantino filed a motion to sever his case in December 2019.  The magistrate judge recommended severing his case out of concern that an email between Todd and someone else, unrelated to Tarantino, could prejudice Tarantino because it referred to a "crooked accountant."  The magistrate judge also pointed out that Tarantino was charged with far less criminal activity than the Chrisleys.

The district court rejected that recommendation and instead denied the motion to sever.  The court explained that, while Tarantino may not have been involved in all the alleged schemes charged in the indictment, that is commonly the case in joint trials.  The court found that a limiting instruction would be sufficient to prevent any prejudicial spillover.  And it excluded the "crooked accountant" email and prohibited references to a "crooked accountant" at trial.  So the district court tried Tarantino alongside the Chrisleys, and the jury ultimately convicted him on all counts.  On

appeal, Tarantino argues he suffered compelling prejudice from the joint trial and should receive a new trial. We disagree.

The government may join multiple defendants in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). And "defendants charged with a common conspiracy should be tried together." *Lopez*, 649 F.3d at 1234 (citation omitted).

If the joinder of defendants in an indictment or a consolidation for trial "appears to prejudice a defendant or the government," the court can sever the cases. Fed. R. Crim. P. 14(a). But this happens only in "exceptional circumstances" that are "few and far between." *Lopez*, 649 F.3d at 1234. And the defendant carries a "heavy burden" to show that he received an unfair trial and suffered "compelling prejudice." *United States v. Kennard*, 472 F.3d 851, 858–59 (11th Cir. 2006) (citation omitted).

When we review a district court's decision on a motion for a new trial based on the need for severance, "the question is not whether we would reach the same decision utilizing these well-established principles and considering the evidence anew," but rather "the question is whether the district court clearly abused its discretion in [deciding whether to] grant[] a new trial." *United States v. Pedrick*, 181 F.3d 1264, 1272 (11th Cir. 1999). That's so because

"[t]he district court saw the witnesses, heard all of the evidence, and is in the best position to evaluate whether [the defendant] suffered compelling prejudice warranting a new trial." *Id.*

Tarantino argues that his case presents one of those exceptional circumstances where severance was required because the joint trial featured an "overwhelming" amount of evidence about the Chrisleys' guilt across three schemes, even though Tarantino was alleged to be involved in only one scheme with far less evidence presented against him. Plus, Tarantino asserts, the jury may have misconstrued the legitimate aspects of his role as an advocate for the Chrisleys when dealing with the IRS because his advocacy role was presented alongside evidence of the Chrisleys' own unlawful acts. On top of that, he argues, the evidence concerning the Chrisleys' wealth and conduct likely inflamed the jury.

We begin by recognizing that the fact that most of the evidence was introduced against the Chrisleys does not demand severance on its own. *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997) ("The mere fact that there may be an 'enormous disparity in the evidence admissible against him compared to the other defendants' is not a sufficient basis for reversal."). That is particularly so here, where there was undisputedly sufficient evidence to convict Tarantino.

Still, Tarantino argues that this case is "nearly identical" to *Pedrick*, where we affirmed the district court's order granting the defendant a new trial because he suffered compelling prejudice as a result of being jointly tried with another defendant, 181 F.3d at

1273.  We disagree.  First, in *Pedrick*, we thought it was clear "the jury did not adequately sift all th[e] evidence and make an individualized determination as to Pedrick." *Id.*  The jury deliberated for only three hours and found each defendant guilty on all counts.  *Id.*  Second, and relatedly, in *Pedrick*, it was "questionable" whether sufficient evidence against Pedrick established her involvement in eighty-nine of the counts she was convicted of.  *Id.*  Third, and most importantly, when we applied the required abuse-of-discretion standard in *Pedrick*, we were reviewing the district court's order *granting* a new trial.  And we recognized that the district court was "in the best position to evaluate whether Pedrick suffered compelling prejudice" because it had seen the witnesses and heard all the evidence.  *Id.* at 1272.  We concluded that the district court's determination to grant a new trial fell within its discretion.  *Id.*

Those three considerations we relied on in *Pedrick* support affirmance here.  First, Tarantino has not shown that the jury failed to adequately sift through the evidence and make individualized determinations as to each defendant.  Unlike the quick three-hour deliberations on 125 charges in *Pedrick*, the jury here deliberated across three days as to the twelve counts against defendants.  *Id.* at 1273.  Plus, here, the jury sent several notes to the judge during deliberations asking questions about legal requirements and evidence.  Among those questions, the jury asked to rehear an audio tape of the IRS interviewing Tarantino.  Unlike in *Pedrick*, the deliberation time and jury questions indicate the jury took its role seriously in considering each charge and the evidence against each defendant separately.

Second, unlike the situation in *Pedrick*, here, there is no dispute that sufficient evidence supports Tarantino's convictions on all three counts against him.

Third, the district court denied Tarantino's motion to sever and motion for a new trial. So unlike in *Pedrick*, the decision that we apply the deferential abuse-of-discretion standard to is a decision denying relief to Tarantino. But as in *Pedrick*, the district court was best positioned to judge whether compelling prejudice inured to Tarantino. Of course, if that decision were an abuse of discretion, we would reverse. But Tarantino has not shown the district court's decision was an abuse of discretion, especially against the well-established preference for jointly trying conspirators.

And last, but certainly not least, "[a] jury is presumed to follow the instructions given to it by the district judge." *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005). The Supreme Court has noted that limiting instructions "often will suffice to cure any risk of prejudice" when multiple defendants are tried together. *Zafiro*, 506 U.S. at 539. Indeed, we have often found that to be the case. *See, e.g.*, *United States v. Francis*, 131 F.3d 1452, 1459 (11th Cir. 1997) ("The district court minimized any possible prejudice by instructing the jury to consider the evidence against [each defendant] separately."); *Kennard*, 472 F.3d at 859 ("[A] court's cautionary instructions ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilt."); *United States v. Gari*, 572 F.3d 1352, 1365 (11th Cir. 2009) (same); *Schlei*, 122 F.3d at 984 (same).

Here, the court instructed the jury, "Although the defendants are being tried together, you must give separate consideration to each defendant.  In doing so, you must determine which evidence in the case applies to a particular defendant and disregard any evidence admitted solely against some other defendants.  The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant."  That instruction expressly explained to the jury that it was required to consider the evidence as it pertained to each defendant separately, without relying on irrelevant evidence against codefendants.  And based on the jury's lengthy deliberations and questions to the court, we have every reason to believe the jury followed that instruction.

## III.    CONCLUSION

For the foregoing reasons, we affirm the district court as to each issue except for the loss amount attributable to Julie.  We vacate Julie's sentence and remand to the district court for the sole purpose of making necessary factual findings and calculations as to the proper loss, restitution, and forfeiture amounts, and any required changes to the sentence that those findings warrant.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

### ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 21, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-14074-GG
Case Style:  USA v. Peter Tarantino, et al
District Court Docket No:  1:19-cr-00297-ELR-JSA-3

Opinion Issued

Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing

The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in the clerk's office within the time specified in the rules. **A petition for rehearing must include a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th Cir. R. 35-5(k) and 40-1.

Costs

No costs are taxed.

Bill of Costs

If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees

The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion